UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

      Plaintiff,

    v.

JONATHAN JOSEPH NELSON, et al.

      Defendants.

Case No. 17-cr-00533-EMC-1

**FILED UNDER SEAL**

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO SUPPRESS**

Docket Nos. 2065-2, 2067, 2068-2, 2069-1, 2070

Currently pending before the Court are: Defendant Wendt's Motion to Suppress Evidence Seized (Docket No. 2068-2), Defendant Wendt's Motion to Suppress Cell Phone Records (Docket No. 2069-1), Defendant Ott's Motion to Suppress Evidence Seized (Docket No. 2070), Defendant Ott's Motion to Suppress Cell Phone Records (Docket No. 2065-2), and Defendant Nelson's Motion to Suppress Evidence Seized and Cell Phone Records (Docket No. 2067). The Court held a hearing on the motions and heard arguments on October 22, 2021.

For the reasons stated below, the Court **DENIES** all of Defendants' motions to suppress.

## I.     **INTRODUCTION**

In this multi-defendant RICO conspiracy case, government agents submitted a "master affidavit" ("Menke Affidavit") authored by Santa Rosa Police Detective Travis Menke ("Menke"), which was used to justify the search of dozens of different locations, including homes, businesses, and Hells Angels ("HA") clubhouses.[1] The Menke affidavit was focused on the Sonoma Charter

---

[1] All three Defendants attach the Menke Affidavit as an exhibit to their respective suppression motions: Wendt Mot., Ex. A at 38, Menke Affidavit, Docket No. 2068-4; Nelson Mot.,

of the Hells Angels ("HASC"), the charged RICO enterprise.  Notably, the Menke Affidavit describes the following 12 premises:

1. the Sonoma Hells Angels clubhouse located at ███████████, Santa Rosa, CA 95404

2. the Fresno Hells Angels Clubhouse located at ██████████, Fresno, CA 93721

3. the Fresno Pet Cemetery located at ████████████, Fresno, CA 93706

4. the business location (Nelson Brothers Painting) of HASC president Jonathan Nelson located at ██████████, Healdsburg, CA 95448

5. the residence of Jonathan Nelson located at ██████████, Santa Rosa, CA 95407

6. the residence of Russell Lyles located at ██████████, Windsor, CA 95492

7. a business owned by Russell Lyles, Big Shots Screen Printing, located at ██████████, Santa Rosa, CA 95492

8. a business owned by Damien Cesena, North Bay Roofing and Gutter Co., located at ██████████, Santa Rosa, CA 95407

9. the residence of Damien Cesena located at █████████████r., Santa Rosa, CA 95401

10. the residence of HASC Sergeant at Arms, Will Fonteno, located at ██████████ █., Santa Rosa, CA 95409

11. the residence of Russell Ott located at ██████████., Santa Rosa, CA 95401

12. the residence of Brian Wendt and Stephen Meza, located at ██████████, Tulare, CA 93274

13. the "trailer style" residence of Louis Valdez, located at ██████████████ Windsor, CA 95492

14. the residence of Jason Beek located at ██████████, Santa Rosa, CA 95407

15. the residence of HASC member Herb Cody located at ████████████, Rohnert Park, CA 94928

---

Attachment 1 at 2., Menke Affidavit, Docket No. 2067-1; and Ott Mot., Ex. A, Menke Affidavit at 3, Docket No. 2070-1.

A.    Warrants Pertaining to Locations

On November 15, 2017, Magistrate Judge Joseph Spero issued a search warrant for the █████████████████████████████████. premises which pertain to Defendant Nelson and the HASC.  Nelson Mot. to Suppress ("Nelson Mot.") at 1, Docket No. 2067.  This search warrant included the Menke Affidavit which contains a lengthy probable cause statement and a copy of the indictment as an exhibit.  *Id.*

On November 16, 2017, Magistrate Judge Spero issued a search warrant, also containing the Menke Affidavit, to search Defendant Ott's residence at ████████████. and the HASC clubhouse at ████████████.  Ott Mot. to Suppress ("Ott Mot.") at 1, Docket No. 2070.

On November 16, 2017, a search warrant application that included the Menke Affidavit sought authority to search:  (1) Defendant Wendt's home at ████████████; (2) the Fresno HA Clubhouse; and (3) a nearby Fresno pet cemetery.  Wendt Mot. to Suppress ("Wendt Mot.") at 2, Docket No. 2068-2.  The warrant was issued by Magistrate Judge Stanley Boone of the Eastern District of California.  The FBI and Santa Rosa Police Department officers executed the searches on November 20, 2017.  *Id.*  The warrant included permission to search and seize electronic devices pursuant to the Northern District's electronic protocol and included descriptions of the aforementioned three Fresno area premises to be searched.  *Id.* at 12.  Additionally, the warrant authorized the search of "vehicles parked at the above-described premises or driven by HASC members and associates, including motorcycles" that are in the "immediate vicinity" of the above-listed locations, including any containers in the vehicles as premises that are covered by the search warrant.  *Id.* at 20.

As for Mr. Wendt's storage unit, a separate warrant was issued by Magistrate Judge Boone on November 20, 2017.  That warrant incorporated the Menke Affidavit and contained an Addendum authored by Menke.  Opp'n Attachments at 54, Attachment H, Docket No. 2106-1.[2]

---

[2] Notably, counsel for Defendant Wendt states that the probable cause statement pertaining to the November 20, 2017 search warrant for Defendant Wendt's storage unit was not produced in discovery and only now produced as an exhibit to the Government's opposition.  Wendt Reply at 24, n12.  Counsel states that this "is yet another example of the government's repeated failures to produce timely, complete, organized discovery.  The defense has no way of knowing whether the information we have received on numerous topics that are essential for preparation has been

United States District Court
Northern District of California

B.    Warrants Pertaining to Cell Phone Records

On October 15, 2014, Sonoma County Superior Court Judge Peter Otten Weller signed a search warrant for records regarding AT&T cell phone number 707-536-8170 associated with Defendant Ott for the time period of July 1, 2014, 001 hours through October 14, 2014, 2359 hours.  In addition to the type of information sought for a pen register and trap and trace, the warrant authorized search of, *e.g.*, sent and received text messages, physical addresses of cell sites, all stored communications or files including voice mail, email, digital images, and all connection logs and records of user activity for the period designated.  Ott Cell Mot. at 2, Docket No. 2065-2. This warrant also included a statement of probable cause signed by Menke.  *Id.*  (While not the same as the Master Affidavit, there is substantial information overlap therewith.)

On October 29, 2014, Menke applied to Superior Court Judge Shelly Averill for a search warrant for call detail records for several phone numbers, including one belonging to Brian Wendt, 559-679-3936.  Wendt Cell Mot. at 7, Docket No. 2069-1.  This warrant included an affidavit from Menke and authorized the search of AT&T phone records for this number for the time period of July 15, 2014 through October 28, 2014.  *Id.* at 2, n.1.

The search warrant for Defendant Nelson's phone records was issued on January 5, 2017, by Sonoma County Superior Court Judge Lawrence Ornell and included an affidavit from Menke. Nelson Mot. at 2.  The warrant sought records for a three-month period from June 1, 2014 to August 31, 2014, which included subscriber, billing, and service information, as well as call detail records.  *Id.* at 3.

## II.    LEGAL STANDARD

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV.  Evidence resulting from an unconstitutional search or seizure cannot be admitted as proof against the victim of the search, and therefore must be suppressed.  *See Wong Sun v. United States,* 371 U.S. 471, 485 (1963).  The Supreme Court has held that "the proponent

---

produced in its entirety."  *Id.*  Counsel also states in a supplemental declaration that Exhibits E and F to the Government's opposition were also not produced in discovery and had not previously been produced by the government.  McClure Supp. Decl. at 3, Docket No. 2114-2.  In the future, any late produced document may subject the Government to sanctions.

United States District Court
Northern District of California

of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005) (citing *Rakas v. United States*, 439 U.S. 128 (1978)).

Under the Fourth Amendment, a search warrant may not issue without probable cause. U.S. Const. amend. IV. Probable cause exists where the issuing judge can determine that there is a "fair probability" that the evidence sought will be found in the place searched. *Illinois v. Gates,* 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."). In making this determination, a magistrate judge must assess the "totality of the circumstances" and make a "practical, common-sense decision." *Id.* "Under the totality of the circumstances test, otherwise innocent behavior may be indicative of criminality when viewed in context," and "issuing judges may rely on the training and experience of police officers." *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002) (citations omitted). "Probable cause . . . is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Probable cause requires only that "there is a fair probability" that evidence, fruits, or instrumentalities of a crime will be found in the premises to be searched, not a "hard certainty." *Gates*, 462 U.S. at 238, 231. "[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Id.* at 235 (citation omitted). "Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision." *Id.*

The affidavit in support of a warrant must be read through a "commonsense and realistic" lens. *United States v. Ventresca*, 380 U.S. 102, 108 (1965). "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should largely be determined by the preference to be accorded to warrants." *Id.* at 109; *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007) ("In borderline cases, preference will be accorded to warrants and to the decision

of the magistrate issuing it."). "We are not in a position to flyspeck the affidavit through de novo review. This deferential approach is the antithesis of a 'grudging or negative attitude' toward search warrants and 'a hypertechnical rather than a commonsense' analysis." *United States v. Gourde*, 440 F.3d 1065, 1070-71 (9th Cir. 2006) (en banc) (citations omitted).

In assessing the sufficiency of probable cause, there is a "narrow standard of review" applied to a magistrate's decision to issue a search warrant. *United States v. Estrada*, 733 F.2d 683, 684 (9th Cir. 1984). "The duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing] that probable cause existed.'" *Id.* (quoting *Gates*, 462 U.S. at 238). "A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236. A reviewing court may not reverse such a determination unless the magistrate's decision is "clearly erroneous." *Estrada*, 733 F.2d at 684.

## III.     <u>MOTIONS TO SUPPRESS EVIDENCE</u>

A.    <u>Defendant Brian Wendt</u>

Defendant Wendt moves the Court to suppress "all evidence seized from and observations made" pursuant to the November 20, 2017 search of: (1) the residence at which Defendant Wendt was residing, located at 648 Auburn Street, Tulare (2) the search of Defendant Wendt's vehicle, parked in front of 648 Auburn Street, Tulare; (3) the Fresno HA Clubhouse located at 2273 G Street, Fresno; and (4) Defendant Wendt's storage unit at Tulare Mini Storage (Unit Y34) located at 201 N. West Street, Tulare. Wendt Mot. at 2. Defendant Wendt states that these searches were made pursuant to search warrants issued by Magistrate Judge Boone in November 2017. *Id.*

1.    <u>Probable Cause as to Wendt's Locations</u>

Defendant Wendt argues that the November 2017 search warrant that authorized the search of his home, vehicle, and the Fresno HA clubhouse violated the Fourth Amendment's probable cause requirement. Wendt Mot. at 21. In particular, Defendant Wendt argues that the Menke Affidavit is facially insufficient in that it fails to provide probable cause that evidence of weapons, drugs, HASC property, or violent crimes would be found at the subject Fresno area premises. *Id.* at 25. As for his underlying claim regarding the sufficiency of the Menke Affidavit, he argues that: (1) there are no facts in the November 2017 search warrant establishing probable cause to

United States District Court
Northern District of California

search his home; (2) the warrant provides no probable cause that evidence of drug trafficking would be found at the Fresno area premises; (3) probable cause is lacking to search for weapons in his home, vehicle, storage unit, and the Fresno HA clubhouse; (4) the warrant fails to provide probable cause that indicia of the HASC would be found in the Fresno area premises; and (5) the warrant provides no facts to support the claim that evidence of the "Silva killing" would remain at the Fresno Clubhouse three years after it is alleged to have occurred.  *Id*. at 25-30.

The Government highlights several portions of the Menke Affidavit in its opposition and argues that the "affidavit presents evidence of a significant connection between Defendant Wendt, the Fresno charter, and the HASC enterprise.  Wendt can only claim that [] the affidavit lacks probable cause that the evidence in connection would be found at his residence and clubhouse by pretending these portions of the affidavit do not exist."  Opp'n at 5, Docket No. 2106.

Probable cause exists if the issuing judge can reasonably conclude, based on the totality of the circumstances, that there is a fair probability that the evidence sought will be found in the place to be searched.  *Gates,* 462 U.S. at 238.  Probable cause does not require direct evidence that the evidence sought will be found in the place searched.  *United States v. Angulo–Lopez,* 791 F.3d 1394, 1399 (9th Cir. 1986).  Instead, the issuing judge "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense."  *Id.*

a.   Association with the HASC

Here, the Menke Affidavit details a connection between the Fresno Hells Angels charter and the HASC and notes that at the time of the searches, Defendant Wendt was the President of the Fresno Hells Angels charter.  Menke Affidavit ¶ 29.  For example, the Menke Affidavit notes that members of the Fresno Hells Angels, Defendant Wendt in particular, have "close relationships with HASC" and have traveled together, including to a 2014 motorcycle rally in Laconia, New Hampshire.  *Id*.  The Menke Affidavit states that Defendant Wendt attended and was photographed at HASC member Defendant Lyles' engagement party in Sonoma County in 2017 and notes that Wendt's motorcycle vest features a "Sonoma County" side patch.  *Id.*

More centrally, the Menke Affidavit details the connection between the HASC and

Defendant Wendt in describing how Wendt participated in the 2014 killing of HASC member Joel

Silva ("Silva") with HASC members Nelson and Ott. *Id.* ¶¶ 31-32, 57-59. The Menke Affidavit

notes that Silva's status with the HASC "became perilous as his drug use became more severe"

and states that leading up to the summer of 2014, "the leadership of HASC and related chapters

such as the Fresno and Salem/Boston Hells Angels began viewing Silva's erratic behavior as

increasingly problematic." *Id.* ¶ 31. "The final straw came in June 2014, when Silva threatened to

kill a well-respected member of the Salem/Boston chapter over a perceived personal slight. The

President of the Salem/Boston Hells Angels, Christopher Ranieri, and Brian Wendt, the President

of the Fresno Chapter, decided that Silva had to be killed shortly after Silva made these threats.

They quickly secured the agreement of HASC President Jonathan Nelson, who put a plan in

place." *Id.* Additionally, the Menke Affidavit states that on July 15, 2014, Nelson arranged for

HASC member Russell Ott to take Silva from the HASC clubhouse, "where Silva believed that he

would address the grievances Wendt had against him." *Id.* ¶ 32. "Soon after Silva arrived at the

clubhouse, however, Wendt shot him in the back of the head. His body has never been found

because it was likely incinerated in a nearby animal crematorium." *Id.* The Menke Affidavit

states that on the date Silva disappeared, he traveled to a meeting with Wendt at the Fresno HA

clubhouse and phone records show that they were in contact on that date. *Id.* ¶ 44. Notably, the

last call from Silva's cell phone was to Wendt's cell phone. *Id.* Moreover, phone records also

show that Wendt was in contact with Defendant Nelson around the time of Silva's disappearance.

*Id.* ¶ 49. In particular, the Menke Affidavit states that,

> [a]ccording to CI-1, based in part on conservations with Robbie
> Huff and [] Wendt, Wendt murdered Silva. According to CI-1,
> Silva went to the Fresno Hells Angels Clubhouse in mid-July 2014
> with HASC member Russell Ott to meet with Wendt. In the
> clubhouse, Wendt directed Silva to inspect some marijuana, and
> when Silva bent down to do so, Wendt shot him in the back of the
> head. CI-1 learned of the murder when Wendt bragged about the
> incident. *Id.* ¶ 58. Further, according to CI-1, Defendant Wendt
> indicated that Mr. Silva's body was transported to a nearby pet
> cemetery and crematorium that is less than a 10-minute drive from
> the Fresno HA clubhouse.

*Id.* ¶ 59. The Indictment charges Defendant Wendt, though not an HASC member, was an

associate of the HASC that conspired with the HASC to murder HASC member Silva as a matter

8

of Hells Angels business.

b.  Instrumentality of Crime

The Government thus contends there was probable cause to search Defendant Wendt's property for evidence of his affiliation with the Hells Angels and the HASC in particular, and of his participation in criminal actions of the HASC including the Silva murder.  As to evidence of association with the HASC, Menke states in the affidavit that based on his training and experience, "[m]embers and associates of HASC keep signifiers of their membership in association with the enterprise in their residence, places of work, and clubhouses." *Id.* ¶ 84(a).  The Menke Affidavit provides specific examples of instances in which enterprise signifiers were found in prior searches of HASC members' and associates' residences and vehicles.  *Id.*; *see also id.* ¶ 99 (search of Defendant Lyles' business found weapons and Hells Angels indicia); *id.* ¶¶ 84(b)(iv), 51 (firearm and HASC vest found in HASC prospect Trent Miles' vehicle & HASC indicia and firearm found at his residence).  With respect to the search for firearms and other weapons, the Menke Affidavit notes that, "[m]embers and associates of HASC often possess weapons, both for themselves and for other members and associates of the enterprise." *Id.* ¶ 84(b); *see also id.* ¶ 86 (firearms found during a 2008 search of the HASC clubhouse).

As to the instrumentality of crimes such as weapons, the Menke Affidavit also states that,

> [m]embers of the enterprise will frequently hide weapons, specifically guns, used in crimes with [] fellow members or associates who may not be subject to search or be unknown to law enforcement.  Members will in some cases retrieve weapons from a fellow member and keep them at their residences or in their vehicles or on their person when they believe the member would no longer be subject to a search.  It is also my opinion that members of racketeering enterprises will store, hold, keep, and conceal weapons to be used by the entire membership should the need arise.  Based on my training and experience, I know that instrumentalities, such as weapons, that are utilized by member of the enterprise may be circulated amongst the membership for use and/or concealment purposes.

*Id.* ¶ 84(b)(v).  The Menke Affidavit also indicates that HASC members and associates possess firearms in connection with drug trafficking.  *Id.* ¶ 84(c)(xv)-(xvi) ("It is my opinion that any such firearms constitute further evidence of narcotics trafficking in that they are commonly associated with those actively engaged in this criminal enterprise; and [t]hat persons who traffic in controlled

United States District Court
Northern District of California

Case 3:17-cr-00533-EMC   Document 2537   Filed 04/14/22   Page 10 of 51

substances may also keep the items listed [] in storage units, post-office boxes, and safety deposit boxes."). *See id.* ¶ 84(b)(i) (firearms and ammunition found in a 2008 search of Defendant Nelson's residence). *See also id.* ¶ 77 (firearms, ammunition, bulletproof vests, and drugs found at Defendant Lyles' residence).

The Menke Affidavit also notes Defendant Wendt's involvement specifically with weapons possession as well as his affiliation with the Hells Angels generally. In February 2017, a Minnesota State Patrol Trooper pulled over a truck that Defendant Wendt was driving. *Id.* ¶ 79. The Trooper suspected that Wendt and Fresno HA Treasurer Stephen Meza, who was a passenger in the vehicle, were using the truck for drug trafficking. *Id.* ¶ 80. Troopers executed a search of the vehicle and found several weapons and Hells Angels regalia. *Id.* ¶¶ 81-82. Notably, the Troopers recovered ammunition, a silencer attachment, and several firearms. *Id.* ¶ 81. In addition, there was evidence that Defendant Wendt used a gun in killing Mr. Silva.

Thus, Menke concluded in the master affidavit that "based on my training and experience, I believe the following categories of evidence (enterprise evidence, weapons possession, evidence of drug trafficking, evidence of linkage between HASC members and associates and the subject premises, physical evidence, computer equipment and cell phones, and HASC motorcycles) will be found at the premised to be searched . . . ." *Id.* ¶ 84.

c. Wendt's Storage Unit

As for the search warrant pertaining to Defendant Wendt's storage unit, he claims that the "warrant contains no statement of probable cause or affidavit." Wendt Mot. at 12-13. Moreover, he emphasizes that the master Menke Affidavit does not list his storage unit as one of the premises to be searched. *Id.* at 13. The Government responds that the "application to the Magistrate for the rollover search warrant included and incorporated by reference the Menke Affidavit and the Indictment in the case." Opp'n at 13.

Notably, the search warrant application for Defendant Wendt's storage unit did include and incorporate by reference the entire Menke Affidavit and the indictment for the case. *See* Opp'n Attachments at 29, Attachment H. Additionally, the search warrant application for Wendt's storage unit also includes an Addendum authored by Menke that informed Magistrate Judge

1   Boone that agents found the following items at Wendt's residence in the initial November 2017

2   search: "22 firearms, to include handguns and assault rifle-type weapons, ammunition, and Hells

3   Angel Motorcycle Club paraphernalia. Agents also located approximately $39,000 dollars in

4   cash." *Id.* at 103, Addendum ¶ 4. The Addendum also notes that agents found: (1) a receipt for

5   storage unit Y-034 at Tulare Mini Storage facility with Defendant Wendt's name and previous

6   address on it; and (2) a second receipt in Defendant Wendt's vehicle that indicated he had

7   purchased locks at that facility. *Id.*, Addendum ¶ 6. Further, the Addendum states that agents

8   went to the storage facility and spoke to an employee who indicated that unit Y-034 was leased by

9   Wendt and noted that the unit had been accessed less than two weeks earlier. *Id.*, Addendum ¶ 7.

10  Menke also states in the Addendum that based on his training and experience, individuals will

11  often conceal contraband in storage lockers. *Id.* at 104, Addendum ¶ 8.

12              d.       Probable Cause

13          Based on the foregoing, with one exception as noted below, the evidence in the Menke

14  Affidavit (and the Addendum as it pertains to the search of the storage unit), provided a substantial

15  basis for the issuing judge to find that there was a fair probability that agents would find evidence

16  of the RICO conspiracy (including his affiliation with the Hells Angels and with the HASC in

17  particular) and Defendant Wendt's participation therein. There is evidence of a substantial

18  connection between Defendant Wendt, the Fresno charter, and the HASC enterprise charged in the

19  Indictment. And given the evidence regarding the criminal network of the HASC, the method of

20  Silva's alleged murder, and Defendant Wendt's prior Minnesota weapons possession, there was

21  probable cause to believe agents would find evidence of weapons possession on Defendant

22  Wendt's property.

23          Thus, based on the totality of the circumstances, the issuing judge had a substantial basis

24  for concluding that there was probable cause that RICO enterprise evidence (including evidence of

25  weapons possession, Hells Angels membership and membership and association with the HASC,

26  and physical evidence and trace evidence of the Silva homicide)[3] would be found at the locations

27  ─────────────────

28  [3] Defendant Wendt's argument that the bases for searching for weapons possibly related to the
    homicide was stale is addressed below.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  pertaining to Defendant Wendt. *See United States v. Angulo-Lopez*, 791 F.2d at 1399 ("Direct

2  evidence that contraband or evidence is at a particular location is not essential to establish

3  probable cause to search the location.") (citation omitted).

4      However, the Court finds that evidence here did not provide a substantial basis for the

5  issuing judge to find that there was a fair probability that evidence of HASC related drug

6  trafficking would be found in the execution of the 2017 search warrants pertaining to Wendt's

7  home, vehicle, storage unit, and the Fresno HA Clubhouse.  There was no evidence that Wendt's

8  association with the HASC enterprise included participation in its drug trafficking.  The only

9  crime in which he was alleged to have participated in association with the HASC is the Silva

10  murder.  In fact, there is no evidence that Wendt participated in any drug trafficking, much less

11  that he did so in connection with the HASC enterprise.  Accordingly, the Court finds that the

12  November 2017 search warrants issued by Magistrate Judge Boone failed to establish probable

13  cause that evidence of HASC related drug trafficking would be at Defendant Wendt's house,

14  vehicle, storage unit, and the Fresno Hells Angels Clubhouse.

15      2.    Wendt's Standing as to the Fresno HA Clubhouse

16      The Government challenges Defendant Wendt's standing to challenge the search of the

17  Fresno HA clubhouse.  Wendt Mot. at 21.  Wendt argues that as President of the Fresno HA

18  chapter he had joint control and supervision of "what was essentially the office" of the Fresno HA

19  chapter.  *Id*. at 22.  Defendant Wendt submitted a declaration and states that he stored personal

20  belongings there, spent a considerable amount of time there including sleeping there overnight,

21  excluded members of the public, had the authority to exclude other Fresno HA members due to his

22  status as President, and as such, certainly had a reasonable expectation of privacy in the Fresno

23  clubhouse.  *See* Wendt Decl., Docket No. 2068-16.

24      "Fourth Amendment rights are personal rights which, like some other constitutional rights,

25  may not be vicariously asserted." *Rakas*, 439 U.S. at 133-134 (citation omitted).  It has "long

26  been the rule that a defendant can urge the suppression of evidence obtained in violation of the

27  Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were

28  violated by the challenged search." *United States v. Padilla*, 508 U.S. 77, 81 (1993) (per curiam)

(emphasis in original).  The touchstone of such a demonstration is an affirmative showing that the defendant had a "legitimate expectation of privacy in the invaded place." *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (citation omitted).

The Government does not contest that Defendant Wendt has standing to challenge the searches of home, vehicle, and storage unit so the Court need not address these claims.  However, the Government argues that Defendant Wendt lacks standing to challenge the search of the Fresno HA clubhouse and emphasizes that Wendt has not asserted that he exercised daily management and control over the Fresno HA clubhouse or shown a personal connection to the places searched and the material seized.  Opp'n at 10-11.  The Government also emphasizes that Wendt "offers no reason to think that he had any 'private place' within the clubhouse" and states that there is no evidence that he maintained a private office or locker within the clubhouse.  *Id.* at 11. Additionally, the Government notes that Wendt "does not state whether he 'ever exercised his claimed right to exclude.'"  *Id.* (citing *United States v. Pirk*, 282 F. Supp. 3d 585, 593 (W.D.N.Y. 2017) (emphasis original).  As such, the Government argues that Defendant Wendt has not met his burden of establishing standing.  *Id.*

"Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property."  *Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (plurality opinion).  Specifically, "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home."  *New York v. Burger*, 482 U.S. 691, 700 (1987).  With regard to employees and their workspaces or offices, the Ninth Circuit noted that "it is crucial to Fourth Amendment standing that the place searched be given over to the defendant's exclusive use" and found that "an employee of a corporation, whether worker or manager, does not, simply by virtue of his status as such, acquire Fourth Amendment standing with respect to company premises."  *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 695-96 (9th Cir. 2009).  Moreover, "except in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized."  *Id.* at 698.

13

In *U.S. v. Gonzalez, Inc.* 412 F.3d 1102 (9th Cir. 2005), the Ninth Circuit analyzed whether small business owners had standing to challenge the seizure of their wiretapped conversations that were intercepted at the location of their family-run office. *Id.* at 1116. The Ninth Circuit noted that it was "important to assess the nature of the location where the[] conversations were seized" to determine whether the Gonzalezes "had a reasonable expectation over the intercepted calls." *Id.* The Court noted that it was "a small, family-run business housing only 25 employees at its peak" and concluded that "[i]n such an office, individuals who own and manage the business operation have a reasonable expectation of privacy over the on-site business conversations between their agents." *Id.* at 1116-17. In reaching this conclusion, the Court emphasized that "we simply hold that because the Gonzalezes were corporate officers and directors who not only had ownership of the [] office but also exercised full access to the building as well as managerial control over its day-to-day operations, they had a reasonable expectation of privacy over calls made on the premises. *Id.* at 1117.

*SDI* and *Gonzalez* represent the opposite ends of a continuum. Defendant Wendt makes a fair argument that the Fresno HA charter is a smaller club, more akin to the family-run business in *Gonzalez* than a corporate company premises like in *SDI Future Health.* Similar to the defendants in *Gonzalez*, as President of the Fresno HA charter, Wendt had a reasonable expectation of privacy in the Fresno HA clubhouse since he managed the small club's operation as its President and used the clubhouse as a kind of pied-a-terre. To be sure, although he had the authority to exclude the public and members from the clubhouse, he did not cite instances where he actually exercised that authority. *Cf. Pirk*, 282 F. Supp. 3d at 593 (a Kingsmen Motorcycle Club member made "a great deal out of his purported right to exclude others from entering the clubhouse" but failed to state in his declaration that "*he* could prevent entry of an invitee or another KMC member, or whether he ever *exercised* his claimed right to exclude). Nonetheless, unlike the defendant in *Pirk*, Wendt was President of the Fresno HA charter, not a mere member and had substantial control over the premises.

Accordingly, the Court finds that Defendant Wendt has standing to challenge to the search of the Fresno HA clubhouse.

14

United States District Court
Northern District of California

### 3.      Staleness of the Probable Cause (Wendt & Ott)

Defendant Wendt claims that the November 2017 search warrant fails to establish probable cause because the information it was based on was stale.  Wendt Mot. at 30.  He specifically argues that:  (1) the Minnesota weapons evidence from nine months prior to the issuance of the warrant was stale; (2) the warrant provides no support for the claim that evidence of the "Silva killing" would remain at the Fresno Clubhouse three years after the crime occurred; and (3) the information from CI-1 accusing Defendant Wendt of the Silva killing was also stale.  *Id*. at 30-31.

Defendant Ott also claims in his motion to suppress that the information in the Menke Affidavit "was too stale to provide probable cause" to search his house and the HASC clubhouse.  Ott Mot. at 13.  Similarly, Ott notes that the November 2017 search warrant was issued by Magistrate Judge Spero three years and four months after Silva's alleged disappearance.  *Id*.  Ott specifically argues that the Menke Affidavit "failed to show a sufficient 'continuing pattern' or 'other good reasons' to support a belief that the items to be seized" would be at his house and the HASC clubhouse almost three and half years later.  *Id*.

The Government argues that Defendants Wendt and Ott ignore that "the crime is an ongoing RICO conspiracy, not a singular criminal event in the past.  By repeatedly referring to it in the present tense, Det. Menke alleges that HASC is a continuing enterprise, and in fact it remains in operation today."  Opp'n at 25.  Thus, the Government claims that the November 2017 warrants issued by Magistrate Judges Boone and Spero were "directed at searching for and seizing evidence of current criminal activity—the conduct of an ongoing RICO enterprise."  *Id*.  Additionally, the Government notes that the items sought in the warrants are significant to the Court's staleness analysis and claims that evidence located on computers, smartphones, and other electronic devices, "increased the likelihood that the evidence at issue would be found at the search locations despite the passage of time."  *Id*. at 26-27.

"The mere lapse of substantial amounts of time is not controlling in a question of staleness."  *United States v. Dozier,* 844 F.2d 701, 707 (9th Cir. 1988) (citing *United States v. Foster,* 711 F.2d 871, 878 (9th Cir. 1983), *cert. denied,* 465 U.S. 1103 (1984)).  The Court must evaluate staleness in the context of the particular facts of the case, and the nature of the alleged

15

1    crimes. *See United States v. Greany,* 929 F.2d 523, 525 (9th Cir. 1991). "One may properly infer

2    that equipment acquired to accomplish the crime and records of the criminal activity will be kept

3    for some period of time." *Id.* This is particularly true when the evidence sought is related to an

4    ongoing criminal enterprise. *Id.*

5         As noted above, the Government asserts that the overarching crime is an ongoing RICO

6    conspiracy, which applies to evidence of membership in (Ott) and association with (Wendt) the

7    HASC enterprise. The Menke Affidavit states that Defendant Ott was a former HASC president

8    and current HASC member, that participated in the Silva murder with Defendants Wendt and

9    Nelson. Additionally, the Menke Affidavit details the connection between Wendt and the HASC,

10   especially with regard to the Silva murder. *See* Menke Affidavit ¶¶ 31-32, 57-59. Notably, the

11   assertion that Wendt is associated with the HASC enterprise is weaker in comparison to Ott's

12   HASC membership since Ott's HASC membership is not contested and there is no indication that

13   Wendt, as an associate, participated in further crimes with the HASC after the 2014 Silva murder.

14   There was no clear and discrete date of Wendt's alleged association with the HASC, especially in

15   light of the length of time of his relationship with HASC members. Relevant to the Court's

16   staleness analysis, the evidence sought at Defendant Wendt's residence, vehicle, storage unit, and

17   the Fresno HA clubhouse, as well as the evidence sought at Defendant Ott's residence and the

18   HASC clubhouse, was evidence related to the investigation into the HASC enterprise (evidence of

19   racketeering enterprise membership and association, evidence of weapons possession, evidence of

20   drug trafficking, evidence of linkage between HASC members and associates and the subject

21   premises, physical evidence pertaining to the Silva murder, etc.). *See id.* ¶ 84. Notably, much of

22   the evidence sought in the search warrants at issue was arguably not of a transient nature. Indeed,

23   HASC membership signifiers, firearms, and weapons are the types of "personal" items that are

24   generally kept for a long time. *See United States v. Gann*, 732 F.2d 714, 722 (9th Cir. 1984) (the

25   Ninth Circuit held that the information in the affidavit was sufficient to establish probable cause to

26   search the defendant's car and home due to the "ongoing nature" of the bank robberies, "the

27   personal nature of the some of the items sought (e.g., hat, firearms, ammunition, items of

28   identification . . .)," and the testimony of the Agent regarding the "propensity of bank robbers to

United States District Court
Northern District of California

hide evidence of their crimes in their cars or residences"); *United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997) (staleness is evaluated in light of the particular facts of the case and the nature of the criminal activity and property sought; the affidavit here demonstrated that individuals who possess or distribute child pornography rarely, if ever delete such images); *United States v. Flores*, 802 F.3d 1028, 1043 (9th Cir. 2015) (finding that information regarding the Facebook post at issue was not stale where the post was made three months before the government obtained the search warrant, reasoning that it was unlikely the post had been deleted in the interim and even if deleted, it was likely that it could be recovered); *United States v. Gourde*, 440 F.3d at 1070-71 ("Thanks to the long memory of computers, any evidence of a crime was almost certainly still on his computer, even if he had tried to delete the images"). Additionally, as noted above with respect to weapons possession, the Menke Affidavit states that "[m]embers will in some cases retrieve weapons from a fellow member and keep them at their residences or in their vehicles or on their person when they believe the member would no longer be subject to a search. It is also my opinion that members of racketeering enterprises will store, hold, keep, and conceal weapons to be used by the entire membership should the need arise." Menke Affidavit ¶ 84(b)(v).

Moreover, regarding physical evidence pertaining to Silva's murder at the Fresno Clubhouse, the Menke Affidavit states that, "it is believed that the body was moved from one location to another. During the transportation and movement of the body there is the potential for evidence recovery from any number of areas in the Fresno Clubhouse and/or Pet Cemetery." Menke Affidavit ¶ 84(e)(v). Further, the Menke Affidavit states that

> [h]air, blood, fibers, bone, and minute DNA evidence may have been shed or deposited by the victim and/or suspects during the movement and/or following the incineration of the body. There is probable cause to believe physical evidence at the above listed locations may be located on or adhered to concrete, wood, sheet rock, or other building materials present at the places to be searched.

*Id.*

Thus, based on the context of the particular facts of the case and the nature of the alleged crimes it appears that the Court cannot say that the lapse of time of which Wendt and Ott complain rendered the probable cause in the November 2017 search warrants stale. Accordingly, the Court

17

1    finds that Magistrate Judges Boone and Spero could reasonably have concluded that the probable

2    cause for the November 2017 search warrants still obtained. *See, e.g., United States v. Collins,* 61

3    F.3d 1379, 1384-85 (9th Cir. 1995) (citing cases from around the country holding that the mere

4    lapse of time, ranging from two and a half weeks up to nine months, does not render probable

5    cause stale in firearms cases).

6           4.      Wendt Searches & the Scope of the Warrant

7           Defendant Wendt specifically claims that:  (1) the search of his storage unit exceeded the

8    scope of the November 2017 warrant; and (2) the items seized from the Fresno area premises

9    exceeded the scope of the warrant.  Wendt Mot. at 33, 35.  Wendt again claims that the "warrant

10   for the storage unit has no statement of probable cause appended to it" and argues that "officers

11   simply provided the original 'master affidavit' to the issuing magistrate late on the day of the

12   Fresno area searches, which was plainly inadequate given the affidavit contains no statement of

13   probable ca[u]se as to that separate location." *Id.* at 34.  As such, he argues that "[a]ll items

14   recovered inside [the] storage locker must be suppressed." *Id.* at 35.  As for the items seized from

15   the Fresno area premises, Wendt specifically claims that the search warrant lists "HASC

16   Motorcycles" under the items to be seized and that the language employed in that section of the

17   warrant was "clearly directed to *members* of the HASC" and not associates. *Id.,* (emphasis in

18   original).  As such, Defendant Wendt argues that the "warrant did not authorize the search [and]

19   seizure of his Fresno-related motorcycle or other Fresno Hells Angels items seized by the agents

20   in [the warrant's] lengthy list of items seized from [his] home, storage unit, car and clubhouse."

21   *Id.*

22          The Government argues that "there existed probable cause to seize Hells Angels indicia

23   from all of the location described" in the November 2017 search warrant and reiterates that the

24   Menke Affidavit explained how the HASC is a subset of the transnational Hells Angels

25   Motorcycle Club organization and that Wendt had a close relationship with the HASC, a fact that

26   arises within the context of the Hells Angels generally.  Opp'n at 15.  As such, the Government

27   claims that "items bearing Hells Angels indicia—even if not limited to items bearing Sonoma

28   County indicia—seized from Wendt's possession still constitute proof of Wendt's participation in

United States District Court
Northern District of California

18

the offenses outlined in the affidavit, warrant, and attached indictment." *Id*. at 16.

"Whether a search exceeds the scope of a search warrant is an issue we determine through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search." *United States v. Hitchcock,* 286 F.3d 1064, 1071 (9th Cir. 2002); *see also United States v. Rettig,* 589 F.2d 418, 423 (9th Cir. 1978) ("In determining whether or not a search is confined to its lawful scope, it is proper to consider both the purpose disclosed in the application for a warrant's issuance and the manner of its execution."). "The tests of what is necessary to 'execute a warrant effectively' is reasonableness. 'An officer's conduct in executing a search is subject to the Fourth Amendment's mandate of reasonableness from the moment of the officer's entry until the moment of departure." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005) (citing *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997)). If the "scope of [a] search exceeds that permitted by the terms of a validly issued warrant . . . [the search and any] subsequent seizure [are] unconstitutional." *Horton v. California*, 496 U.S. 128, 140 (1990).

For example, in *San Jose Charter of Hells Angels Motorcycle Club,* the Ninth Circuit found the execution of search warrants at the residence of members of the Hells Angels unreasonable where "officers seized literally 'truckloads' of personal property for the sole purpose of showing in a murder prosecution that the Hells Angels had common symbols, which in turn would qualify it as a criminal street gang" and support a gang sentencing enhancement. 402 F.3d at 965. The Ninth Circuit noted that in seizing this indicia evidence, "the officers seized numerous expensive Harley-Davidson motorcycles, a concrete slab, and a refrigerator door and in so doing, caused significant damage to the items seized as well as to other property." *Id*. at 965-966. The Ninth Circuit concluded that the "the authority to seize indicia evidence to support a sentencing enhancement [] did not justify the level of intrusion and excessive property damage that occurred during the search of the various locations." *Id*. at 972. The Ninth Circuit explained that "indicia warrants, like many warrants, authorized the search of nearly every corner of the residence," but are issued "to obtain evidence on just one fact—membership in the Hells Angels. Unlike most warrants, the evidence on this issue would be needlessly cumulative once enough evidence was

19

United States District Court
Northern District of California

1    obtained to establish membership." *Id*. at 972 (citation omitted).  The Ninth Circuit also explained

2    that "any" does not equate to "all" with regard to the warrant's direction to seize any indicia

3    evidence and noted that "the record indicates that other officers understood that they had

4    discretion not to seize items with Hells Angels indicia." *Id*. at 974.

5           Here, as noted above, Defendant Wendt appears incorrect as to his claim that evidence

6    seized from his storage unit must be suppressed because no probable cause theory was provided as

7    to the search of that location.  *See* Footnote 2 (the Menke Affidavit and Menke Addendum were

8    included and incorporated by reference in the search warrant for Defendant Wendt's storage unit).

9    As noted, the warrants were directed at searching for and seizing evidence of past and current

10   criminal activity—the conduct of a RICO enterprise.  Thus, given the relationship between the

11   HASC and the Fresno HA and the events pertaining to the alleged Silva murder described in the

12   Menke Affidavit, the search of Defendant Wendt's storage unit for indicia of Hells Angels

13   membership did not exceed per se the scope of the warrant.  *See United States v. Becker*, 929 F.2d

14   442, 446-47 (9th Cir. 1991) (reversing the district courts suppression order, holding that the initial

15   search where agents jackhammered beneath a concrete slab to find aluminum pieces containing

16   methamphetamine was within the scope of the initial broad warrant that permitted officers to

17   search an entire residence and that search provided probable cause to obtain a second warrant for

18   another similar search).  As for Wendt's specific claim pertaining to his Fresno HA motorcycle

19   and Fresno HA indicia that were seized during the searches, evidence of Hells Angels membership

20   generally might be evidence of a crime as it provides relevant background to his associating with

21   the HASC to commit the Silva murder.

22          However, the warrant's reference to search and seizure of "any" Hells Angels indicia (*see*

23   Attachments B1-B12), as in *San Jose Charter of Hells Angels Motorcycle Club*, did not authorize

24   seizure of "all" such indicia.  In *San Jose Charter of Hells Angels Motorcycle Club*, seizure of

25   indicia evidence may be "needlessly cumulative once enough evidence was obtained to establish

26   membership."  402 F.3d at 972.  This is especially true with respect to indicia of Hells Angels

27   membership generally, as opposed to affiliation with the HASC.  Defendant Wendt's Fresno HA

28   membership does not appear to be in dispute and he notes that "among the items seized were

United States District Court
Northern District of California

1    jewelry indicating 'Fresno Hells Angels.'"  Wendt Mot. at 41.  As such, the seizure of his Fresno

2    HA motorcycle was needlessly cumulative.

3         Accordingly, the Court finds that the search of Defendant Wendt's storage unit did not

4    exceed the scope of the November 2017 warrant to search Wendt's storage unit, but the seizure of

5    his Fresno HA motorcycle was excessive and did exceed the scope of the November 2017 warrant

6    pertaining to the search of his residence.

7         5.    Specificity (Wendt and Nelson)

8         Relatedly, Defendant Wendt argues that the November 2017 warrant failed to provide the

9    specificity demanded by the Fourth Amendment.  Went Mot. at 36.  He specifically argues that the

10   warrant is overbroad as it allowed the seizure of vast amounts of personal items, including

11   jewelry, personal papers and effects, non-HASC motorcycles, and other personal memorabilia

12   "belonging to Hells Angels Members, and in particular Brian Wendt, regardless of whether those

13   items had any connection to the HASC."  *Id*. at 38.  Further, Wendt claims that the warrant's

14   listing of "Evidence of Membership and Association to the Hells Angels and/or Hells Angels

15   Sonoma County" is overbroad because it "authorized the seizure of virtually every single

16   document, computer file, electronic device, cell phone, or physical item that is related in any way

17   . . . to the larger Hells Angels global organization . . . as the warrant expressly provides, evidence

18   of membership in 'any motorcycle club.'"  *Id*.[4]  Additionally, Wendt argues that the warrant is

19   overbroad because it authorized the seizure of all electronic data without a time limitation

20   regardless of ownership.  *Id*. at 41.  Moreover, he claims that the warrant is overbroad because it

21   "is clear from the affidavit, that the agents were looking for evidence linking Brian Wendt to the

22   alleged Silva homicide" and the "search and seizure of electronics should have been limited to that

23   purpose" because there was "no probable cause to believe that evidence of the Sonoma RICO

24   enterprise would be found inside a Fresno member's home."  *Id*.

25         Similarly, Defendant Nelson argues in his motion to suppress that the November 2017

26

27   _____

28   [4] The Government states in its opposition that it will not seek to offer items seized from Wendt's
     residence, storage unit, or the Fresno HA clubhouse "that pertain to motorcycle clubs other than
     the Hells Angels as evidence."  Opp'n at 16, n3.

warrant that was issued by Magistrate Judge Spero for the search of 516 Frazier (HASC Clubhouse),[5] 91 Bailache, and 2765 Antelope Lane "lacked specificity with regard to computer equipment and cell phones" and "did not limit the scope of the seizure to a time frame . . . ." Nelson Mot. at 7-8. Specifically, Defendant Nelson argues that since the warrant failed "to describe with any particularity the items to be seized, the warrant is indistinguishable from the general warrants repeatedly held by the Ninth Circuit to be unconstitutional" and should be suppressed. *Id.* at 8.

A warrant is overbroad if it fails to establish "probable cause to seize the particular thing[s] named in the warrant," and courts will invalidate warrants "authorizing a search which exceeded the scope of the probable cause shown in the affidavit." *In re Grand Jury Subpoenas*, 926 F.2d 847, 857. For example, in *SDI Future Health*, the Ninth Circuit found that certain categories of items to be seized were overly broad, because the warrant failed "to describe the crimes and individuals under investigation" and, as a result, "provided the search team with discretion to seize records wholly unrelated to the" defendants' finances. *SDI Future Health*, 568 F.3d at 705.

The Fourth Amendment requires that a search warrant's description of the things to be seized be "specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *United States v. Spilotro,* 800 F.2d 959, 963 (9th Cir. 1986). How specific the description needs to be varies according to the circumstances of the case, and the types of items the warrant seeks. *Id.* To determine whether a warrant is sufficiently particular, a court may look to one or more of the following factors: (1) "whether probable cause exists to seize all items of a particular type described in the warrant," (2) "whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not," and (3) "whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *Id.* (citations omitted). For

---

[5] As for Defendant Nelson's claim that the evidence seized from the HASC clubhouse must be suppressed because the warrant lacked the requisite specificity, he fails to assert that he has standing to suppress evidence from that search. It is Defendant Nelson's burden to prove standing, and since he did not attempt to do so, the Court finds his arguments related to the search of the HASC clubhouse waived.

United States District Court
Northern District of California

United States District Court
Northern District of California

example, HA-related indicia, by its nature, is not amenable to a detailed description. *See United States v. Cerna*, No. CR 08–0730 WHA, 2010 WL 3749449, at *14 (N.D. Cal. Sept. 22, 2010) ("By its nature, gang-related indicia may include a broad swath of 'everyday' or 'ordinary' items that only become gang-related indicia in certain contexts or once certain modifications or inscriptions are made to the items.").

The Government argues that the warrants were sufficiently particular given the circumstances of the case and notes that Attachment B to the Menke Affidavit specifies categories of evidence (weapons possession, drug trafficking, etc.), "which are either limited by reference to specific offenses under investigation or by reference to specific physical items to be seized." Opp'n at 14. As for overbreadth, the Government claims that the "warrant did not seek to search all Hells Angels offices and clubhouses; it sought evidence from Wendt's home and storage unit, and from the Fresno clubhouse." *Id.* at 15. The Government again argues that Wendt does not have standing to challenge the search of the Fresno HA clubhouse and reiterates that the Menke Affidavit details Wendt's close relationship with the HASC. *Id.* As such, the Government states that, "[i]n any event, there existed probable cause to seize Hells Angels indicia from all of the locations described" in the warrant and emphasizes that "Wendt's association with the Hells Angels as a whole, as well as the Fresno charter, is itself evidence of the RICO conspiracy alleged in the Menke Affidavit and attached indictment." *Id.* at 16. The Government claims that Defendants' overbreadth claims as to the lack of a time limitation on the seizure of all electronic data are "equally without merit." *Id.* at 17. As for overbreadth pertaining to the electronic data and equipment generally, the Government emphasizes that the warrants at issue "did not authorize the seizure of every document from Wendt's and Nelson's electronic devices: only those that matched the specific descriptions outlined in Attachment B." *Id.* at 18.

In the event the Court finds that the portions of the warrants were overbroad, the Government argues that the agents executed the searches in good faith and as such, the good faith exception would apply. Opp'n at 19. The Government further claims that if the Court were to find portions of the warrant overbroad and that the good faith exception did not apply, "wholesale suppression would [] not be warranted." *Id.* Instead, valid portions of an overbroad search warrant

23

United States District Court
Northern District of California

1 may be severed from the invalid portions and the search made pursuant to the valid portions

2 upheld. *See United States v. Sears*, 411 F.3d 1124, 1129 (9th Cir. 2005) (the "doctrine of

3 severance [] 'allows a court to strike from a warrant those portions that are invalid and preserve

4 those portions that satisfy the fourth amendment.'") (Citation omitted).  Moreover, the

5 Government states that it "does not intend to offer as evidence one of the categories of evidence

6 that Wendt attacks here:  items related to "any other motorcycle club" seized from Wendt's

7 residence, his storage unit, and the Fresno clubhouse" and notes that Wendt "identifies no other

8 categories of items that are subject to suppression."  Opp'n at 19-20.

9      There are instances where a warrant is clearly overbroad, particularly in reference to

10 specific crimes which provided a basis for the search.  For instance, in *Center Art Galleries-*

11 *Hawaii, Inc.*, 875 F.2d at 750-51, the Ninth Circuit concluded that warrants authorizing the search

12 of an art gallery for evidence of mail and wire fraud were overbroad.  Notably, the Ninth Circuit

13 found that the affidavit provided probable cause to search for evidence of mail and wire fraud

14 involving the sale of forged Salvador Dali artwork, but the "government . . . failed to limit the

15 warrants to items pertaining to the sale of Dali artwork despite the total absence of any evidence of

16 criminal activity unrelated to Dali." *Id.* at 750.  Because approximately 80% of the plaintiff's

17 business concerned non-Dali art, the court also concluded that the "permeated-by-fraud" theory

18 would not justify such a broad seizure of documents. *Id.*

19      Similarly, in *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995), the Ninth Circuit

20 found that the warrant that "authorized the seizure of virtually every document and computer file

21 at HK Video" was unconstitutionally overbroad where it "contained no limitations on which

22 documents within each category could be seized or suggested how they related to specific criminal

23 activity." *Id.*  The Ninth Circuit explained that the generalized seizure of business records was not

24 justified since the warrant "did not limit the scope of the seizure to a time frame within which the

25 suspected criminal activity took place" and failed "to describe with any particularity the items to

26 be seized." *Id.*  As such, the Ninth Circuit concluded that "the warrant [was] indistinguishable

27 from the general warrants repeatedly held by this court to be unconstitutional." *Id.*  Additionally,

28 the Ninth Circuit noted that the affidavit indicated a time frame for the alleged criminal activity

United States District Court
Northern District of California

1  and "summarized in detail the various locations within HK Video where officers could find

2  relevant documents," but emphasized that this information "was excluded from the warrant." *Id*.

3  The affidavit conceded that HK Video was a legitimate business and contained no allegation that

4  HK Video was permeated with fraud or that the government could not reasonably segregate HK

5  Video's documents on the basis of whether or not they were likely to evidence criminal activity.

6  *Id*. at 428.

7        These cases are distinguishable. For example, unlike the evidence pertaining to the

8  specific crimes of mail and wire fraud involving the sale of forged Salvador Dali artwork at issue

9  in *Center Art Galleries-Hawaii, Inc.*, the HASC enterprise evidence at issue here is arguably not

10  amenable to a detailed description. *See United States v. Cerna*, 2010 WL 3749449, at *14.

11  Additionally, unlike the affidavit in *Kow*, the Menke Affidavit was referenced in and attached to

12  the November 2017 warrants and explained the multiple crimes under investigation: racketeering

13  conspiracy; murder; robbery; drug trafficking; and witness intimidation, all spanning a period of

14  years. Menke Affidavit ¶ 12, *see also id.* ¶ 1 ("This affidavit is submitted in support of

15  applications to search various premises for evidence of racketeering conspiracy and associated

16  crimes committed by members of the Hells Angels Sonoma County chapter (HASC) and their

17  associates."). Moreover, the Menke Affidavit described how the alleged criminal enterprise, the

18  HASC, is a "subset of the transnational organization that is the Hells Angels motorcycle club,"

19  and stated that members of the Sonoma County charter "enjoy[] close relationships with members

20  of other Hells Angels chapters, particularly Fresno and Salem/Boston." *Id.* ¶¶ 13, 28. Further, as

21  noted above, it detailed Wendt's cooperation with members of the Sonoma Charter in killing

22  Silva. *Id*. ¶¶ 31-32. The Menke affidavit also describes that evidence of the crimes under

23  investigation, including the ongoing RICO conspiracy involving both Nelson and Wendt, could be

24  found in "rosters of HASC members," "address books of HASC members and associates,"

25  "communications to or from HASC members and associates and non-HASC members about

26  criminal activity," "audio and/or video recordings making reference to the Hells Angels" . . . all of

27  which could be "stored in computer equipment and digital media." Menke Affidavit ¶ 84(a).

28        Here, the warrants, as a whole, limited the search of electronic data to that evidencing

United States District Court
Northern District of California

1  specifically described crimes and incorporated procedural protocol to insure against unreasonably

2  broad searches.  Unlike the warrants at issue in *SDI Future Health* and *Kow*, the Menke Affidavit

3  and Attachments B-1 to B-12 and B-17 to the affidavit provide limitations by specifying the types

4  of evidence to be seized and how it relates to various RICO enterprise crimes.  Additionally, the

5  Menke affidavit's reference to the "specific illegal activity" would also "provide substantive

6  guidance for the [officers'] exercise of discretion in executing the warrant."  *Spilotro*, 800 F.2d at

7  964.  Further, the warrants also included a "Protocol for Searching Devices or Media that Store

8  Data Electronically." Wendt Mot., Ex. A at 93, Menke Affidavit, Attachment C; Nelson Mot.,

9  Attachment 1 at 68, Menke Affidavit, Attachment C; Ott Mot., Ex. A at 72, Menke Affidavit,

10 Attachment C.  Those Protocols would also "provid[e] executing officers with sufficient objective

11 standards for segregating responsive material from" non-responsive material on Defendants'

12 computers and electronic media.  *See Flores*, 802 F.3d at 1044 (finding that procedures for

13 electronically stored information attached to warrant suggested warrant was not overbroad);

14 *United States v. Martinez*, No. 19-CR-00662-JSW-1, 2020 WL 3050767, at *6-*7 (N.D. Cal. June

15 8, 2020) (even though there was no specified time limit pertaining to the items seized in the

16 warrant, the court concluded that a warrant was not facially overbroad where protocols for

17 searching electronic devices and a list of types of evidence to be seized was attached to the

18 warrant).

19     Thus, although it appears that the warrants do not include a specific time limitation, the

20 Court concludes that that does not render the warrants facially overbroad since the Attachments to

21 the Menke Affidavit and the Affidavit's reference to the specific illegal activity provided

22 limitations and guidance.  To the extent Defendant Wendt may be claiming that the warrant is

23 overbroad because it did not place any limits on ownership, the Court does not find this argument

24 persuasive.  In *United States v. Adjani,* 452 F.3d 1140, 1146 (9th Cir. 2006) the Ninth Circuit

25 stated it had "never held that agents may establish probable cause to search only those items

26 owned or possessed by the criminal suspect.  The law is to the contrary."  Rather, "[t]he critical

27 element in a reasonable search is not that the owner of the property is suspected of crime but that

28 there is reasonable cause to believe that the specific 'things' to be searched for and seized are

located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).

Accordingly, the Court finds that the November 2017 warrants provided the requisite specificity.

### 6. Material Omissions in the Menke Affidavit

Defendant Wendt argues that the search warrant is invalid and a *Franks* hearing is necessary because the Menke Affidavit includes several material omissions and false/misleading allegations of fact. *See* Wendt Mot. at 44-50.

Defendant Wendt claims that the Menke Affidavit contains false statements about the role of Sergeant at Arms generally and specifically with regard to Wendt and his role as the Fresno HA President and the Sergeant at Arms for the West Coast Region of the National Hells Angels Motorcycle Club. *Id.* at 45. Further, Wendt specifically lists the following alleged "material omissions of fact—exculpatory information—that was intentionally withheld" from the issuing magistrate: (1) a witness informed agents that he did not believe Silva was killed at all and that it was more likely he was told to leave and not return; (2) an informant provided information that he had been informed that Silva had been voted out the HASC for bullying individuals and was in bad standing, and that Silva had disappeared before for approximately one year before returning; (3) follow-up interviews of a source who stated that he heard about Silva's alleged disappearance without hearing any connection to Wendt and that he believed Silva's burned truck was related to Silva's practice of committing insurance fraud; (4) the statement of an informant who told law enforcement that he was asked by an HASC member to go with him to take Silva's body and dump it in the ocean and that he attended said dumping over the cliffs somewhere north of Sea Ranch, CA, and afterward was given the bloody gun to dispose; (5) information from an informant who stated that Damien Cesena was the person who killed Silva and also claimed to know where the body was buried; (6) the fact that agents knew that "CI-1" was not a member of Salem/Boston, Sonoma or Fresno chapters of the Hells Angels, but had been a ███████ member, and did not have meaningful access to the private meetings or information of chapters other than his own; and (7) the fact that agents met CI-1 in 2016 and he had a criminal record and was hoping to receive

27

consideration for information in the form of leniency based on his arrest.[6]  *Id*. at 46-47.

A defendant is entitled to an evidentiary hearing regarding the validity of a search warrant only if he makes a preliminary showing that:  (1) the affiant intentionally or recklessly included a false statement in the warrant application; and (2) the false statement was material to the issuing judge's determination of probable cause.  *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978).  Notably, "omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know" and "assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting."  *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000).  For example, in *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993), the court found that the officer acted with reckless disregard when he told the magistrate that a drug sniffing dog showed "interest" in the defendant's bag but failed to inform the magistrate that the dog had not gone into "alert."  *Id*. at 1234.  "Because of the highly relevant nature of the omitted information," the court concluded that "the omission occurred at least with reckless disregard of its effect upon the affidavit."  *Id*.  The defendant bears the burden of proof and must make a "substantial showing" as to both the required mental state of the affiant and the materiality of the alleged misstatements or omissions.  *United States v. Chavez-Miranda,* 306 F.3d 973, 979 (9th Cir. 2002).  "In doubtful cases, preference should be given to the validity of the warrant."  *United States v. Romero*, 382 F. Supp. 3d 966, 976 (E.D. Cal. 2019) (*United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003)).

Material omissions can likewise form the basis of a *Franks* hearing.  *United States v. Stanert,* 762 F.2d 775, 781 (9th Cir. 1985).  Specifically, a defendant must satisfy five requirements to warrant a *Franks* hearing:  (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the

---

[6] Wendt's counsel acknowledged that the statements claiming that Detective Menke omitted that CI-1 had a criminal record were incorrect and clarified that she intended to state that "Detective Menke omitted information that CI-1 had a felony arrest record" and had "already received (or was expecting to receive) consideration for what appears to have been an arrest on felony charges."  McClure Supp. Decl. at 2.

United States District Court
Northern District of California

false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause. *United States v. DiCesare*, 765 F.2d 890, 894-95 (9th Cir. 1985) (internal citations omitted). If, after excising the challenged statements, the remaining allegations in the affidavit support a finding of probable cause, the Court should deny the request for a *Franks* hearing. *Id.* at 895; *see also United States v. Medina Casteneda*, 511 F.3d 1246, 1250 (9th Cir. 2008) (no hearing required where, even considering omitted exculpatory information, the warrant contained probable cause). Whether a defendant is entitled to a *Franks* hearing is a mixed question of law and fact. *See Dozier*, 844 F.2d at 704. When considering a *Franks* challenge, courts must read affidavits in a "commonsense and realistic fashion." *Ventresca*, 380 U.S. at 108.

The Government argues that there were no material omissions in the Menke Affidavit and that Wendt's "principal argument" in support of a *Franks* hearing "is itself based on an obvious falsehood." Opp'n at 29. Moreover, the Government claims that "[a] commonsense reading of the entire Menke Affidavit leads to the conclusion that Det. Menke believed that the manner of Silva's murder and cremation he presented was accurate and consistent with the available evidence." *Id.* Further, the Government emphasizes that "there is no requirement that the detective must include [] different versions of [an] event that he does not credit, that were made by people without information, that were inconsistent with the evidence, or that were plainly false." *Id.*

As for Wendt's claim that the Menke Affidavit contains false statements about the role of the Sergeant at Arms in the HASC and in the Hells Angels Motorcycle Club in general, Wendt offers nothing to support this claim aside from counsel's allegations. Thus, he fails to make a "substantial showing" as to the required mental state of the Menke. Nor has he shown the materiality of the alleged misstatements. *Chavez-Miranda,* 306 F.3d at 979.

As for CI-1's criminal history and the fact that agents knew he was not a member of the Salem, Fresno, or HASC charters, the Menke Affidavit explicitly states that CI-1 had a criminal record and came forward with information about Silva's disappearance following an unrelated

29

arrest. Menke Affidavit ¶ 56. Notably, Wendt's counsel acknowledged that the Menke Affidavit did state that CI-1 had been arrested for criminal offenses in a supplemental declaration. McClure Supp. Decl. at 1. As to Counsel's point that the Menke Affidavit omitted that CI-1 specifically had a *felony* arrest record and that he had either received or was expecting to receive consideration for what appears to have been felony charges, Menke did note that CI-1 had a criminal record and came forward following an unrelated arrest. CI-1 faced criminal sanctions with a prior criminal record. While Menke should have included details of CI-1's record and nature of current charges, the fact of a felony arrest record and possibility that CI-1 was facing felony charges was not necessary for a finding of probable cause. His incentive to cooperate and provide information was evident. Moreover, the information CI-1 provided was specific and consistent with other information (such as CI-1's claim that Wendt shot Silva at the Fresno HA clubhouse in mid-July 2014 in the presence of Defendant Ott that is corroborated by cell phone records and cell tower analysis pertaining to Silva's cell phone, calls, and text messages that show that his cell phone pinged a Fresno cell tower and was in the same vicinity of Ott's cell phone on July 15, 2014 and that it was also in the vicinity of the Fresno charter clubhouse) and thus contained an indicia of reliability. As to whether CI-1 was a member of the Sonoma, Fresno, or Salem Hells Angels charters, there is no suggestion in the Menke Affidavit that he was such a member, and hence there was no material omission. CI-1's information as to the murder and incineration of Silva is based on conversations directly with Wendt himself and with then-Fresno Hells Angel Robbie Huff. *See* Menke Affidavit ¶ 58. As such, whether CI-1 had access to weekly HASC meetings is not material.

As for Wendt's claim that Menke omitted alternate theories regarding Silva's disappearance that did not involve Wendt and information from a confidential informant about Silva's disappearance, Menke's affidavit states that it "does not present all the facts known to me during the investigation discussed below, but just those pertinent to support probable cause." *Id*. ¶ 2. "An affidavit is not a bench memorandum that evenly lays out both sides of an argument. It is a fair assumption that Defendants would have a defense to the facts asserted in the affidavit, and the affiant is not required to present the Defendants' case to the magistrate judge." *USA v. Liang*

1   *Chen*, No. 17-CR-00603-BLF-1, 2020 WL 6585803, at *6 (N.D. Cal. Nov. 10, 2020). Here, the

2   omission of asserted facts regarding alternative explanations for Silva's disappearance does not

3   undermine the warrant.

4           First, Wendt has not established that Menke's omissions were intentional or reckless.

5   Considering the facts set forth in the police reports and the affidavit itself, Menke could well have

6   concluded that various confidential informants and sources describing the murder as charged were

7   more credible than the witnesses who put forth the various alternative theories for what happened

8   to Silva. For example, Menke could have found the alternative theories that Silva had disappeared

9   like he had done previously for year or that he left because he had been voted out of the HASC

10  improbable as Silva had not been heard from in about three years. As for the source that stated

11  that he heard about Silva's disappearance without hearing any connection to Wendt and that he

12  believed Silva's burned truck was related to Silva's practice of committing insurance fraud,

13  Menke could have found this source lacked credibility as to what precisely happened to Silva.

14  Notably, Exhibit H of the McClure Decl. at WA-0002969 shows that this source did not know

15  what exactly happened to Silva. Rather, the source states that Nelson told him that he "was tired

16  of Silva" and that Silva had been causing problems for the HASC and that "Nelson had to go to

17  Europe to address the issue." Exhibit H at 5; Docket No. 2068-11. Moreover, this source

18  arguably corroborates the Menke Affidavit as the affidavit notes that Silva's "status within the

19  HASC became perilous as his drug use became more severe. Leading up to the Summer of 2014,

20  the leadership of the HASC and related chapters such as the Fresno and Salem/Boston Hells

21  Angels began viewing Silva's erratic behavior as increasingly problematic." Menke Affidavit ¶

22  31. The source also notes that "Silva and Ott went to a party in either Fresno or Modesto" and

23  later Silva's truck was found burned and he "thought it was related to Silva's practice of using

24  insurance fraud to make money." Exhibit H at 5. This information arguably in part strengthens

25  the probable cause finding as the Menke Affidavit states, "According to CI-1, Silva went to the

26  Fresno Hells Angels clubhouse in mid-July 2014 with HASC member Russell Ott to meet with

27  Wendt. In the clubhouse, Wendt directed Silva to inspect some marijuana, and when Silva bent

28  down to do so, Wendt shot him in the back of the head." Menke Affidavit ¶ 58. Speculation that

United States District Court
Northern District of California

United States District Court
Northern District of California

the truck was burned for insurance could have been discounted given Silva's complete disappearance. As for the other sources in Exhibits I and J to the McClure Declaration that claimed they had some role in the disposal of Silva's body or other bodies of people killed on behalf of the Hells Angels, agents investigated these claims and found them to be meritless. *See* Exhibits I & J, Docket Nos. 2068-12, 2068-13. Thus, that was arguably not information that a judge would want to know. *See Russo*, 212 F.3d at 788. Because of the improbability of the alternative theories and the witnesses' lack of credibility, Wendt has failed to establish that the omissions were material to the probable cause finding.

Wendt's omission claims focus on the portion of the affidavit pertaining to the Silva murder. However, the November 2017 warrant sought evidence of a RICO conspiracy where the Silva murder was merely one of the enterprise acts explained in the lengthy affidavit. As noted, the Menke Affidavit included numerous facts establishing probable cause in support of warrant applications to search various premises for RICO enterprise evidence. *See* Menke Affidavit *id.* ¶¶ 60-65 (armed robbery), *id.* ¶¶ 66-67, 68-70 (witness intimidation), *id.* ¶¶ 71, 72 (drug tracking), *id.* ¶ 72 (bank fraud).

Accordingly, the Court finds that the alleged misstatements and omissions noted by Defendant Wendt do not satisfy the *Franks* standard. *See United States v. Bergren*, No. C 12-00119 SI, 2014 WL 1217981, at *6-*7 (N.D. Cal. Mar. 21, 2014) (holding that "even if the witness statements were inconsistent with the CI's statement, that would still not be enough to sustain the defendant's burden under *Franks*" because the defendant still needs to prove that the affiant intentionally or reckless omitted facts and that those facts were material to the probable cause finding).

### 7.    Good Faith Exception

The Government maintains that probable cause existed for all of the searches but claims in the alternative that suppression is not warranted since the agents executing the warrants relied upon them in good faith. Opp'n at 51. The Government argues that there is no indication that a reasonably well-trained officer would have known that any of the searches were illegal in light of all of the circumstances and notes that everything indicated the opposite. *Id*. at 52. The

1  Government notes that "this was a serious case with federal charges for which the Grand Jury

2  found probable cause; an AUSA approved the form of the warrant; and a United States Magistrate

3  Judge authorized the search of multiple locations." *Id.* As such, the Government claims that

4  "there is no warranted punishment here because any reasonable officer would have relied upon the

5  warrants in good faith." *Id.*

6         Where a warrant is unsupported by probable cause, evidence obtained from the warrant's

7  execution may be excluded. *Weeks v. United States*, 232 U.S. 383. Additionally, "the

8  exclusionary rule generally bars admission of the evidence seized that was beyond the scope of the

9  warrant." *U.S. v. Sedaghaty*, 728 F.3d 885, 915 (9th Cir. 2013). However, the good faith

10  exception to this general rule of exclusion applies where an officer acted in "good faith" or "in

11  objectively reasonable reliance" when executing an unconstitutional search warrant. *United States

12  v. Leon*, 468 U.S. 897 (1984) (holding that the officer's reasonable reliance on a warrant later held

13  to be invalid met the good faith exception). The burden of demonstrating good faith rests with the

14  government. *Kow*, 58 F.3d at 428. There are also exceptions to the exception: where the affiant

15  misled the magistrate, where the magistrate abandoned his or her judicial role, where the affidavit

16  is "so lacking in indicia of probable cause as to render official belief in its existence entirely

17  unreasonable," and where the warrant is so vague as to be facially deficient. *Leon*, 468 U.S. at

18  922-23.

19         As detailed above, the Court finds that the evidence presented in the Menke Affidavit did

20  not provide a substantial basis for the issuing judge to find that there was a fair probability that

21  evidence of HASC related drug trafficking would be found in the execution of the 2017 search

22  warrants pertaining to Wendt's home, vehicle, storage unit, and the Fresno HA Clubhouse. There

23  was no evidence that Wendt has anything to do with alleged HASC drug trafficking. Further, it

24  does not appear that Wendt himself has ever been charged or convicted of a drug related offense.

25  As such, the Court finds that the Menke Affidavit was "so lacking in indicia of probable cause" as

26  to Wendt's involvement with HASC related drug trafficking that the officers' "belief in its

27  existence [was] entirely unreasonable." *Leon*, 468 U.S. at 922-23. Additionally, as noted above,

28  the Court finds the seizure of Wendt's Fresno HA motorcycle excessive as it was needlessly

United States District Court
Northern District of California

33

cumulative.  In 2005, the Ninth Circuit explained in *San Jose Charter of Hells Angels Motorcycle Club* that intrusive and excessive seizure of indicia evidence may be "needlessly cumulative once enough evidence was obtained to establish membership."  402 F.3d at 972.  Here, Wendt's Fresno HA membership does not appear to be in dispute and the seizure of his Fresno HA motorcycle for purposes of indicia evidence is needlessly cumulative.  Given that the Ninth Circuit's precedent in *San Jose Charter of Hells Angels Motorcycle Club* involving the Hells Angels had been set almost a decade prior to the challenged searches, the Ninth Circuit's message was clear.  The Court finds that the officers did not act in good faith when seizing Wendt's Fresno HA motorcycle.

As such, the Court finds that the good faith exception to the exclusionary rule does not apply to the seizure of any drug evidence found at the locations searched pertaining to Defendant Wendt as well as his Fresno HA motorcycle.  Thus, the Court **GRANTS** Wendt's motion to suppress this evidence.

B.     Defendant Jonathan Nelson

Defendant Nelson moves to suppress evidence seized pursuant to November 2017 search warrant issued for the following locations:  (1) ███████████, Santa Rosa, California 9540; (2) ████████, Healdsburg, California 95448; (3) ██████████., Santa Rosa, California 95404.  Nelson Mot. at 5-7.

1.     Probable Cause as to Nelson's Locations

Defendant Nelson specifically claims that suppression is warranted because there is an insufficient nexus between the Bailache Avenue and Antelope Lane properties and alleged criminal activity to support probable cause for a search warrant for those locations.  *Id.* at 5. Nelson argues that there is an insufficient showing that evidence of any crimes will be located at the Bailache Avenue property (the business location for Nelson Brothers Painting) to support probable cause since there is no mention of "any criminal connection between Nelson Brothers Painting and the alleged HASC RICO enterprise" in the November 2017 warrant issued by Magistrate Judge Spero.  *Id.*  Further, Nelson claims that there is an insufficient showing that he resided at the Antelope Lane residence.  *Id.* at 6.  He states that the "affidavit provides scant evidence" that he resided at the Antelope Lane premises and notes that there "are a total of three

34

United States District Court
Northern District of California

bases for his residency" presented to Judge Spero:

> (1) a vehicle (black Chevy pickup) registered to "Nelson" parked in the driveway on a single day a month before the warrant; (2) a white Mercedes not registered to him (a non-HASC member named Damien O'Neill) on one occasion and subsequently seen at the HASC Clubhouse on Frazier Avenue; and (3) a single observation of Jonathan Nelson arriving in the white Mercedes and opening the door of the residence with a key, about a month before the warrant.

*Id.* Additionally, he states that this "thin presentation" that he resided at the Antelope Lane premises "is remarkable when compared to the evidence of residency of other locations for which searches were requested in the same affidavit." *Id.*

The Government argues that there was probable cause to search Defendant Nelson's locations and notes that the Menke Affidavit "contains facts demonstrating that Nelson was tightly connected with HASC" and discusses his close relationship with other HA charters. Opp'n at 20. The Government emphasizes that the Menke Affidavit notes that an "earlier search of Nelson's residence uncovered HASC paraphernalia, along with several firearms" and "surveillance of Nelson's business showed several HASC members coming and going from that location." *Id.* Further, the Government claims that Nelson "ignores that the point of the search was not for evidence of illegal weapons possession—it was for evidence of the RICO conspiracy . . ." and that "weapons possession is among the types of evidence that qualify under this umbrella, as is evidence of HASC association." *Id.* at 21. As for the search of the Antelope Lane residence, the Government states that despite Nelson's allegation that the probable cause in the Menke Affidavit was thin, it "nevertheless provided a sufficient connection between Nelson to his residence for Judge Spero to issue the warrant . . . ." *Id.* at 22. Finally, the Government claims that "the quantity of probable cause enabled agents executing the warrant on 2765 Antelope Lane to rely on it in good faith." *Id.*

The evidence here provided a substantial basis for the issuing judge to find that there was a fair probability that RICO enterprise evidence would be found in the execution of the November 2017 warrant at both the Bailache Avenue and Antelope Lane premises. As noted, the Menke Affidavit details Nelson's close connection to the HASC, noting his role as the charter president. Menke Affidavit ¶¶ 23, 31, 57. The Menke Affidavit specifically states that due to Silva's erratic

35

behavior and threat to kill Christopher Ranieri, Wendt "decided that Silva had to be killed" and "quickly secured the agreement" of HASC President Nelson, "who put a plan in place." *Id.* ¶ 31. Additionally, the affidavit details how Nelson, along with fellow HASC member, Damien Cesena, took all of Silva's HASC-related possessions from Silva's residence following his disappearance. *Id.* ¶ 38. Further, the affidavit notes that Nelson participated in another racketeering act, the November 26, 2017 assault on an HASC member Victim 4. *Id.* at ¶ 68. The affidavit states that Victim 4 was initially attacked by HASC members Raymond Foakes and Russell Lyles, but that Nelson joined the assault and hit Victim 4 in the left side of the face with a handgun, causing the bones around Victim 4's left eye to break. *Id.* ¶ 69. Nelson also struck "Victim 4 with a whip during the assault." *Id.* Victim 4 noted that not all HASC members took part in the assault on him and that at times during the assault, his face was covered with a hood or a sheet. *Id.* Additionally, while Victim 4 was detained at clubhouse being assaulted, HASC members Cesena, Fonteno, Diaz, Lyles, and Johnson went to Victim 4's house and took all of his HASC paraphernalia, including his motorcycle. *Id.* ¶ 70. Victim 4 was eventually transported to his residence by HASC members and then hospitalized. *Id.* ¶ 71. Menke states that he observed "significant injuries all over Victim 4's body; with the most visible being to Victim 4's face and abdomen. Victim 4 had fresh tattooing to the forehead, the left side upper chest, and middle of upper back." *Id.* Menke notes that there was still dried blood on Victim 4's face and that his nose was clearly broken. *Id.*

Additionally, Menke states that he sought a search warrant for the cell phone records of various HASC members, including Nelson, pertaining to the night hours on November 26, 2016. *Id.* ¶ 73. The cell records showed "numerous calls and text messages between HASC members prior to, during, and following the assault on Victim 4" and that the cell phones for various members, including Nelson, pinged "cell phone towers in the vicinity of the HASC clubhouse." *Id.* Menke states that this "is consistent with their having possessed their cell phones while being present for the assault on Victim 4." *Id.*

Additionally, Menke states that during a July 2, 2008 search of Nelson's residence Petaluma Police Department Officers located HASC paraphernalia, several firearms, and several

36

United States District Court
Northern District of California

boxes of ammunition. *Id*. ¶ 84(b)(i). Menke also states that based on his "training and experience; coupled with the [various racketeering acts and incidents detailed in the affidavit], it is [his] opinion that outlaw motorcycle gang members will often possess weapons, specifically firearms, for protection and as tools used in crimes with fellow gang members. *Id*. ¶ 84(v). Menke notes that "Gang members will in some cases retrieve weapons from a fellow member and keep them at their residences or in their vehicles or on their person when they believe the member would no longer be subject to a search. It is also my opinion that gang members will store, hold, keep, and conceal weapons to be used by the entire membership should the need arise." *Id*.

As for the Bailache Avenue business location, Menke specifically states that surveillance of Nelson's business, Nelson Brothers Painting, showed that several HASC members including David Diaz, Ott, and Nelson had vehicles that were registered to them parked at various times near the business. *Id*. ¶ 93. Additionally, on September 26, 2017, CI-2 related that "Nelson had a gun in the desk in the front office of this location and a second gun in the shop somewhere. CI-2 also knew there were motorcycle parts in the connex boxes next to Nelson's shop." *Id*. The Menke Affidavit also notes that the "motorcycle is often taken from [a] removed [HASC] member's residence. In several cases, the motorcycles are taken following a violence incident in which the removed member may be assaulted or killed." *Id*. ¶ 84(g)(ii). Menke notes that HASC member Cesena was "in possession of parts from Silva's motorcycle following his murder" and states that "possession of these motorcycles and/or parts of motorcycles can be evidence of corresponding crimes." *Id*.

As for the Antelope Lane residence, the Menke Affidavit specifically states that this location is Nelson's residence and notes that his vehicle is registered to a P.O. Box associated with a Healdsburg, California address. *Id*. ¶ 95. Menke states that he conducted "a passing check" at this location and saw a black Chevy pickup truck that is registered to Nelson parked in the driveway on October 5, 2017. *Id*. Additionally, physical surveillance of the residence was conducted and an agent observed Nelson using a "key to open the front door" of the residence. *Id*.

Accordingly, the Court finds that warrant to search both the Antelope Laine and the Bailache Avenue premises was supported by probable cause. *See Bergren*, 2014 WL 1217981, at

1    *6-*7 (finding that search warrant was supported by probable cause where the affidavit was

2    sufficient for the issuing judge to conclude that evidence of gang membership would be found

3    during the execution of the warrant since the affidavit contained numerous details that the

4    defendant was associated with a gang and stated the affiant's belief that gang members keep gang

5    related items in their homes).  However, the Court notes that the probable cause supporting that

6    Nelson resided at the Antelope Lane residence is thin but sufficient.  *See Ventresca*, 380 U.S. at

7    109 ("[a]lthough in a particular case it may not be easy to determine when an affidavit

8    demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this

9    area should largely be determined by the preference to be accorded to warrants"); *Crews*, 502 F.3d

10   at 1135 (9th Cir. 2007) ("In borderline cases, preference will be accorded to warrants and to the

11   decision of the magistrate issuing it.").  In any event, suppression would not be warranted under

12   the good faith standard of *Leon*.

13   C.      Defendant Russell "Rusty" Ott

14           Similarly, Defendant Ott moves to suppress evidence seized from his residence at 129

15   Carrillo Street and the HASC clubhouse at 516 Frazier Avenue pursuant to the November 2017

16   search warrant that was issued by Magistrate Judge Spero.  Ott Mot. at 1.

17           1.      Probable Cause as to Ott's Residence

18           Defendant Ott moves to suppress evidence seized from his residence because he claims

19   there was no probable cause to support the search.  *Id*. at 8.  First Defendant Ott notes that the

20   warrant's date is incorrect as it is dated with the year 2016 instead of 2017 and claims that

21   Magistrate Judge Spero "was perhaps too detached" when issuing this warrant.  *Id*.  Second, Ott

22   states that the Menke Affidavit reads "like proffered expert opinion regarding the Hells Angels

23   Motorcycle Club in general" and the HASC in particular and claims that Menke failed to establish

24   that he is an expert in these areas.  *Id*. at 9.  Additionally, Ott claims that the Menke Affidavit does

25   not allege that he was complicit in the murder of Silva and as such, the search of his residence was

26   a "fishing expedition."  *Id*. at 11.

27           The Government emphasizes that the Menke Affidavit describes Ott's close connection to

28   the HASC enterprise, "including his role as president for over a decade and a half" and his critical

United States District Court
Northern District of California

38

United States District Court
Northern District of California

1  role in the Silva murder and coverup. *Id*. at 22. The Menke Affidavit states that Defendant Ott

2  played a role in the murder of Mr. Silva by traveling with him to Fresno, where he would be

3  murdered, and in any event emphasizes that the "object of the search was evidence of RICO

4  conspiracy," not just the single act of Silva's murder. *Id*. at 25.

5  As for Ott's Carillo Street residence, the Menke Affidavit specifically states that it is an

6  apartment that "is located above the apartment Silva had been living in at the time of his

7  disappearance " and that Menke observed Ott driving a silver Harley Davidson motorcycle from

8  the HASC clubhouse area to his Carillo Street driveway. *Id*. ¶ 108. Notably, the Menke Affidavit

9  also states that "Silva's mother also reported that she learned that Silva's motorcycle was at the

10  HASC clubhouse at some point." *Id*. ¶ 39. Moreover, Menke notes that on October 5, 2017, he

11  conducted a passing check on the location and observed a motorcycle across from the driveway

12  that was "under a tarp," suggesting that Silva's motorcycle could have been the motorcycle at

13  Ott's residence. *Id*. ¶ 108. As noted, the Menke Affidavit notes that HASC members confiscated

14  HASC motorcycles from removed members and that motorcycle parts from removed member's

15  bikes have been found in the possession of other HASC members. *See id.* ¶ 84(g)(ii).

16  Additionally, as noted above, the Menke Affidavit details the affiant's belief that gang members

17  hold onto and conceal weapons to be "used by the entire membership should the need arise" and

18  that firearms and the type of personal item often stored in a residence or vehicle. *See id*. ¶ 84(v).

19  Thus, the Court finds that affidavit provided a substantial basis for the issuing judge to find

20  that there was a fair probability that enterprise evidence would be found at Ott's Carillo Street

21  residence and as such, was supported by probable cause. Notably, as discussed below, the Court

22  need not analyze whether there was probable cause to search the HASC clubhouse as to Defendant

23  Ott since the Court finds that he does not have standing to challenge that search.

24  2. Ott's Standing as to the HASC Clubhouse

25  Defendant Ott argues that he has standing to challenge the search of his residence and the

26  HASC clubhouse. Ott Mot. at 8. Defendant Ott also submitted a declaration stating that as an

27  HASC member, he has a connection to the clubhouse, is free to use the facility, has a key, stores

28  personal items on the premises, and has slept and received mail there. Ott Declaration ¶ 3-10,

39

Docket No. 2070-2.

The Government argues that Defendant Ott has not shown that he has standing to challenge the search of the HASC clubhouse. Opp'n at 22. The Government notes that Defendant Ott has "not shown that any seized evidence was 'personal property or otherwise kept in a private place separate from other work-related material.'" *Id*. at 23 (citing *SDI Future Health, Inc.*, 568 F.3d at 698). Additionally, the Government emphasizes that Defendant Ott also failed "to state whether he ever exercised" his claimed right to exclude individuals from the clubhouse. *Id*. (citing *Pirk*, 282 F.Supp.3d at 593).

Unlike Defendant Wendt, at the time of the HASC clubhouse search Defendant Ott was only an HASC member (not the President). Ott does not demonstrate that as a member who is not an officer, he has special authority over the use of the clubhouse; nor has he shown that he has exercised his claimed right to exclude individuals from the HASC clubhouse. He does not state that he has exclusive use of the clubhouse or demonstrated an intent to keep any part secure from the interference of others. As the court held in *Pirk*, 282 F.Supp.3d at 593, a member does not have a sufficient expectation of privacy to have standing to challenge search of the HASC clubhouse.

Accordingly, the Court finds that Defendant Ott does not have standing to challenge the search of the HASC clubhouse. As such, the Court need not address Ott's probable cause challenge to the search of the HASC clubhouse.

D.    Cell Phone Evidence (Wendt, Ott, and Nelson)

    1.    Standing

The Government argues that "much of the data at issue" in Defendants' motions to suppress cell phone evidence "is not subject to suppression at all." Opp'n at 39. The Government explains that all three warrants sought three categories of information: (1) sent and received text messages; (2) subscriber and call-detail records; and (3) cell-site location records. *Id*. Additionally, the Government notes that it "did not receive any sent and received text messages or stored communications and files, so there is no material to suppress for that category of information." *Id*. The Government specifically claims that Defendants "lack standing to suppress

subscriber and call-detail records" because the Supreme Court has held that there is no legitimate expectation of privacy information that is voluntarily turned over to third parties. *Id.*

In *Smith v. Maryland*, 442 U.S. 735, 744 (1979) the Supreme Court held that when the petitioner used his phone, he "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business. In so doing, [the] petitioner assumed the risk that the company would reveal to police the numbers he dialed." As such, the Supreme Court held that the petitioner had no actual or legitimate expectation of privacy in the numbers he dialed. *Id.* at 745. Relying on the reasoning in *Smith*, the Ninth Circuit in *United States v. Reed*, 575 F.3d 900, 914 (9th Cir. 2009), held that there is no expectation of privacy in data about the call origination, length, and time of call.

As such, the Court finds that Defendants lack standing as to the subscriber and call-detail records.[7] Additionally, since the Government did not receive any sent and received text messages, there is nothing to suppress as to that category. Thus, Defendants only have standing to challenge the seizure of the cell-site location records.

2.    Probable Cause as to the Warrant for Ott's Cell Records

Defendant Ott claims that the 2014 warrant issued by Superior Court Judge Weller was not supported by probable cause because it rests entirely on Detective Menke's "bare bones" conclusions. Ott Cell Mot. at 7, Docket No. 2065-2. Defendant Ott claims that the "only suspicious event set forth in the affidavit" was that Mr. Silva's truck was found burning in a rural area of Merced County. *Id.* at 8. Additionally, he argues that Detective Menke made "unsupportable conclusions" that the crimes of kidnapping and murder had occurred given Johnny Crail's statement that Silva was in good standing with the Hells Angels. *Id.*

Menke details his training and experience in the affidavit. Ex. A, Ott Cell Affidavit at SW-1340-1341, Docket No. 2065-3. Additionally, the affidavit states that on August 5, 2014, Ann and Johnny Crail (Joel Silva's mother and stepfather) reported Joel Silva as a missing person because

---

[7] Defendants have not contended the Government violated, *e.g.*, 18 U.S.C. §§ 3121 [General prohibition on pen register and trap and trace device use; exception], 3122 [Application for an order for pen register or trap and trace device], and 3123 [Issuance of an order for a pen register or trap and trace device].

United States District Court
Northern District of California

they had not heard from him since July 14. 2014. *Id*. at SW-1341. The affidavit notes that at the time of his disappearance, Silva was an HASC member in good standing that held the position of Sergeant at Arms and was in the process of opening a tattoo shop across the street from the HASC clubhouse. *Id*. at SW-1342. Further, the affidavit notes that Mr. Crail stated that it was not unusual for Silva to go out of town for several days at a time, but that Silva had never gone this long without making contact with any family members. *Id*. at SW-1341. The affidavit also notes that Ann Crail, Silva's mother, stated she learned from the CHP that Silva's truck was completely burned and found in a rural area in Merced County. *Id*. The CHP had stored the vehicle. *Id*. at SW-1342. The affidavit notes that on August 14, 2014, Menke went to Los Banos to process the vehicle for evidence with a field evidence technician and a Cal Fire investigator. *Id*. The affidavit states that based on the state of the vehicle, it did not appear that the fire started in the engine compartment and was instead consistent with someone having intentionally started the fire in an effort to destroy evidence. *Id*. On August 15, 2014, Menke spoke with Silva's wife, Stacy Silva, who stated that she had last spoken with him on July 15, 2014. *Id*. She told Menke that she did not believe Silva had packed a bag and assumed that she would see him the next morning. *Id*. The affidavit notes that on October 14, 2014, Stacey Silva confirmed that Silva was still missing (three months after she last spoke to him). *Id*. Menke stated his belief that although Silva told his stepfather that he would be leaving for a week, that the fact that Silva was still missing for approximately two months, with no family contact, was highly suspicious and indicative of foul play since Silva did not take any belongings and his vehicle was found burned. *Id*. at SW-1343. Menke also noted in the affidavit that he spoke with Ann Crail on August 13, 2014, and she stated that she had been contacting other HASC members about Silva's disappearance. *Id*. Ms. Crail found out that Silva and HASC member Russell Ott had gone to a bar in San Francisco and after leaving, they went to Fresno. *Id*. While Silva and Ott were drinking at a house in Fresno, likely on July 15, 2014, Silva got a phone call and then got his truck and left Ott stranded in Fresno without a ride. *Id*. Ott then contacted Nelson and got a ride back to Santa Rosa. *Id*. The affidavit notes that Ms. Crail told Menke that this scenario seemed odd because she did not believe that Silva would leave Ott stranded because of his close connection with the Hells Angels. *Id*.

42

United States District Court
Northern District of California

1    Additionally, Menke notes that he obtained a search warrant for Silva's phone records on

2    August 20, 2014, and that the records show that on July 16, 2014, at approximately 1724, Silva's

3    cell phone was pinging a tower in Fresno and was "the last completed call to Silva's phone." *Id.*

4    The affidavit also notes that on August 12, 2014, Hells Angels gang participant Jaron Wisinger

5    was arrested in Madera County and during his arrest CHP officers located several pages of

6    documents with cell phone numbers of Hells Angels members. *Id.* Officers specifically found a

7    document that contained a section titled "Sonoma Co (707)" with the names of HASC members

8    and their phone numbers. *Id.* The name "Rusty" was next to the phone number 707-536- 8170

9    and Menke states that he believes that phone number belongs to Russell "Rusty" Ott, and is a

10    number utilized to communicate with other Hells Angels gang participants. *Id.* The affidavit

11    notes that Silva's phone records showed that Defendant Ott's phone (707-536-8170) called Silva's

12    phone on July 14, 2014, at 1659 hours. *Id.*

13    There was thus substantial evidence suggesting Silva was the victim of foul play and that

14    Ott had a role in it. Based on this information, Menke requested in the search warrant in question

15    seeking the cell phone records for Defendant Ott's phone (707-536-8170); the records could show

16    "communications between Ott and Silva and any possible co-conspirators before and at the time of

17    Silva's disappearance" and "will tend to show who was involved and identify possible suspects

18    . . . ." *Id.* at SW-1344.

19    As noted, the affidavit contains facts that: (1) Joel Silva was member of the Hells Angles

20    and had been missing for approximately two months without any contact with family members

21    and that was unusual; (2) indicate that Silva left without taking any personal belongings; (3)

22    Silva's last contact with a family member was on July 15, 2014, when he called his wife Stacey;

23    (4) Silva's truck was found burned in a manner consistent with arson in a rural area; (5) Silva's

24    mother reported that she learned Silva had been with Russell Ott on July 15, 2014, drinking in

25    Fresno and that she thought it was odd for him to leave Ott stranded; and (6) Silva's phone records

26    show that he was in Fresno on July 16, 2014 and Ott's phone communicated with Silva on July 14,

27    2014. Thus, the aforementioned evidence in the affidavit provided a substantial basis for the

28    issuing judge to find that there was a fair probability that evidence pertaining to Silva's

43

United States District Court
Northern District of California

1    disappearance would be found in the requested cell records.

2        Accordingly, the Court finds that the warrant was supported by probable cause for

3    searching Ott's phone records.

4        ### 3.   Probable Cause as to the Warrant for Wendt's Cell Records

5        Defendant Wendt moves the Court to suppress all historical cell site location information

6    ("CSLI"), all call detail records, text messages and other materials containing any content of

7    communications from telephone number 559-679-3936, seized from AT&T pursuant to a search

8    warrant issued by Sonoma County Superior Court Judge Averill.  Wendt Cell Mot. at 2, Docket

9    No. 2069-1.  This warrant contained an affidavit from Menke that is similar to the affidavit

10   included in the warrant to search Defendant Ott's cell records.  *Id.*  Defendant Wendt also moves

11   to exclude all AT&T phone records seized in this case without a warrant, or whose seizure appears

12   to have exceeded the scope of the warrant.  *Id.*  Wendt specifically argues that the October 2014

13   warrant for his cell phone records lacked probable because the affidavit failed to establish that he

14   "had any involvement in Joel Silva's disappearance."  *Id*. at 14.

15       In addition to the information noted in the affidavit for the warrant pertaining to Defendant

16   Ott's cell records, the affidavit for Defendant Wendt's cell phone records states that Menke

17   learned from Ann Crail that Ott and Damien Cesena had gone to Silva's residence approximately

18   two weeks after his disappearance and took all of Silva's Hells Angels paraphernalia.  Ex. A,

19   Wendt Cell Affidavit at SW-4529, Docket No. 2069-3.  Additionally, the Wendt cell phone search

20   warrant affidavit notes that Menke identified Wendt's phone number through the use of law

21   enforcement and FBI databases, and also identified Wendt as a member of the Fresno HA chapter.

22   *Id*. at SW-4530.  The affidavit also adds details regarding information obtained from Silva's cell

23   phone records, which were analyzed by an FBI special agent.  *Id.*  Silva's phone records showed

24   that on July 15, 2014, at approximately 23:05, his cell phone entered the Fresno area, and he was

25   communicating primarily with three people: Cesena, Wendt, and Kimberly Schwarze (Silva's

26   girlfriend).  *Id.*  At 23:12, the records show Silva's phone made a call to Wendt's phone.  *Id.*  Then

27   at approximately 23:36, Silva's phone again made a call to Wendt's phone.  *Id.*  The affidavit

28   notes that these are the last connected communications made or received from Silva's cell phone

and that the last outgoing call made from Silva's phone went to Wendt's phone. *Id.* Additionally, cell tower analysis of the calls and text messages show that Silva's cell phone stopped at the Fresno charter clubhouse. *Id.* From 23:36 on July 15, 2014, to 04:45 on July 16, 2014, Schwarze's cell phone sent 31 text messages to Silva's phone. *Id.* On July 16, 2014, Schwarze's cell phone called Silva's cell phone 20 times between the hours of 02:00 to 05:00. *Id.* Menke notes in the affidavit that amounts to over 50 texts and calls in a 4.5 hour time span, and he stated that this appeared consistent with someone who is concerned about Silva not answering the phone and who is "potentially worried about his well-being." *Id.*

Notably, the affidavit identifies Wendt as a member of the Fresno Hells Angels, notes that Silva's last call was to Wendt, and that Silva's phone stopped at the Fresno HA clubhouse, which was the last location of his phone prior to his disappearance. As such, the Court finds that there is a fair probability based on the aforementioned facts presented in the affidavit that Wendt's phone would contain evidence related to Silva's disappearance.

Thus, the Court finds that the warrant was supported by probable cause for searching Wendt's phone records.

### 4.    Probable Cause as to the Warrant for Nelson's Cell Records

Defendant Nelson moves to suppress AT&T records for subscriber Jonathan Nelson, telephone number 707-849-1008 because the January 5, 2017 warrant issued by Sonoma County Superior Court Judge Ornell lacked probable cause. Nelson Mot. at 8. Defendant Nelson claims that the warrant lacks probable cause because there is an inadequate connection between his phone and Silva's disappearance and no motive was stated for anyone from the HASC to kill Silva. *Id.* at 9. Additionally, Defendant Nelson specifically argues that the affidavit is "wholly insufficient" because Detective Menke merely "patches together a few phone calls and text messages made by" Defendant Nelson to Ott and Wendt "with vague and conclusory opinions about gangs and murder. *Id.* at 10.

In addition to the information contained in the affidavits attached to the Ott and Wendt cell record warrants, the affidavit attached to the warrant for Nelson's cell records contains additional facts, including information obtained from the warrant authorizing the search of Defendant Ott's

United States District Court
Northern District of California

United States District Court
Northern District of California

1   cell records.  *See* Attachment 2, Nelson Cell Affidavit at SW-547, Docket No. 2067-2.  Notably,

2   the affidavit states that on October 15, 2014, Menke authorized a search warrant for Ott's

3   cellphone.  *Id*. at SW-549.  Records from Ott's cellphone showed that his cell phone entered the

4   Fresno service area at approximately 1616 on July 15, 2014, and Silva's cell phone activity shows

5   Silva in approximately the same area at approximately the same time.  *Id*. at SW-550.  The

6   affidavit states that Ott placed a call to Nelson at 2256 on July 15, 2014 and placed additional calls

7   to Nelson at 0135, 0225, 0313, and 0340 on July 16, 2014.  *Id*.  The affidavit also identified

8   Nelson as President of the HASC.  *Id*.  Further, the affidavit notes that on October 29, 2014,

9   Menke authored a search warrant for the phone records of Brian Wendt that revealed that on July

10  15, 2014, Wendt placed and received several phone calls and text messages to Silva.  *Id*.

11  Additionally, the affidavit notes that on July 15, 2014, at 1010, Wendt received an incoming call

12  from Nelson and on July 16, 2014, at 1538, Wendt sent and received a text message from Nelson.

13  *Id*.  Menke states that "[t]his is consistent with Wendt and Nelson having communicated prior to

14  Silva's arrival in the Fresno area, and then shortly after his disappearance."  *Id*.

15          Additionally, on January 27, 2015, the affidavit notes that Menke contacted a close friend

16  of Silva's that relayed that the last thing Silva told him was, "[i]f the Club ever tells you I ran from

17  them, don't believe it."  *Id*.  The friend also stated that Silva was on edge when he came from

18  Laconia (June 14-22, 2014) and that he felt the issue Silva was dealing with was a "national" issue

19  and not local Sonoma County issue.  *Id*.  The affidavit notes that on April 2, 2015, Menke spoke

20  with another close friend of Silva's who said he had seen Silva two weeks before Silva had come

21  up missing and that Silva told him that if anything happened to him, he would know who did it;

22  meaning the HAMC was responsible.  *Id*.  Menke notes in the affidavit that as of August 23, 2016,

23  Silva is still missing and that Silva being missing for more than two years without family contact

24  is "highly suspicious."  *Id*

25          Notably, in contrast to the Ott and Wendt warrants for cell phone records, Menke sought

26  this warrant for Nelson's phone records two years after Silva disappeared.  There had been no sign

27  from Silva.  The affidavit attached to the 2017 warrant for Nelson's cell phone records identifies

28  Nelson as the President of the HASC and shows that Ott was frequently communicating with

1    Nelson at the time Ott's phone arrived in Fresno, which was around the same time that Silva's

2    phone was in Fresno on the day of Silva's disappearance.  Additionally, it shows that Nelson was

3    in communication with Wendt on July 15, 2014 and July 16, 2014, which is consistent with

4    communications prior to Silva's arrival in Fresno and shortly after his disappearance.  As such,

5    there is a fair probability based on the aforementioned facts presented in the affidavit that Nelson's

6    phone would contain evidence related to Silva's disappearance.

7        Thus, the Court finds that the warrant was supported by probable cause for searching

8    Defendant Nelson's phone records.

9        5.    Specificity as to the Cell Phone Warrants (Wendt & Ott)

10       Defendants Ott and Wendt both argue that the 2014 warrants for their cell phone records

11   were overbroad because they sought records before and after Mr. Silva's alleged disappearance.

12   Defendant Ott specifically claims the cell phone warrant was overbroad because it authorized the

13   seizure of telephone records from July 16, 2014 to October 15, 2014, "three months after Silva

14   disappeared" and "[t]his was bridge too far."  Ott Cell Mot. at 10.  He argues that this warrant

15   authorized a "fishing expedition" because it "exceeded the purported showing of probable cause."

16   *Id.*

17       Similarly, Defendant Wendt claims that the cell phone warrant was impermissibly broad

18   because the supporting affidavit that was authored by Menke indicated that the police were

19   searching for evidence relating to Mr. Silva's July 15, 2014 disappearance, arson, and possible

20   homicide, but "authorized the seizure and search of *all* stored communications and location data

21   relating to [] Wendt's phone number for a three month period."  Wendt Cell Mot. at 19, (emphasis

22   in original).  He specifically argues that the warrant failed to "link the data to be seized to the

23   person under investigation" and "included a broad time frame that is not temporarily related to the

24   alleged crime."  *Id.* at 20-21.

25       As noted above, unlike the warrants at issue in *SDI Future Health* and *Kow*, the 2014

26   warrants for Ott and Wendt's cell phone records specified three categories of information sought

27   (sent and received text messages, subscriber and call-detail records, cell-site location records) and

28   stated temporal limits.  Notably, the warrants appear limited in time to around two weeks prior to

United States District Court
Northern District of California

47

Silva's suspected disappearance and about two and half months after. The time frame limitation, given the nature of what the suspected crime was, appears sufficiently specific.

Accordingly, the Court finds that the October 2014 Ott and Wendt cell phone warrants provided the requisite specificity.

### 6. Material Omissions in Cell Phone Affidavits (Ott, Wendt, & Nelson)

Defendants Ott, Wendt, and Nelson all claim that Menke made material omissions in the affidavits that were included in the respective cell phone warrants and contend that a *Franks* hearing is warranted.

Defendant Ott claims that Menke deliberately omitted that the Cal Fire inspector's report noted that there were other possible nonintentional causes, such as electrical and mechanical causes for the fire in Silva's truck. Ott Cell Mot. at 12. Ott also claims that Menke's omission of a statement from Stacey Silva, that she did not know where Silva went the day before he disappeared or whether he packed a bag because she was asleep, was a material omission. *Id.* at 12-13. Additionally, Ott claims that Menke intentionally or negligently omitted the times of the two phone calls involving Silva's phone that were cited as bases for the cell phone search warrant. *Id.* at 12. Ott specifically claims that Menke's statement that Silva called Ott on July 15, 2014 at 11:00 a.m. is not supported by Silva's phone records since Silva called Ott's number at 9:10 a.m. and the "duration of the call was 0.13 seconds, so it likely did not go through." *Id.* Ott also notes that there was another call by Silva to Ott's cell phone at 10:23 a.m. that lasted a little over a minute. *Id.* Lastly, Ott claims that Menke relied on documents seized in a Madera County search without showing that there was "any reason to credit the accuracy and reliability of the information therein and that the documents were lawfully obtained." *Id.* at 13.

Similarly, Defendant Wendt argues that the following information was materially omitted from the affidavit included in the 2014 warrant for his cell phone records: (1) a Cal Fire report from the fire investigator who inspected Silva's truck on July 16, 2014 that included both mechanical and electrical as possible causes of the fire, in addition to arson; (2) a witness who had informed agents in August 2014 that he did not believe Joel Silva was killed at all, but that it was more likely he was told to leave and not return; (3) an informant who had provided information in

United States District Court
Northern District of California

October 2014 that Silva had disappeared previously for approximately one year before returning, and that his wife still believes he is going to come back at some point; (4) information from an informant provided to agents on October 3, 2014 who stated that Damien Cesena was the person who killed Joel Silva; and (5) the other individuals from Silva's phone records with whom Silva was in communication by phone on July 15, 2014.  Wendt Cell Mot. at 24.

Relatedly, Defendant Nelson argues that Menke omitted a "critical piece of information that would provide an innocent explanation for the communications between [him] and Russell Ott around the time of [] Silva's alleged disappearance" from the affidavit attached to the 2017 warrant for Nelson's cell records.  Nelson Mot. at 11.  Specifically, Nelson claims that Menke "omitted the information that Ann Crain told him during his August 13, 2014 interview" that was included in Menke's affidavit in support of the 2014 warrant for Ott's phone records but omitted from the Nelson cell phone record warrant application.  *Id*.  The omitted information was that "Ott was left stranded in Fresno" by Silva without a ride home and Ott contacted Nelson to get a ride home.  *Id*.  Nelson states that this information explains "why [he] was contacting [] Ott after Silva 'disappeared.'"  *Id*.  Nelson argues that since the 2014 affidavit included in the warrant for Ott's cell phone records and the 2017 affidavit "track each other substantially," the omission of this information "is either deliberately designed to mislead the reviewing magistrate, or recklessly indifferent to the truth."  *Id*.

As for Ott and Wendt's claim regarding Menke's omission regarding the Cal Fire report's note that mechanical and electrical were potential causes of the fire in Silva's truck in addition to arson, the investigator explicitly states in the report:

> I included ARSON, because of the smell of diesel in the area of the passenger compartment [where the fire started], and being a gasoline drive vehicle.  Also the drivers['] side door being left open with no one around the area was suspicious.  With my knowledge and training the doors are left open so the fire has more oxygen [to] sustain combustion . . . .  I included ELECTRICAL, because most of the electrical was destroyed by the fire and I was unable to determine if it was an electrical issue . . . .  I included MECHANICAL, because I am uncertain if this vehicle had any mechanical issues, and the damage was too severe to make any determinations.

Wendt Cell Mot., Ex. B at 3; Docket No. 2069-4.  Thus, Menke's assertion that the fire in Silva's

United States District Court
Northern District of California

truck was intentionally set was consistent with the CAL Fire report.  The other causes noted in the report were mentioned only because they could not be ruled out given the extensiveness of the fire and damage.  The omission of the mention of other possible causes in this instance falls short of the standard that "'[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'"  *Russo*, 212 F.3d at 788 (citing *Jacobs*, 986 F.2d at 1235).  The clear thrust of the report was that arson was the most likely explanation.  At the very least, Ott and Wendt have not established that Menke's omission of the other two causes was intentional or reckless.  *See United States v. DiCesare*, 765 F.2d 890, 894-95 (9th Cir. 1985) (holding that even if information is found to be intentionally and recklessly omitted, a *Franks* hearing is not warranted if the challenged information is not necessary to find probable cause).

As for Ott's claim regarding the omission of the statement from Stacey Silva, her statement does not call into question or contradict any of the information presented in the affidavit.  The fact remains Silva disappeared and has not been heard from for over two years.  As such, Ott has not established that the omission was material to the probable cause finding.  Nor has Ott established that Menke's inaccuracy regarding the timing of Silva's calls and the reliability of the documents seized in the Madera County search was material to the probable cause finding.  Again, there is also no basis to find an intentional or reckless omission by Menke.

As for Wendt's claims that Menke materially omitted alternative theories from witnesses and informants, as noted above, these alternative explanations were improbable, especially since at the time of the warrants in question, Silva had been missing for over two years.  Wendt fails to show that Menke intentionally or recklessly omitted this information.  As for Wendt's claim regarding the omissions of Silva's phone records showing other people with whom he was communicating on July 15, 2014, Wendt likewise fails to show that Menke intentionally or recklessly omitted this information or that it was material to the probable cause finding.

Regarding Nelson's claim that Menke materially omitted information about Ott's and Nelson's phone contact on the night Silva went missing that would have provided an innocent explanation for the phone contact, this information does not negate probable cause.  Arguably, it increased it.  While the information may provide an innocent explanation for the phone contact, it

United States District Court
Northern District of California

1   would have also presented the judge with information that one of the suspects in the Silva killing

2   (Ott) admitted to being with Silva around the time Silva disappeared; to traveling with Silva to the

3   location where he was killed; that he and Silva were in a vehicle that was later found burned; and

4   contacting another suspect (Nelson) shortly after the homicide.

5          Accordingly, the Court finds that the omissions noted by Defendants do not satisfy the

6   *Franks* standard. *See Russo*, 212 F.3d at 788 ("a police officer cannot be expected to present a

7   judge with complete background").

8                                    **IV.      CONCLUSION**

9          For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART**

10  Defendant Wendt's motion to suppress. In particular the motion to suppress is granted with

11  respect to drug trafficking evidence seized on Defendant's Wendt's properties and the seizure of

12  his Fresno Hells Angels motorcycle, but denied in all other respects. Additionally, the Court

13  **DENIES** Defendant Ott's and Defendant Nelson's motions to suppress and all Defendants' related

14  cell phone motions to suppress.

15         This order disposes of Docket Nos. 2065-2, 2067, 2068-2, 2069-1, and 2070.

16

17  **IT IS SO ORDERED**.

18

19  Dated: December 9, 2021

20

21

22  EDWARD M. CHEN
    United States District Judge

23

24

25

26

27

28

United States District Court
Northern District of California