**Pages 1 - 120**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )       **NO. CR 17-0533-EMC**
                                )
JONATHAN JOSEPH NELSON, ET AL.,)        **SEALED**
                                )
          Defendants.           )
_____)

San Francisco, California
Friday, March 11, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    OFFICE OF THE UNITED STATES ATTORNEY
                    450 Golden Gate Avenue
                    San Francisco, CA  94102
          BY:  **KEVIN BARRY**
               **LINA PENG**
               **AJAY KRISHNAMURTHY**
               **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Jonathan Joseph Nelson:
                    LAW OFFICE OF JAI M. GOHEL
                    819 Eddy Street
                    San Francisco, CA  94109
          BY:  **JAI M. GOHEL, ESQUIRE**

                    RICHARD G. NOVAK, A PROFESSIONAL LAW
                    CORPORATION
                    P.O. Box 5549
                    Berkeley, CA 94705
          BY:  **RICHARD G. NOVAK, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
              Official Reporter

**APPEARANCES CONTINUED:**

For Defendant Raymond Michael Foakes:
                          BORO LAW FIRM
                          345 Franklin Street
                          San Francisco, CA  94102
                     BY:  **ALBERT J. BORO, JR. ESQUIRE**

For Defendant Russell Allen Lyles, Jr.:
                          LAW OFFICES OF MICHAEL CLOUGH
                          6114 LaSalle Avenue
                          Oakland, CA  94611
                     BY:  **MICHAEL W. CLOUGH, ESQUIRE**

For Defendant Jeremy Daniel Greer:
                          LAW OFFICE OF RANDY SUE POLLOCK
                          286 Santa Clara Avenue
                          Oakland, CA  94610
                     BY:  **RANDY SUE POLLOCK, ESQUIRE**

For Defendant Brian Wayne Wendt:
                          LAW OFFICES OF JOHN T. PHILIPSBORN
                          507 Polk Street, Suite 350
                          San Francisco, CA  94102
                     BY:  **JOHN T. PHILIPSBORN, ESQUIRE**

                          LAW OFFICES OF ALEXANDRA MCCLURE
                          214 Duboce Avenue
                          San Francisco, CA 94103
                     BY:  **ALEXANDRA MCCLURE, ESQUIRE**

For Defendant Russell Taylor Ott:
                          LAW OFFICE OF ROBERT WAGGENER
                          214 Duboce Avenue
                          San Francisco, CA 94103
                     BY:  **ROBERT WAGGENER, ESQUIRE**

For Defendant Christopher Ranieri:
                          LAW OFFICE OF JOHN G. WALSH, P.C.
                          63 Atlantic Avenue
                          Boston, MA  02110
                     BY:  **JOHN G. WALSH, ESQUIRE**

For Defendant Damien David Cesena:
                          DURIE TANGRI LLP
                          217 Leidesdorff Street
                          San Francisco, CA  94111
                     BY:  **GALIA AMRAM, ESQUIRE**

**APPEARANCES CONTINUED:**

For Defendant Brian Burke:
                        LAW OFFICES OF ERIK BABCOCK
                        707 Washington Street
                        Oakland, CA  94607
              **BY:  ERIK BABCOCK, ESQUIRE**

For Defendant David Salvatore Diaz:
                        LAW OFFICES OF JAMES S. THOMSON
                        732 Addison Street
                        Berkeley, CA  94710
              **BY:  JAMES THOMSON, ESQUIRE**

For Defendant Merl Frederick Hefferman:
                        LAW OFFICES OF JAMES BUSTAMANTE
                        1000 Brannan Street
                        San Francisco, CA  94103
              **BY:  JAMES BUSTAMANTE, ESQUIRE**

<u>**Friday - March 11, 2022**</u>                                    **1:00 p.m.**

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  The Court is calling the case United

States vs. Jonathan Joseph Nelson, Criminal action 17-533;

U.S.A. vs. Brian Wayne Wendt, and U.S.A. vs. Russell Taylor

Ott.  The Court has allowed all other counsel and defendants to

appear by Zoom.

Counsel, please state your appearance for the record,

beginning with the Government.

**MR. BARRY:**  Good afternoon, Your Honor.  Kevin Barry,

Ajay Krishnamurthy, and Lina Peng for the United States.

**THE COURT:**  All right.  Good afternoon, Mr. Barry.

**MR. CLOUGH:**  Good morning, Your Honor.  Michael Clough

on behalf of Mr. Lyles, who is watching on Zoom.

**THE COURT:**  All right.  Thank you, Mr. Clough.

**MR. GOHEL:**  Good afternoon, Your Honor.  Jai Gohel and

Richard Novak for Jonathan Nelson.  He is present and watching

by Zoom.

**THE COURT:**  All right.  Thank you, Jr. Gohel.

**MS. AMRAM:**  Good afternoon.  Galia Amram on behalf of

Damien Cesena, who is present via Zoom.

**THE COURT:**  All right.  Thank you, Ms. Amram.

**MR. BABCOCK:**  Erik Babcock for Brian Burke, who is

also present by Zoom.

```
1          THE COURT:  All right.  Thank you, Mr. Babcock.
2          MS. POLLOCK:  Good afternoon, Your Honor.  Randy Sue
3    Pollock on behalf of Jeremy Greer.  I would request his
4    appearance be waived today.
5          THE COURT:  All right.  So waived.  Thank you,
6    Ms. Pollock.
7          MR. WALSH:  Good afternoon, Your Honor.  John Walsh on
8    behalf of Christopher Ranieri, and I also request that his
9    presence be waived.
10         THE COURT:  All right.  So waived.  Thank you,
11   Mr. Walsh.
12         MR. WALSH:  Thank you, Your Honor.
13         MR. WAGGENER:  Good afternoon, Your Honor.  This is
14   Robert Waggener.  I'm appearing for Russell Ott, who is
15   appearing by Zoom.  Co-counsel in the case, Marcia Morrissey,
16   is not attending today's proceeding, but there is a piece of
17   information regarding that that I want to provide to the Court.
18   It has to do with some medical issues for Ms. Morrissey.
19     She took a serious fall in Southern California eight days
20   ago.  She was hospitalized.  She had surgical repair to her
21   hip, and so she's now been released, and she is home
22   recuperating with physical therapy and prescribed painkillers.
23   So I don't really know -- I talked to her this morning, and
24   it's -- I'll keep the Court apprised of what the situation is.
25         THE COURT:  All right.  Well, I'm sorry to hear that,
```

1  and I wish her a speedy recovery.

2          MR. BORO:  Good afternoon, Your Honor.  Albert Boro

3  for Defendant Raymond Foakes, who is present by Zoom in

4  custody.

5          THE COURT:  All right.  Thank you, Mr. Boro.

6          MR. THOMSON:  James Thomson on behalf of David Diaz,

7  who is appearing by Zoom, Your Honor.

8          THE COURT:  All right.  Thank you, Mr. Thomson.

9          MR. THOMSON:  You're welcome.

10          MR. BUSTAMANTE:  Good afternoon, Your Honor.  James

11  Bustamante on behalf of Merl Hefferman, who is appearing by

12  Zoom.

13          THE COURT:  Good afternoon, Mr. Bustamante.

14          MR. PHILIPSBORN:  Good afternoon, Your Honor.  Alex

15  McClure and John Philipsborn for Mr. Wendt, who is present in

16  custody, and I apologize for being late.

17          THE COURT:  Thank you, Mr. Philipsborn.

18      Has everybody made their appearance at this point?  All

19  right.

20      Before I start in with the motions in limine, let me cover

21  one thing, and that is the jury selection process.  I have

22  submitted to our jury administrator the questionnaire, the

23  proposed questionnaire largely adopting what the parties have

24  agreed to.  Some there wasn't agreement, but I've made

25  decisions about what's going to be in, what's going to be out.

1    I've also tweaked some of the questions and added a couple

2    myself, but it's fairly lengthy.  It's like 23-pages long, 70

3    questions or so.  But given the gravity of this case, I think

4    it's appropriate -- and it does mean there is going to be a lot

5    of pages to look at.

6        And so as a result, what I want to do is set a time prior

7    to the actual in-court *voir dire* for the parties to get

8    together with me to go over the written questionnaires to see

9    if there are some folks that we can just simply say don't

10   bother coming in.  And the more we can sort of vet that group,

11   I think the more efficient we can be in terms of the in-court

12   *voir dire*.

13       So I have -- and I don't know how long this is going to

14   take.  There may be -- given the number of people we're going

15   to have to try to summon in, which will probably be in excess

16   of 200 -- so you multiply that by 23 pages or so and you've got

17   a lot of reading to do.

18       But I have the morning of the 6th, Wednesday April 6th, as

19   well as most of the day -- the first half of the day, first

20   portion of the day of the 8th on Friday.  I think if we meet

21   those two times, that will be enough to get through -- at least

22   sort of weed out those that we can come to an agreement on or

23   that I decide have made such a showing, for instance, of

24   hardship or cause or anything else that we don't need to have

25   them coming in and taking up time and space.

1    So I'm going to set April 6th at 9:00 and April 8th at

2    9:00 as a hearing to go over the questionnaires and see if we

3    can come to some agreements on that.  So I want to get that on

4    calendar.

5        The other thing is the vaccination status -- I wanted to

6    bring that up -- of witnesses, counsel, and the parties,

7    including the defendants.  I would like to know what the

8    vaccination status is of the trial participants, putting aside

9    the jury question.  I raised that with you before, and we'll

10   talk about that at some point, but with respect to the parties,

11   counsel, and the witnesses, at least, that are intended to be

12   called, I'd like to know the vaccination status.

13       So first let's start with counsel.  For those who are on

14   either side, is there anybody who hasn't been fully vaccinated

15   that I should know about?  All right.  It sounds like everybody

16   is.

17       In terms of what about the three defendants?

18           **MR. NOVAK:**  Your Honor, this is Richard Novak for

19   Mr. Jonathan Nelson.  He has not been vaccinated.

20           **THE COURT:**  Okay.

21           **MR. NOVAK:**  When the Court is done with this issue, I

22   did have a question about the dates that the Court just set on

23   the 6th and the 8th.

24           **THE COURT:**  All right.

25           **MR. NOVAK:**  I'll hold those.

1          **THE COURT:**  All right.  What about Mr. Ott and

2    Mr. Wendt?

3          **MR. WAGGENER:**  Mr. Ott has been fully vaccinated.

4          **THE COURT:**  Okay.

5          **MR. PHILIPSBORN:**  Mr. Wendt has been vaccinated,

6    Your Honor.

7          **THE COURT:**  All right.  And can I assume, Mr. Novak,

8    that Mr. Nelson -- his status won't change before trial?

9          **MR. NOVAK:**  It's not going to change, Your Honor, and

10   I think to get into it in a public hearing is --

11         **THE COURT:**  I don't need to get into it.  I just need

12   to know the status.

13         **MR. NOVAK:**  That's not going to change.

14         **THE COURT:**  All right.  What about the witnesses?

15   Does the Government know the vaccination status of the

16   witnesses?

17         **MS. PENG:**  We do not, Your Honor.

18         **THE COURT:**  Okay.  Because that may influence what

19   I -- whether I require masks, etc., etc., what precautions

20   of -- because I am contemplating with the -- with the numbers

21   approaching where they are, that I may change the mask rule.

22   We can see how it -- it causes some difficulty even with the

23   clear mask in terms of clarity, so it's not ideal, but I -- you

24   know, what I would -- what I would like the Government to do

25   is, especially as we get to hopefully paring down that witness

1   list, which I guess we'll talk about next week, I'm hoping that

2   with some stipulations and things, the Government will pare

3   that down so it's a more reasonable number, that I find out in

4   advance which witnesses are vaccinated, and if there are any

5   that aren't, who isn't vaccinated.  So I will require that

6   information.

7       **MR. BARRY:**  And, Your Honor, if someone is unwilling

8   to tell us, then we'll just indicate that they should mask.

9       **THE COURT:**  Yes.  If they don't -- well, yeah.  If

10  they say they don't want to say, I need to know that, too.

11      **MR. BARRY:**  And, Your Honor, I think this could sort

12  of -- especially if there are administrative witnesses, if --

13  it sounds like this also can be sort of a game-day decision,

14  like if we find out, that can be a question we ask them right

15  before they take the stand.  If they're not vaccinated or they

16  don't want to say, we'll just give them masks.

17      **THE COURT:**  Well, I may require a rapid test.  I'm

18  looking at it, and I'm going to get some consultation about,

19  you know, health risks, and I'll have to make a decision about

20  any defendant.  I guess we have one who is not vaccinated,

21  whether we would have a rapid test, so I will put on the table

22  that's something I'm considering in addition to the masks.

23      All right.  So I just want to flag that so you can begin

24  to make some inquiries -- since you have such a long list of

25  witnesses, that we will need to know vaccination status.  Same

1    with the Defense witnesses.  Anyone that comes in the

2    courtroom, because I also want to be able to represent to the

3    jury, prospective jurors who may have concerns about COVID,

4    what are the protocols, what are the protections because that

5    may be relevant to their willingness to serve, their comfort in

6    serving, etc., etc., so that's another reason.

7        All right.  So you had a question about the dates,

8    Mr. Novak?

9        **MR. NOVAK:**  Yes, Your Honor.  And if I'm behind the

10   curve on some of my colleagues, I'm sure I will be corrected,

11   but the last time we were on the record discussing the jury

12   selection process, I believe that the Court said we would have

13   the completed questionnaires available to us by the 6th and

14   then we would meet in court on the 11th to deal with, I guess,

15   what I'll just call for-cause challenges, which is really what

16   I think the Court was talking about that can be agreed upon,

17   and now the Court is talking about doing that on the 6th and

18   the 8th.  So, again, if I'm being slow or redundant, I

19   apologize, but I'm wondering when we will have the completed

20   questionnaires prior to the 6th.

21       **THE COURT:**  All right.  Well, that's a fair question.

22   My indication is that we can get these -- because we're getting

23   it to the jury administrator in advance, I think we can get the

24   questionnaires back more quickly.  So that's a fair question

25   because obviously if we can't get them back until the 6th, then

1    that's not going to work because you need -- given it's going

2    to be a couple thousand pages, we are all going to need some

3    time to go over them.  I am assuming that you'll be able to get

4    this at least two days in advance, if not more, perhaps as

5    early as the beginning of April, but that's a fair question

6    because if there is not enough time, then it's not going to

7    work, but if we can do it, I'd rather get ahead of the curve

8    because otherwise, you know, if we end up -- frankly if, for

9    instance, we find that out of the 200 and something we can't

10   draw a pool, we've got to go back to the well and get more

11   people, and then the process ends up taking a lot longer than

12   we thought, and then pretty soon, you know, we're not actually

13   starting trial until the end of April or some date, and I don't

14   want to get into that.  So that's why I'm trying to push this

15   up, but I hear you in that you need a decent amount of time.

16          **MR. NOVAK:**  Yes.  And I think that -- I may be wrong

17   about this because I'm not looking at notes, but I think the

18   Court initially -- when we talked about this, the Court thought

19   we would have them on the 6th.  The Court said why don't we

20   meet on the 8th, and I made a pitch for at least having the

21   weekend to prepare, and Your Honor said okay, we'll do it on

22   Monday the 11th.  I'm saying if the Court wants to start on the

23   6th, that's fine, but, yeah, I think we need them --

24          **THE COURT:**  By the Friday before?

25          **MR. NOVAK:**  Yeah.  At least.  And I don't know what my

1   colleagues think, and some of them have been more involved in

2   the jury questionnaire work than I., so...

3        **THE COURT:**  Well, let's do this.  I would like you to

4   pencil in the 6th and the 8th.  It may be we don't do the 6th,

5   we do the 8th, or it may be that we don't do either, but I

6   would rather have that as an option if we can get these things

7   back early, the week before.

8        **MR. NOVAK:**  Does the Court know when the jury

9   commissioner will punch that button that sends out the

10  SurveyMonkey and what the deadline for responding will be?

11       **THE COURT:**  That's what I'm going to confirm.  She was

12  in the middle of -- she's a little preoccupied with a couple

13  other matters so I'm going -- I will email her today to see if

14  I can get an update on that.  But that's why I pressed you for

15  the joint -- and I worked over the last weekend to get it to

16  her so that she could get this thing ready to go.

17       So let me -- and I'll report back to you all by way of a

18  minute order or something.  But I hear you.  You need time.

19  You need at least a weekend to go -- a weekend and some days to

20  go over it.  But if you could pencil in the 6th and the 8th, if

21  worse comes to worse, we can't get it out until the 6th or get

22  it back until the 6th, then I guess we'll go with original plan

23  A, but I am concerned because we're not time qualifying these

24  people based on our earlier discussion, so we are going to get

25  a lot of hardship stuff, and I think in the Holmes case, even

1    with time qualification, they lost quite a few people on that.

2    Let's see what happens here.

3            **MS. PENG:**  Your Honor --

4            **THE COURT:**  Yes?

5            **MS. PENG:**  -- one administrative matter.  Will you be

6    filing for the record the actual questionnaire that you will be

7    sending out resolving the objections?

8            **THE COURT:**  I can send that.  I think I've heard your

9    views.  If you want to look at it, I'll -- we'll get that

10   out -- I'll get that out today.

11           **MR. NOVAK:**  I think it would help us, Your Honor, to

12   have the questionnaire so that whatever preparation we can

13   do --

14           **THE COURT:**  Yeah.

15           **MR. NOVAK:**  -- for scoring them, so to speak.

16           **THE COURT:**  All right.

17           **MR. BARRY:**  This is Kevin Barry, Your Honor.  The 8th

18   and the 6th, those hearings will be in person in Your Honor's

19   court?

20           **THE COURT:**  Yeah.  I think as we get to trial, we

21   might as well do these things in person.

22           **MR. BARRY:**  I think it's probably a critical stage,

23   Your Honor, so...

24           **THE COURT:**  Yeah.

25           **MR. PHILIPSBORN:**  Your Honor, two last questions --

1  John Philipsborn.  You -- I believe you made this clear to us,

2  but it sounds as though you are going to be doing a

3  hardshipping as part of the meeting on -- you're going to be

4  expecting us to join you in doing a hardshipping beginning on

5  the 6th, assuming everything goes forward as you planned?

6          **THE COURT:**  Hardshipping, and if there is some obvious

7  cause issues, yes.

8          **MR. PHILIPSBORN:**  Got it.

9      And the second thing is, Your Honor, do you happen to know

10  if the people in the jury services office could actually -- can

11  provide you with a list of the returned questionnaires in a

12  particular order so that essentially we have some idea of what

13  the priorities may be which might facilitate our being ready on

14  these days?

15          **THE COURT:**  Yeah.  You will get an order.  You will

16  get the list.  You will get the order.

17          **MR. PHILIPSBORN:**  Thank you, Your Honor.

18          **THE COURT:**  Now, the other thing is I'm going to use

19  and call jurors by number and not name.  You'll have the names

20  on the list and they may be on the questionnaire, but when we

21  get to court, it's going to be -- I'm going to refer to Juror

22  No. 1 as opposed to "Mr. Smith."  That's my intent at this

23  point.

24          **MR. BARRY:**  Your Honor, this is Kevin Barry.  We ask

25  that the parties do that, too, for the sensitivities that we

1    faced at the last hearing.

2            **THE COURT:**  Yes.  And I'm going to order -- you'll

3    have the parties' names, but that should be under protective

4    order.  I don't want names -- it should stay under protective

5    order.  So that is my intent.  You'll know who they are, but in

6    terms of, you know, addressing folks, it will be by number.

7        All right.  So let's talk about the MILs.  I'm not going

8    to go through every one of these.  We could probably be here to

9    the evening, if I did, but I'm going to go through a lot of

10   these, and some of these are just questions that I have so I

11   fully understand in order for me to rule.  So let me just

12   start.

13       I'll just start with the Government's MILs, and the first

14   one is about DMV records, and I'll just trying to understand,

15   are these just records to show ownership of vehicles and

16   addresses, or is there -- is there something else in there that

17   these are for?

18           **MS. PENG:**  They are just DMV records showing

19   ownership, Your Honor.

20           **THE COURT:**  And that's the purpose, to show ownership?

21           **MS. PENG:**  Correct.

22           **THE COURT:**  Let me ask about No. 2, evidence of

23   regularly-conducted actively.  These include medical records,

24   cell phone call detail, and there's reference here to some of

25   these records containing information that's beyond documenting,

for instance, medical injury.  There's some reference in here
about a narrative description from the victim's wife and other
stuff.

What's the Government's view about that?  Are these going
to be redacted or what's the plan?

**MS. PENG:**  Your Honor, our position is that all of
these statements are admissible under 803(4) and 803(6).
803(4) states that statements made for the purpose of medical
diagnosis and treatment are admissible, and that's a classic
exception.  I mean, certainly for purposes of medical
diagnosis, the background of what happened to the patient is
relevant, and it's considered a classic exception that's
permitted without sort of fine tuning the exact language in
there.

And, furthermore, medical records themselves are routinely
admitted under 803(6) as business records.  And, you know, the
Ninth Circuit has held that repeatedly.  So our position is
that these records are admissible wholesale.

**THE COURT:**  All right.  Response from one of the
Defense counsel.

**MR. GOHEL:**  Your Honor, I can talk about this.

There are certain circumstances in which the
information -- I am going to use one example as an assault
victim, alleged victim in this bar fight.

**THE COURT:**  Yes.

1      **MR. GOHEL:**  You know, I think that's what the Court

2  was referring to.

3      There is speculation embedded in there, there is lack of

4  foundation, and unless they can show that the doctor

5  specifically utilized that information, which has multiple

6  levels of hearsay and speculation and lack of foundation, and

7  even used it to make a diagnosis, then it's just pure hearsay

8  and it's inadmissible.  So we're going to make objections to

9  that.  I think it may have to come in case by case, but I just

10  wanted to alert the Court in our in limine that there are going

11  to be some statements that we are going to object to and ask

12  for a foundation be laid.  Not everything comes in a medical

13  record.

14      **THE COURT:**  Let me ask Ms. Peng.  If it's not

15  demonstrated that it informed the diagnosis or the course of

16  treatment, is there any basis to admit that portion of the

17  record?

18      **MS. PENG:**  Your Honor, I think if you look at the case

19  law, it's actually reverse; right?  What Mr. Gohel said that

20  there needs to be a showing that the doctor actually relied

21  upon what was stated in the medical record to make a diagnosis

22  before the exception applies, there is simply no legal

23  authority for that proposition.  Instead, if you look at the

24  cases time and again, medical records, including the patient's

25  description of background information that alleged the jury are

1    routinely admitted wholesale.  This requirement that Mr. Gohel

2    is pointing to, there is simply no legal authority --

3            **THE COURT:**  I don't have any doubt that the patient's

4    description of the background of what happened, you know, "the

5    reason why I have a fractured hip is because," you know,

6    "someone hit me and I fell," but if it -- if it amounts to, you

7    know, what somebody said to him before and what he said back or

8    the -- that -- I mean, it seems to me that it needs to be -- if

9    it's going to come in as a medical record, it has got to have

10   some nexus to a medical purpose.

11       Now, I haven't looked at these records specifically, but

12   I'm just trying to get guidance, and it doesn't seem

13   unreasonable to say that, you know -- and I don't know -- I

14   haven't looked at it, frankly.  I haven't looked at it, but if

15   it is something that doesn't, on its face, appear to be related

16   to treatment or diagnosis, then I have a harder time seeing how

17   that's, you know, relevant.

18           **MS. PENG:**  Your Honor, that's fair.  If there is a

19   report in there, which I don't think exists in the medical

20   records that we're proffering, that says, you know, patient one

21   says some other party stated X, right, that would be another

22   layer of hearsay, but my recollection is that the medical

23   records here are just routine descriptions of the events that

24   occurred that led to the injury that they're seeking treatment

25   for, putting it squarely within the classic exception.

1        Certainly if there are specific objections to something
2   like that, like a report of a third-party statement in the
3   medical record, that's fair.  They can object to that, and we
4   can resolve it that way, but overall, if it's a medical record
5   containing routine descriptions of what happened to them, that
6   comes in.
7        **THE COURT:**  All right.  Well, this is -- this
8   underscores why I want to have this procedure -- and we'll talk
9   about this at the pretrial conference -- of disclosure of
10  witnesses and exhibits that are going to be used well in
11  advance so that we can look at this, and I don't want to take
12  time in front of the jury to start talking about how we are
13  going to redact something.
14       **MR. GOHEL:**  Your Honor, just one last thing.  I mean,
15  the Government has introduced these medical records.  I'm just
16  using an example.  I won't use the person's name, but it's an
17  alleged assault, a different alleged assault, alleged victim.
18  I mean, there's, I don't know, 4- or 500 pages of medical
19  records that involve all kinds of personal medical -- I mean,
20  you're supposed to introduce medical records not wholesale.
21  Like, what is relevant to the assault?  If we are going to go
22  into a person's -- whether it's his allergies -- I think
23  there's at least a hundred pages about this person's issues
24  with allergic reactions.  I mean, we're not just going to admit
25  that stuff.  It's not relevant.

1      So the Government needs to hone this stuff down and it has

2  to be relevant -- otherwise, it's just going to be these big

3  stacks of medical records that are just -- clearly haven't been

4  narrowed down and focused to what's relevant.

5      **THE COURT:**  Well, without seeing it, I don't know.

6  Allergies may be relevant because that may affect the course of

7  treatment or may explain why somebody reacted in a certain way.

8  I don't know without looking at it.

9      Now, if you're saying that the Government appears to be

10  wanting to introduce a 300-page medical record on somebody when

11  the gist of it is like four pages about the injury, then that's

12  a 403 problem because I don't want the jury to have to deal

13  with thousands of pages of stuff, so I would ask the Government

14  to pare it down and make sure that what you want to get in is

15  really relevant.  And, sure, there is going to be some

16  background information that may be necessary, but, again, not

17  having seen this, I don't know, but there is a potential 403

18  issue, too, if the stuff is just overwhelming.

19      But I can't make that judgment until I see it.  But, you

20  know, have flagged an issue.  Hopefully the Government will

21  keep that in mind, and when you do meet and confer about these

22  exhibits, that's something you all can work out.

23      All right.  So the big -- of the big ones, of course --

24  and we've already had a hearing on Victim 6, and then there is

25  other incidents of alleged sexual violence in this case, MJ and

1  BT, and I guess my -- my question is, first of all, the --

2  the -- in this case, the -- the alleged perpetrator is not --

3  the two perpetrators with respect to those two victims are not

4  on trial in group one, so this goes really to the question of

5  enterprise and showing the depth and the activities of the

6  enterprise, but especially, since these two alleged

7  perpetrators are not in this group, I have a concern about

8  scope and what is the cumulative -- what is the incremental

9  value of this stuff when, as the Government acknowledges, that

10  there is a -- there is going to be a lot of evidence of overt

11  acts, a lot of evidence from insiders about shootings of a

12  homeless person, assaults, many, many, many assaults, drugs,

13  guns, fraud.  Why do we need this?

14        **MS. PENG:**  I'll take this, Your Honor.

15        So I think -- the first thing I'll say is that for the

16  purposes of the RICO conspiracy, I think the Second Circuit put

17  this -- right?  The crime is not the individual acts that are

18  committed by each individual defendant, but the crime that's

19  being targeted by the statute is the association by defendants

20  of a long-running criminal enterprise, and it's that

21  association in itself of a subculture of crime that really is

22  the crime that is being targeted here.

23        **THE COURT:**  Which is why I am allowing all the overt

24  acts, even though they don't  -- I know there has been a

25  renewed challenge by Mr. Wendt to the eleven.  I have already

1    ruled on that.  I'm not going to revisit that.  That stuff is

2    coming in.

3        My question, the incremental value of these acts against

4    the backdrop of all the other stuff coming in through CIs,

5    through experts, through all this stuff, the murder, the Mongol

6    stuff, why do we need this?

7        **MS. PENG:**  Your Honor, I think -- first of all,

8    Your Honor has already excluded some -- a good portion of the

9    Government's case through its order to show cause hearing and

10   the exclusion of what the Defense has described as a

11   significant insider witness.  So I would -- I would not agree

12   that, you know, the Government at this point has an

13   overabundance of evidence to prove the existence of enterprise.

14       But to your question specifically, you know, the

15   Government needs to prove the existence of the criminal

16   enterprise, and the testimony of MJ and BT go towards that in

17   significant ways.  In particular, I think if Your Honor were to

18   look at all of these incidents in conjunction, they show a

19   significant probative value as to the agreement amongst the

20   parties with respect to the violence towards women.

21       And so if you look at the MJ incidence in particular, it

22   happened over a course of time in three different instances

23   with other members present, and then they specifically

24   facilitated the assaults that occurred to make sure that no one

25   stopped it from happening.

1    And so that is -- the assaults, although they may be of a

2  different nature, are specifically alleged in the superseding

3  indictment which alleges that it's the means of violence used

4  to control people.  And so this is another instance of that

5  violence.  It just so happens --

6         **THE COURT:**  There is nothing in the superseding

7  indictment about sexual violence another Victim 6; right?  I

8  didn't see that in there.

9         **MS. PENG:**  Correct.  But violence is violence,

10 Your Honor.  Just because it so happens that violence against

11 women often takes the form of sexual violence does not make it

12 different in kind of the violence that is alleged in the

13 superseding indictment.

14    And, you know, I can address the notice issue before, but

15 as Your Honor has mentioned, the fact that sexual violence is a

16 part of the means of this enterprise is abundantly noticed by

17 the fact that Victim 6's sexual assault is alleged specifically

18 in the superseding indictment.

19    So going back to the idea of the treatment of MJ and her

20 status as not just an "old lady" but as a girlfriend and the

21 systematic particular abuse that she suffered as that status is

22 part and parcel of the Government's case of how this enterprise

23 uses violence to control and intimidate members of the

24 community.  So that is it directly relevant.

25    And the fact that she was being punished during one of the

1     first assaults for breaking a rule of the enterprise also makes

2     it relevant to proving that the enterprise operated in a

3     specific way.  And the fact that this is repeated over time on

4     multiple instances at motorcycle runs that are Hells Angels'

5     activity with other Hells Angels' members present, again, makes

6     this extremely probative of the enterprise.

7          And then the other thing -- and the same arguments can be

8     applied with the BT instance as well.

9          And the other thing I'll say is that, you know, to exclude

10    the testimony of MJ or -- of the assaults that she experienced,

11    there is just no way to do that without wholesale excluding her

12    entire testimony.  So it's really, you know -- to say that she

13    can't talk about the assaults really is tantamount to

14    preventing her from sharing her experience as a victim of abuse

15    at the hands of the Hells Angels altogether because --

16         **THE COURT:**  Let me ask you this:  Is her testimony,

17    aside from the assaults -- she's going to -- it is the intent

18    for her to testify about the ongoings, the doings, the sort of

19    insider view of the HASC?

20         **MS. PENG:**  She will also be providing information

21    regarding how the organization -- how the organization

22    functioned and its rules because she had to abide by those

23    rules and experienced relationships with multiple members that

24    are at issue in this case.  So her testimony -- you know, she

25    is going to -- that's actually related to one of the other

1   challenges that the Defense has been bringing against her

2   testimony for lack of foundation for lay opinion testimony.

3   And that's also why these assaults are relevant to that,

4   because --

5       **THE COURT:**  Can you be more specific?  What is she

6   going to testify about -- if she didn't testify about the

7   actual assaults, what would her testimony be about?

8       **MS. PENG:**  She would testify regarding the status of

9   women and how they were treated by members.  So she would

10  testify about the structure of the old ladies and how they were

11  treated relative to girlfriends and other women that did not

12  have girlfriend status.  She would be testifying that she was

13  considered the property of Foakes and that, you know, that was

14  a common ethos that was shared amongst members towards women

15  that were associated with them.

16      And then -- so, you know -- and her experiences with

17  different members while she was associated with them.

18      **THE COURT:**  What does that mean?  Can you be more

19  specific, "experience with other members"?  What does that

20  mean?

21      **MS. PENG:**  I think she originally was in a

22  relationship with a different member of the Hells Angels before

23  she became the girlfriend of Foakes.  She was asked to live at

24  a marijuana grow as basically an indentured servant at the

25  direction of Foakes.  That was Russell Lyles' marijuana grow.

So she has multiple connections with multiple members of the Hells Angels and gives her a foundation to testify as a lay witness about how the enterprise operated.

**THE COURT:**  All right.  So she has a foundation to testify because she was there, she was told things, she saw things.  Assuming that foundation is laid, why would the actual -- there are, like, three -- three incidents -- at least three -- about the -- about what happened to her.  Why does that need to be -- why does that need to be included in her testimony?

**MS. PENG:**  It's because her experience can -- of being abused by members of the Hells Angels cannot be extricated from her testimony overall about the enterprise.  Her, more than, I think -- you know, maybe even more than MC -- actually more than MC -- her entire experience with the Hells Angels is intertwined with an experience unfortunately of abuse.  And it goes towards her credibility, and the flip side of that is that it goes towards her bias as well which the Defense inevitably will attempt to impeach her on.

And so the requirement that the Government, number one, lay a foundation for her opinions I think will include her experience of being assaulted, and, second, the fact that the jury is required to assess completely the credibility of the witness which, again, her -- her -- the significant portion of her experience are these instances of abuse that she suffered.

1   There is just no way for her to credibly testify as a witness

2   without going into these incidents.

3       And so that's another --

4           **THE COURT:**  All right.  Let me hear the response.

5   Those are pretty good arguments.  Why not?  There is probative

6   value here if it goes -- it informs the foundation of her

7   testimony about the workings of the HASC.  It goes to her

8   motive, potential bias, etc., etc.

9           **MR. GOHEL:**  Your Honor, maybe I can -- I think

10  Ms. McClure chime in.

11      So this, even more so than alleged Victim 6, involves

12  issues of 403.  This is -- these are incidents that were

13  only -- just a little background.  These are incidents -- this

14  person was interviewed at least a half a dozen times in lengthy

15  interviews starting in 2008, 2011, and the first time that she

16  brought it up was after this RICO indictment was charged in

17  June of 2020 at an interview, I think, that some of the

18  prosecutors in this case were involved in, and she brings up

19  this information.  So she never brought it up before.  She

20  never had any -- never raised it in any fashion.

21      Then -- and I understand that may go more to the weight

22  than the admissibility, but it also goes to the 403 aspect of

23  this.  None of these incidents, for example, allegedly involved

24  Jonathan Nelson.  She doesn't even name who the other alleged

25  Hells Angels that Ms. Peng is claiming were there -- she can't

even name a single person that was there, who they were.  One time she claims that it was while she was inside a tent, and so how are you going to know that there are Hells Angels outside and who they are is, quite frankly, preposterous.

So I think if we had an evidentiary hearing with respect to Victim 6, we definitely need to -- and I would request on behalf of Mr. Nelson since it's so prejudicial, the idea that some incidents that she doesn't give a specific time or -- time or place for, never gives a specific time, never gives a specific place --

**THE COURT:**  But she appears to testify that there were three incidents in which she was raped:  One in a tent, one in a hotel room and once at the clubhouse with other members of the HASC there, either surrounding or being there and not helping, and she doesn't identify any of the three, but that's a slightly different issue.

I mean, I understand that goes to the probative value to a certain extent, but it still -- it still seems relevant.  I mean, arguably -- conditionally relevant based on her testimony, and even in a 104 hearing, all one would have to say is could a jury have believed her, you know.

**MR. GOHEL:**  Well, but then the Court still would have to look at the 403 issue.  If the 403 is issue is there of a single incident in which Victim 6 was claiming that she was sexually assaulted during a time that there is an enterprise

activity allegedly going on that is charged in another aspect,
you have three individuals who are going to be in a trial in
which this person is going to testify that there were sexual
assaults of unnamed Hells Angels where she has no foundation to
even know specifically that they were Hells Angels or not, at
least on one of the incidents, and that evidence is just going
to come in without there being some determination by the Court
that this is -- that she has a proper foundation for the
information, that it's -- and that it actually has probative
value or if it's just something that was either made up or was
created, let's see, 12 years after her initial lengthy 302
interviews.  So I think that this would be an appropriate issue
for the Court to determine, just in the same vein that there
was with Victim 6.

**THE COURT:**  Are you saying that she should not be able
to testify about the -- for instance, the status of women
generally, the -- what it means to be an old lady, being
treated as property and told what to do, that kind of stuff?

**MR. GOHEL:**  Well, it is unclear, at least from her
interviews, what her -- she didn't -- she didn't testify in
front of the grand jury, but it's unclear what her -- the basis
for that information is as it relates to other women or wives
or girlfriends.  She has what she claims to be her personal
experience, but there is no indication that she has any
information about what other women -- how other women are

1  treated with the Hells Angels, at least in the 302 reports that

2  I've seen.

3       So I do think that there is a foundation problem with

4  respect to that as well.  So not only the specific instances --

5  she has some information about the marijuana grow that

6  Mr. Lyles was allegedly involved in, and she has some

7  information possibly about, I think, one of the other overt

8  acts that relates to the mortgage fraud where she worked there

9  during a period of time.  But other than that, these opinions

10  lack foundation and certainly would need to be explored prior

11  to something like this being admitted that, you know, all Hells

12  Angels treat their women like, you know, property and they

13  sexually assault them and/or domestically abuse them.  And then

14  also her specific instances where it's incredibly prejudicial

15  and she doesn't even really have a foundation to know who these

16  other alleged Hells Angels were, what their activities were

17  with respect to keeping them away.  So I think it -- it's

18  something that would require a hearing.

19            **MS. PENG:**  Your Honor, may I respond?

20            **THE COURT:**  Yep.

21            **MS. PENG:**  So, first of all, on the objection, again,

22  of lacking foundation, I mean, counsel is really saying -- like

23  the foundation can be laid; right?  She has personal experience

24  with Hells Angels members, multiple of them.  She functioned in

25  that role as the girlfriend and testifies about that

experience.  To the extent that she doesn't know personally the experience of every other woman who has ever associated with the Hells Angels, that goes to weight, not admissibility.

So they are trying to preclude on the one hand her for lack of foundation and also preclude the very information that would provide the foundation for her knowledge in that it's her experience with those members.

And I will just say something on the 403 issue, too.  So, you know, with respect to the sex assault, like I said, it's violence of a different kind, but also there is guidance on this, Your Honor.  The Ninth Circuit, when it assesses cases of sex assault under Rule 413, which I understand the Defense says does not apply here, but even conceding that, we agreed that in those 413 cases, Rule 403 still applies and the Ninth Circuit says it still applies.  But, nevertheless, in those cases where sex assault is directly alleged, the Ninth Circuit allowed in prior evidence of other sex assaults notwithstanding Rule 403, finding that it's not unfairly prejudicial.  And in those cases, I would say it's much more unfairly prejudicial than in this case because there they are talking about the exact same offense.

And I would say here that, you know, they -- there -- sorry -- in those cases they were admitted anyways, and the Ninth Circuit provides context for how to assess sex assaults. I think Your Honor should look to those cases in terms of

1    evaluating the relative level of prejudice.  And here --

2           THE COURT:  But part of -- part of the context goes to

3    probative value.  Probative value of what?  In a sexual assault

4    situation, it's highly probative because that is the very crime

5    that is at issue.  Here the sexual assault is being used to

6    show an enterprise, sexual assault by others to show an

7    enterprise by way of conduct that doesn't involve the direct

8    three.

9           Now, it is relevant, and that's why I've allowed overt

10   acts to come in, but in terms of its overall probative value,

11   when you have lots of other enterprise evidence, that was my

12   point, the -- the incremental value to prove the enterprise is

13   less than when it is the sole evidence to prove the sexual

14   assault.  That becomes the main thing.

15          Here it's one of many things to prove one point.  So I'm

16   looking -- I'm looking at the incremental probative value on an

17   issue that is relevant to this case which is enterprise or not.

18          MS. PENG:  Right, Your Honor.  But the 403 analysis is

19   kind of a sliding scale in a way; right, because here, yes,

20   it's not directly proving the -- another sex assault, but also

21   because there are a host of other violent acts, including a

22   murder, that makes these particular acts in the host of a RICO

23   conspiracy less prejudicial as well because the jury is already

24   going to hear all of these other acts of violence.  I mean,

25   this is part and parcel of that.

1          So I think in analyzing those sex assault cases where the

2    Ninth Circuit did allow, I do think that they were more

3    prejudicial in those cases and more probative, but we still

4    have to look at the overall balance that is being struck here.

5    And, you know, 403 requires that the evidence be excluded only

6    if substantially outweighed by the risk of unfair prejudice, as

7    Your Honor knows.  And so I think the balance here weighs in

8    favor of admission.

9          And the last thing I'll say on this is that we have to

10   also look at the Government's case in terms of probative value

11   collectively.  So now you have MC, MJ, BT, right.  All of this

12   is very probative of a pattern of behavior, and the repeated

13   nature of these acts is important, too, because it shows that

14   the members knew what they were getting into when they decided

15   to associate with this enterprise, and that these are not

16   one-off events, that they repeat and they show a pattern, and

17   that means they corroborate each other as well, and so the

18   admission of all of these together makes it even more probative

19   to the Government's case.

20          **MS. McCLURE:**  Your Honor, may I respond briefly?

21          **THE COURT:**  Briefly, and then I'm going to move on.

22          **MS. McCLURE:**  We have gotten so far afield of what the

23   charged conspiracies are in this case, Your Honor.  It is

24   unbelievable to me that we are at the point where we have an

25   indictment, we have a bill of particulars, we've never had

sexual assaults and domestic violence against girlfriends and

wives as part of an enterprise.  That -- that wasn't the

Government's theory until this motion in limine arrived.

So we have notice problems here.  We have an issue of just

the frame, how do we analyze this?  The Government is assuming

it is somehow relevant to the enterprise.  It's other-act

evidence.  This is uncharged other-act evidence that has to be

analyzed under that framework.  I don't think we can just say

any act of violence is somehow part and parcel.

And, look, the Government's cases that they cite even show

you -- and I can't remember the name of it.  Maybe

Mr. Philipsborn will help me.  I think it's *Zelaya*, but it's a

case that talks about the limited purpose for which evidence of

some violent -- or some act in the past is introduced.  It

can't just be if it's violent it comes in at this trial.  And I

think that is a fundamental flaw in the Government's argument,

and we need to just sort of go back to what are we really

talking about here and what are the conspiracies charged here.

There is absolutely no evidence that all the members of

the Hells Angels know what is happening in the bedrooms of the

other Hells Angels members.  So this theory, the linking it

together and corroborating each other, it is -- it is a

fabrication, and I think at a minimum, we would need an

evidentiary hearing before this prejudicial, inflammatory-type

of evidence -- I mean, it really is mini trials, multiple mini

1    trials here of very personal, abusive situations -- allegedly

2    abusive situations that have no bearing on the scope of this

3    enterprise and certainly have nothing to do with Mr. Wendt,

4    which is our focus.

5        But there has to be a tie, and when it's violent crime,

6    there has to be some link to the enterprise, and that has not

7    been made here.  There is a creative argument, but it isn't

8    based on the law, as far as I read it, and I would encourage

9    the Court just to look at the cases cited in our brief.

10            **THE COURT:**  All right.

11            **MR. WAGGENER:**  Your Honor, could I make a brief point

12   on behalf of Mr. Ott?

13            **THE COURT:**  Very brief.

14            **MR. WAGGENER:**  Because Defendant Ott filed a specific

15   brief on this domestic violence and sexual assault issue, and

16   that was authored by Ms. Morrissey, who isn't here, but there

17   is also a 404 issue here, basically 404(b) character evidence

18   issue.  Basically that the proof of the argument from the

19   Government is that because Rusty Ott is a Hells Angels, he

20   beats his old lady and that every one of them does that.  So I

21   just refer the Court to that particular brief authored by

22   Ms. Morrissey on the 403 and 404(b) issues.

23            **THE COURT:**  I understand the 403 argument.  I don't

24   find that particularly persuasive.  I think the big issue is

25   403.  The simple matter at the end of the day is what is the

incremental value of what is trying to be proved if what is

trying to be proved is not Mr. Foakes' participation in the

conspiracy but Mr. Ott's participation in the conspiracy.  Then

it only goes to the existence of an enterprise, not that

perpetrator's participation, knowing participation.

So when you have a crime committed, allegedly committed by

the person who is on trial, it seems to me there is -- at least

an argument can be made there is sort of a double relevance

there.  It goes to both the existence of the enterprise as well

as that person's participation, knowing participation if they

are actually doing some of the acts.

When it's somebody else, then it only goes to the

existence of the enterprise, and therefore the probative value,

the incremental probative value goes down.  I'm not saying it's

nonexistent.  I understand the Government's argument, but

that's the -- that's the analysis, in my view.  And I've got to

weigh 403, and I think that's the key here, that probative

value, that incremental probative value versus the prejudicial

value.  So that's how I'm going to look at it.  So let's move

on.

The presentation of character evidence, I'm not sure what

we're talking about here.  I understand that there's --

Mr. Wendt says he's not seeking to present character evidence,

and so I don't know -- if that's the case, then the Government

has no basis for 404(a)(2)(A) or 405(b) exception.  So

1    what's -- am I missing something here?  I'm not sure.  I just

2    want to make sure -- am I correct that there is not going to be

3    character evidence introduced by the Defense?

4           **MR. PHILIPSBORN:**  Philipsborn for Wendt.

5       Correct, Your Honor.

6           **THE COURT:**  All right.  Then there is no need for

7    rebuttal.  There is no need for impeachment of that.

8           **MR. BARRY:**  Actually, Your Honor, let me just address

9    that briefly.

10       I think it's going to come up in two ways.  First, I

11   anticipate that the -- each of the defendants is going to argue

12   in closing -- in opening statements that these are family men,

13   like all the points that are raised in the brief.  I think

14   that's all going to come out in the opening statement, and

15   there's going to be no evidence to support any of that.  There

16   is going to be no testimony, unless there is character

17   evidence, about whether someone was a college graduate, whether

18   someone is a loving father, whether someone is an upstanding

19   member of the community employing a lot of people.  So that's

20   the one issue.  So if there is going to be no evidence of that,

21   then it shouldn't come up in opening statement.

22       And the second point is, you know -- and we're not going

23   to get into this now, but this incredibly late, you know, quasi

24   alibi evidence introduced by Mr. Wendt is through his family

25   members.  And the notion that they're not going to slide in any

kind of character evidence, I just can't credit that, because the same thing happened in Williams. You know, I moved in the morning of these witnesses -- I said these witnesses are going to give character evidence about how upstanding these people are in the community. The answer -- the Defense said no, that's not going to happen. And, sure enough, you know, their opinions about who these people were and what they were all about and -- that all came sailing in and we were not able to address it.

So if that happens, fine, but I'm just putting the Court on notice that these are the two ways I think it's going to be at issue.

**THE COURT:** Well, if it gets -- if it comes in as evidence, then that will open the door. I mean, everybody knows the Rules of Evidence, and I'll have to see how it plays out.

All right. Let me ask Mr. Nelson's motions in limine, there -- and this is -- part of this is in the co-conspirator exclusion stuff. There is a lot of cross-reference to various statements. But my understanding is that if the witness heard, for instance, Mr. Nelson or one of the other defendants say something and not double hearsay but sort of single hearsay, then -- then, you know, that comes in as an admission of a party opponent.

On the other hand, if it's double hearsay, if Verhagen

1    says he heard from Beek that he heard from Nelson, then it's a

2    double hearsay problem, and I can't tell from all this exactly

3    how it's going to play out, but I'm going to make that

4    observation.  There is that problem.

5        And then there is a question about what if you're in a

6    room and you can't tell who's making the statement or you're on

7    the phone or whatever it is, and somebody said X, does that

8    come in?  And so then it's harder to say that's a party

9    opponent if you can't identify that that was, in fact, one of

10   the three defendants on trial, but it still could come in if,

11   you know, there's a fair inference that it was somebody that

12   was part of the club and part of the enterprise -- alleged

13   enterprise and that the statement was made in furtherance of

14   that enterprise.  At least that's how I see it.  And from some

15   of this, it's a little hard to tell the exact context, but

16   that's my framework.

17       Does anybody have a different view of how this should be

18   analyzed?

19       **MR. NOVAK:**  Your Honor, this is Richard Novak, and

20   I'll try to address that quickly because I drafted that

21   particular motion and that particular reply.

22       I think that the Court is correct, that there's a

23   different evidence code analysis if you know that the statement

24   was made by a party.  I would point out that you still have a

25   question of whether the statement is relevant, right, so not

1   every statement by a party is admissible as a party statement.

2   There is -- there is an issue of relevance, and I'm not sure

3   that they -- that 403 issues come up in these statements which

4   we're debating, but you still have relevance and 403.

5       But you're correct, Your Honor, that if the witness

6   doesn't know who said it, it raises other issues, namely, the

7   question of whether it's made during and in furtherance of by a

8   member of the conspiracy.  And then where somebody -- and it's

9   typically BT, right, statements 52 through 64 -- overhears

10  conversations between two other people -- I think many of those

11  are supposedly Mr. Nelson and Mr. Lyles -- but she can't say

12  who said what, I think that creates serious problems, not only

13  as the co-conspirator statement because I do think it becomes

14  mere chatter among a couple people that doesn't move the

15  enterprise forward which is what I think the case law has to

16  say.  The statement has to have a purpose; right?  It's for the

17  purpose of.  It's not just chatter.  It's not just, you know,

18  telling old stories.  It's not even, you know, like, you know,

19  humor.  It's got to have a purpose.  And when BT doesn't even

20  know who said it, it has all those same problems.

21      So I think I am on the same page as the Court, and I think

22  that unfortunately, given what the Government has presented to

23  the Court, you know, we are left with many, many, many unknowns

24  as to who said these things, and I am very concerned, frankly,

25  that between now and then, you know, the witnesses'

1   recollections may change, and so I don't know -- I think the

2   Court just has to exclude those where it's clearly excludable

3   now and the others, you know, we may just have to wait and see.

4             THE COURT:  Right.  Determining whether something is

5   in furtherance of the enterprise -- I mean, that is still

6   possible even if you don't know who said it, but if they said,

7   "Well, let's go get the guns and the explosives and blow up

8   this house," I mean, that --

9             MR. NOVAK:  Context may inform that without knowing

10  who the speaker is, but a lot of those in that area, 52 through

11  64, sound like Mr. Nelson and Mr. Lyles, at least according to

12  BT, who have been friends since they were children -- and

13  that's not character evidence, Mr. Barry, that's just a fact.

14  They've been friends since they were children talking about

15  their experiences or something that happened.  That doesn't

16  mean they're statements made to move a criminal enterprise

17  forward.  And it's especially problematic where she doesn't

18  know who said it.

19            THE COURT:  Well, so --

20            MR. NOVAK:  Because it wasn't --

21            THE COURT:  -- taking an example, discussing of

22  dealing weed.

23            MR. NOVAK:  Which statement are you referring to,

24  Your Honor?

25            THE COURT:  No. 54.

1              **MR. NOVAK:**  I've got a gigantic chart here.

2              **THE COURT:**  I do, too.  One of those double-chart

3    things.  NOVARTIS.

4              **MR. NOVAK:**  Mr. Waggener taught me to use 11 by 17

5    paper.

6              **THE COURT:**  That's exactly what I have.  And, by the

7    way, that's how I'm going to issue the order, too.

8              **MR. NOVAK:**  54.

9              **THE COURT:**  54.

10             **MR. NOVAK:**  That we use 11 by 17 paper?

11             **THE COURT:**  Well, you are going to get it in digital

12   form.  You are going to have to print it out --

13             **MR. NOVAK:**  Okay.  54.

14             **THE COURT:**  "Lyles and Diaz discuss dealing weed."

15             **MR. NOVAK:**  First of all, that's Lyles and Diaz.

16             **THE COURT:**  Yeah.  All right, well -- all right.  52,

17   "Lyles, Nelson, others talk about dealing weed, cocaine,

18   steroids."

19             **MR. NOVAK:**  "Talked about."  I mean, that doesn't

20   really tell you anything.  Is that some other person's current

21   ongoing illegal controlled substances distribution or is it a

22   member of the club who's going to share the proceeds with the

23   club?  It could be everything from completely meaningless to

24   something that really is about the enterprise, and she doesn't

25   know.

1          **THE COURT:**  Let me get the Government's response to

2    that.

3          **MR. KRISHNAMURTHY:**  First, I think we also agree with

4    the Court's framework which is it's either a party opponent

5    statement if a witness can specifically identify the party

6    opponent who said it.  It's also possible if the witness hears

7    people who are only co-conspirators talking about a subject in

8    a way that advances the goals of the conspiracy, it can also be

9    a co-conspirator statement regardless of which of a small

10   subset of people said it.

11         With respect to specific statements, I mean, I think we

12   put the grand jury testimony of BT in front of the Court as

13   Exhibit F, and I know that we put a lot of paper in front of

14   the Court, and so all this is -- is sort of hard to keep track

15   of, but --

16         **THE COURT:**  Exhibit F to which docket?

17         **MR. KRISHNAMURTHY:**  I think it was our response to

18   some motion in limine.  I think it was Ms. Peng's declaration.

19         **THE COURT:**  Okay.  In response to this particular

20   motion in limine?

21         **MR. KRISHNAMURTHY:**  Correct.

22         **THE COURT:**  Okay.

23         **MR. KRISHNAMURTHY:**  The testimony in the grand jury is

24   that BT did not identify specifically who said what during

25   those conversations, and so that's accurate.  But the question

and answer was, "Do you know if members of the HASC deal drugs," and she said, "Yes."  "How do you know?"  "Because I overheard these people talk to each other about dealing drugs."

So I think the inference there is they are talking about dealing drugs in a way that advances their goals of dealing drugs, which is one of the --

MR. NOVAK:  Your Honor, if I might say one thing, Your Honor?  We had a -- are there was a bunch of briefing on the question of whether any criminal activity by a charged member of the enterprise is sort of attributable to the enterprise, and I don't know that that briefing led to any particular ruling, but I think this is an example of where the parties differ on the admissibility of what Mr. Krishnamurthy just said just because, for example, if you go to 54 -- and I'm just going to use this as a hypothetical.

Let's say that Mr. Lyles and Mr. Diaz are talking about Mr. Diaz having sold some weed.  Is that an enterprise activity, or does it depend on Mr. Diaz's, you know -- the relationship between Mr. Diaz selling weed and the -- and the enterprise?  I mean, is every, you know, gram of marijuana that Mr. Diaz sells to somebody attributable to the enterprise no matter what?  And there is no time, there is no context, there is no quantities, there is no who -- you know, there is nothing about the financing of it.  It's just -- you know, it's -- I mean, we are beginning to hear over and over again that every

single act and statement proves the existence of the

enterprise, and so we're sort of losing track of what is the

enterprise and what's the core activity --

**THE COURT:**  We have had this discussion, and I am

still of the view that there has to be some kind of nexus.

**MR. NOVAK:**  That's what I'm saying.  I should have

just said "nexus."

**THE COURT:**  There's a personal act -- and I understand

you're saying VICAR and RICO and all that.  At the end of the

day, still, somebody can do something that is totally personal,

nothing to do with the enterprise, and that does not

automatically demonstrate the existence of the enterprise.

I understand the Government's theory, but I'm not

convinced.  So the problem is, you know, if the witness

testifies that what they or she or he heard sounded like a deal

that concerned the -- the HASC, that somehow the HASC

facilitated this, it was part of the deal of, some of the

proceeds went to it, then obviously there is that nexus.

Absent that nexus, then there is a problem about whether this

is truly relevant or not.

**MR. NOVAK:**  And that's a problem with the way the

question was asked in the grand jury because the question is

just, "Do you know anything about any member of the enterprise

every selling dope?"  Even the grand jury proceeding doesn't

ask the nexus question.

1          **MR. KRISHNAMURTHY:**  Well, Your Honor, just two points

2     of clarification.  One is that the grand jury testimony is

3     actually Exhibit B to the Peng declaration, not Exhibit F.  My

4     apologies.

5          The second is if the Court looks up at statement 53, which

6     is -- sort of immediately precedes that testimony, which is,

7     you know, in the context of seeing other people sell drugs,

8     while -- BT is also going to testify that Lyles told her that

9     everything he does and all his money and resources and

10    everything goes to the benefit of HASC and his brothers.  So I

11    think --

12         **THE COURT:**  All right.  So there is your predicate.

13    There is your predicate for the nexus.

14         **MR. KRISHNAMURTHY:**  Correct.

15         **MR. NOVAK:**  I doubt that it's true, but I think that

16    statement might be admissible.

17         **THE COURT:**  Yeah.

18         **MR. NOVAK:**  But that doesn't mean -- well, whatever.

19    We will deal with the truth --

20         **THE COURT:**  We have a framework.  I mean, you know how

21    I'm going to look at it, and if there is some evidence of a

22    nexus that a jury could believe -- I don't say I have to agree

23    with it, I don't say that it has to be greatly credible, but if

24    there is some evidence that a jury could believe that provides

25    that nexus, then it becomes enterprise evidence.  If there is

1    no such evidence, then it fails.  That's just how I'm going to

2    look at it.  So this was a useful discussion.

3        Let me ask, weapons-related evidence, there is a

4    cumulativeness problem.  I understand, you know, the argument

5    about the ubiquity of weapons and use of weapons and firearm

6    possession, and I think that -- I mean, sort of similar to the

7    argument that we've had, although this one, you know, to the

8    extent that there is going to be evidence of use of weapons and

9    various things, I think the nexus is going to be a little

10   easier to demonstrate.  On the other hand, there is a concern

11   about, you know -- and I don't know how many photographs and

12   exactly -- because I haven't looked at the -- all the evidence,

13   but at some point, there is going to be a problem of cumulative

14   and unnecessary.

15       So I don't know what the Government is planning, but I

16   think the Government should be aware that it ought to exercise

17   some judgment and discretion in this because I'm just not going

18   to let stuff come in by huge numbers just to prove a single

19   point.

20       Racial animus.  Now, I understand this is a hot topic that

21   could be prejudicial.  On the other hand, I think the question

22   is whether the views that are depicted in some of those photos

23   and in the rules is something that's kind of either

24   institutionalized so that it is part of the enterprise dogma or

25   whatever or something that is widely held so it's not just some

individual spouting off.  And here there seems to be evidence
that -- that this was widely endorsed, not only because of the
number of photos but then there is the house rules about
certain people being excluded, etc., etc., and it seems to me
that evidence of the rules and the -- whether they are formally
written or not of the organization is -- does go to the
existence or not of the enterprise.

**MR. NOVAK:**  Well, let me address that if I may,
Your Honor, and I think there are a couple of different ways to
cut this up.

First of all, the evidence of, quote, rules of certain
ethnic groups that can't be members are, as I pointed out in
the reply brief, documents found in other clubhouses, not in
Sonoma, that are decades old.  I mean, many decades.  And I
would ask the Court to look back -- and it's in my reply -- as
to where they were found and the date on those documents.  They
were not current rules found in the Sonoma clubhouse.  So I
think that there's a -- there's a balancing issue there.

I would agree that if there is a photograph of a couple
members, including one or more who are defendants, and behind
them or on the vest that they're wearing are some lightning
bolts on a sticker or on a patch, that's one thing because, you
know, there are some things that some people might consider,
you know, symbolic of intolerance that are integrated, you
know, into patches or stickers, but that's very different from

1   an unknown person wearing a white robe and a hood with a noose.

2   Like that has no role in this trial at all.  That is just pure

3   throwing stuff against the wall, you know, and hoping it

4   splatters on the defendants.  There is nothing about those

5   photographs that has any role in this case at all.

6       And then I think there is a bunch of stuff in between that

7   again, you know, like can you tie it to the people on trial,

8   and so I think -- also let me just say one more thing, and then

9   I will be quiet.

10      I don't think there are that many of these items, if the

11  Court looks at the chart that I attached to the motion in

12  limine on this.  I think that we can deal with these as they

13  come up with the exception of the ones that are at the

14  extremes, like I just described.

15          **MR. GOHEL:**  And --

16          **MR. NOVAK:**  Does that make sense, Your Honor?

17          **THE COURT:**  Yes.  Let me hear the response.

18          **MR. NOVAK:**  I think Mr. Gohel wanted to supplement.

19          **MR. GOHEL:**  Can I add one thing?  Sorry.  I will try

20  to be brief.

21      If the Government is going to go down the road of clearly

22  trying to cherrypick a bunch of pictures and rules that suggest

23  that these guys are racially motivated, then I'm assuming the

24  Court is going to allow us to present evidence -- I'll just

25  give a couple examples.  There are several charters in Mexico,

there are several charters in Japan.  That there are probably a
significant minority of members in the Hells Angels who are of
Hispanic origin, and we will seek to introduce this evidence in
order to refute this -- this -- this allegation that the Hells
Angels are some sort of a racist organization.

And also even if it's unpleasant, there is a First
Amendment issue.  If someone thinks that -- you know, whether
it be lightning bolts or some sort of off color -- that might
be not appreciated by most of society, there is still a First
Amendment issue with a lot of these things.  Like, we think
this is, you know -- having old German -- German, you know,
paraphernalia from World War II is shock value.  So there is a
First Amendment aspect.

But I do think the Court should be prepared that the
Defense may seek to introduce a lot of evidence to counter this
point if the Court will allow it because the Government is now
suggesting that this is a racist organization, which is
contrary to the actual evidence of the organization as it
stands today.

**THE COURT:**  All right.  Let me hear from the
Government.

**MS. McCLURE:**  Your Honor, I may I say I join in the
comments of my colleague.  It's improper evidence --

**THE COURT:**  All right.  So I would like a response on
the age of the rules and the idea that these are outdated and

1  no longer relevant and the notion that, you know, this is going

2  to now invite for rebuttal.

3      **MR. BARRY:**  Your Honor, the Defense can rebut the

4  Government's case however they want.  If they want to bring in

5  evidence of who the Hells Angels are around the world, fine.

6  We're fine with that.

7      Now, the issue here -- and with respect to the First

8  Amendment issue, the defendants, the Hells Angels can say

9  whatever they want, but this is what they've said.  This --

10  these -- this is how they identify themselves.  In fact, it's

11  important that -- I'm glad Mr. Gohel brought up the First

12  Amendment because association -- the right of association in

13  the cases that I cited includes shared ideals and shared

14  concepts, shared beliefs.

15      **THE COURT:**  I'm not as concerned about the First

16  Amendment in this context.  What about the age, using evidence

17  of something that is old from a different clubhouse that has

18  nothing to do with the HASC and is decades old?

19      **MR. BARRY:**  Your Honor, I would direct Your Honor --

20  the Court to TC's grand jury testimony that was submitted in

21  conjunction with the 104 hearing, and my recollection is that a

22  black female prosecutor asked TC, the insider, whether someone

23  like her could be a member, and my recollection is no, the

24  answer is no, you can't because black people don't get in.  I

25  anticipate that every Hells Angels insider that we -- that we

bring to the stand will indicate that black people cannot be
Hells Angels in this particular -- particularly of this charter
because this is the charter that we are dealing with.  The
enterprise is confined to Sonoma County.  So it will be
current.  It will be active.  And the current posture is
consistent with the historical posture.

The -- and the -- the idea that, you know -- that someone
dressed in a KKK outfit is no connection to the defendants,
that's absolutely not true.  I mean, our motion showed that in
that we have people at a Sonoma County Halloween party dressed
up in KKK outfits, and we have Mr. Hefferman from Fresno in the
Fresno clubhouse with a KKK hood and a whip.  And I'm sure that
the Defense is going to argue strenuously that each charter is
completely independent and there is absolutely no indication
that anybody in Fresno is connected with Sonoma County in any
way, and here is direct evidence of a shared ideology, a shared
ideal.

And the -- as we argued, the Defense can't say that if we
pick apart ideals in our First Amendment rights to hold them --
if we pick these ideals, the jury can't hear about it because
they're going to be mad at the ideals that we pick for
ourselves.

**MS. McCLURE:**  Your Honor, not a single crime in this
case is alleged to have been racially motivated.  There has to
be --

1    **THE COURT:**  That doesn't end the inquiry.

2    **MS. McCLURE:**  It doesn't end it, but, Your Honor, this

3    is highly inflammatory evidence that is not probative.

4    Minimally --

5    **MR. BARRY:**  These are the symbols that this

6    organization --

7    **THE COURT:**  Hold on.  I've heard enough.  Let's move

8    on.

9    Text messages from Fonteno to Ms. Maras.  Were these after

10   the beating of -- alleged beating of Joe Fats?

11   **MR. KRISHNAMURTHY:**  Yes, Your Honor.  There has

12   actually been a narrowing of this -- of the dispute for this

13   issue just because we withdrew a couple of these text messages

14   in our most recent supplemental chart.  So we ended up

15   withdrawing all of the 6/29/15 text messages and then the

16   3/6/15 text message, which is number 307.  So I think the only

17   text messages that are at issue are the 4/15/15 text messages

18   which are all at or around the time of the assault.

19   **THE COURT:**  What do they say?

20   **MR. KRISHNAMURTHY:**  So in -- so for the exhibit that

21   the Defense submitted, those are numbers 205 to 259 -- sorry --

22   250 to 259, and basically they explained to the girlfriend that

23   because she and the member in Sacramento violated the rules, he

24   is going to be kicked out of the club.  She is going to have to

25   talk to all of Fonteno's boys in a room which we think is an

inference to the members of HASC at the clubhouse.  And that

she is going to be prohibited from speaking with any members of

the Hells Angels after the next Hells Angels officers meeting.

**THE COURT:**  All right.  What's the response?

**MR. NOVAK:**  I think that if it was just those three

statements, then we may have reached the end of the discussion,

but I think that there are more than just those three, and

maybe I need to look at what Mr. Krishnamurthy is saying

because in our reply when we acknowledged that the Government

had cut some out, I feel like there was still a large quantity

of Mr. Fonteno threatening this woman which, of course, has

nothing to do with the enterprise.  That's about their

relationship and the way he responded to it.

So if what Mr. Krishnamurthy is saying is it's only 250

through 259 inclusive, I can look at those again.  As I

recall --

**THE COURT:**  Your objection is the threats to her, that

appears to be personal and arguably doesn't further the

enterprise unless he's implementing some rule of the enterprise

like you can't come to a meeting anymore or you can't talk or

whatever?

**MR. NOVAK:**  Yes.  And I also think that -- and I think

that Mr. Krishnamurthy would agree with this -- that there are

some texts which are a mix of both of the two things that the

Court just said.  And so it may be that a couple of those texts

1    are partially admissible and partially need to be redacted.

2          THE COURT:  All right.

3          MR. KRISHNAMURTHY:  Your Honor, one note on that.  Our

4    position is also these are sort of rapid-fire texts all coming

5    in the course of one night.  If there is one text with a threat

6    against Ms. Maras that doesn't mention the club and the second

7    threat that follows immediately after it that says you're going

8    to be 86'd from the Hells Angels, our position is that

9    entire -- the entire course of that conversation is invoking

10   the Hells Angels to impose consequences on her for violating

11   club rules.

12         THE COURT:  Well, why don't we do this.  Mr. Novak,

13   why don't you look at 250 through 259, and if there is an

14   update in your position, let me know.

15         MR. NOVAK:  Of course.

16         THE COURT:  Let me know by Monday because I want to

17   start ruling on this stuff.  If there is not, then I'll rule.

18        Let me address this question about procuring legal service

19   for the defendants and use of attorneys that comes up in a

20   couple of different places.  You know, if the -- if there's

21   evidence of that -- that the club procured legal services, then

22   that is arguably evidence supporting the existence of an

23   enterprise because it shows, you know, a group activity or

24   associational activity.  I think that's different from the fact

25   that, for instance -- and I don't know what the evidence is

going to be and obviously we are not going to have any names.
That's a given.

That if several members happen to use on their own dime
the same attorney, I'm not sure that's very probative.  I don't
know if that's going to be the evidence or if it's going to be
more evidence that there was a fundraiser, defense fund raised
by the club for so and so, or there is a case that somebody
served as general counsel, you know, sort of by the club or by
the organization -- but I do see a distinction between sort of
organized active, organized retention of counsel, and the fact
that people happen to use the same attorney.

**MR. BARRY:**  This is Kevin Barry, Your Honor.

So just one point -- well, two points on that.

There is -- there has been -- there is evidence that some
associates were directed to use a specific attorney.  In fact,
one of the witnesses that the Court excluded -- and this is --
this goes back to a question that, you know, the Court has like
*Why do you need this?  You've got so much evidence*, but I think
the Court doesn't necessarily appreciate the impact that the
prior orders of exclusion have had on the Government's case.

So we had a witness who was directed to hire a specific
attorney for a criminal case.  The person did, and the person
didn't pay this person in the right way or didn't contact them
quickly enough, wasn't following up, and Nelson assaulted this
associate because of that.  And so it's direct enterprise

1    evidence of -- related to having, you know, a house lawyer

2    working.

3         So the president directed this person to do something, to

4    retain counsel, and punished him for not doing so in the way

5    that Nelson thought was appropriate.  And the testimony from

6    that witness won't come in.  The testimony about that may come

7    in if other people knew about it, but that's sort of -- you

8    know, there are consequences when the Court says *you don't need*

9    *this* or *you might not need this* or *it's cumulative*.  The Court

10   doesn't necessarily appreciate how things fit together in the

11   Government's case.

12        So we do anticipate that there will be evidence along

13   those lines, that -- that there were directions to use

14   particular attorneys, there were attorneys that were known as

15   club lawyers, there were attorneys who gave updates on other

16   criminal cases by -- by members, and, in fact, the Court heard

17   this testimony by Victim 5 way back in the -- one of the

18   ex parte filings in that there were updates about other

19   members' criminal cases in church by at least one lawyer.

20        Another -- a lawyer provided sort of impromptu lessons on

21   how to beat or how to address a firearms case to a member.  So

22   that's the kind of thing -- that's the kind of evidence that we

23   anticipate coming through.

24        And I agree with the Court, that it is directly relevant

25   to enterprise evidence.

1      **THE COURT:**  Because that's organized activity.  If

2 somebody goes to church and gives a lecture on something,

3 that's not just somebody retaining somebody and somebody else

4 retaining -- happening to retain that same person.

5      **MR. BARRY:**  Yes, Your Honor.

6      And an additional wrinkle, like, this isn't the case where

7 someone had -- let's say someone was directed to a particular

8 lawyer to handle all their personal injury matters, and it just

9 so happened that everyone used, you know, Bob Smith, the

10 personal injury lawyer.

11      This is criminal activity committed by Hells Angels

12 members in Sonoma County who are directed to or share the same

13 kind of lawyers, showing that they knew that other members

14 would commit criminal activity, and therefore it informs

15 whether there was an agreement among the people in the

16 enterprise that some members would commit racketeering acts.

17      **THE COURT:**  All right.  Let me hear briefly any

18 response to that.

19      **MR. PHILIPSBORN:**  Your Honor, Philipsborn for Wendt.

20      When I was first in this case, I forewarned the Court that

21 this was coming down the pike, and so I'll stand on the -- on

22 the arguments that we've made in writing.

23      But the extent to which this kind of evidence tars the

24 lawyers who are representing the accused in the courtroom

25 cannot be underestimated, so I'm assuming that the Court is

1    going to be prepared to instruct the jurors that all of the

2    accused in this case have appointed counsel and that whatever

3    evidence the Court admits over objection, that the -- that an

4    instruction will minimize the prejudice to those of us who are

5    representing our clients in the courtroom.

6        I just think that there is -- the return on the

7    Government's investment for this kind of evidence is minimal.

8    And having been involved in cases in the Second Circuit in

9    which these issues come up, they don't come up because some guy

10   repeatedly represents somebody in an alleged, quote/unquote,

11   crime family.

12       And I -- and -- my experience has been the trial courts

13   are very concerned, the district judges are very concerned

14   about the effects that this kind of evidence will have on the

15   lawyers and the clients who are facing prosecution in the case

16   at hand.  I would just ask the Court to consider those matters.

17       Submitted.

18           MR. GOHEL:  Your Honor, can I add this is another area

19   where we're going to have to open up a whole bunch of things to

20   refute this evidence.  We could get into evidence of what

21   actually happened as opposed to what some informant from the

22   Government claims happened with respect to attorneys who

23   supposedly gave symposiums at church, which their own expert

24   says no one goes to church other than members so it's a little

25   interesting that they've got a witness saying that there is

1    lawyers appearing at church.

2         And, you know, they -- perhaps the reason people use

3    lawyers is because they get good results.  You have police

4    unions that use the same lawyers.  Every single police

5    defendant in a criminal case in the Bay Area has a handful of

6    attorneys, maybe one or two, that are always used.  And I could

7    argue that some police agencies might be RICO enterprises as

8    well.  But I would suggest to the Court that we are going to

9    open up a can of worms, and I cannot agree more with

10   Mr. Philipsborn that there is going to be a pallor put on all

11   of these advocates.  I'm going to except myself from this

12   group, but the other five fine attorneys are going to be in

13   this case and they're going to be painted with this, and the

14   only reason the Government is doing this is to tarnish the

15   attorneys for the Hells Angels and to drag them down with this

16   because they don't need this evidence.  They have plenty of

17   other evidence of the existence of an enterprise.

18        So I would submit to the Court this is really dangerous

19   territory and a dangerous precedent.  And these men are on

20   trial for their lives, and their lawyers are going to

21   besmirched by this very minimally probative evidence that is

22   going to be presented that it's going to take a long time to

23   refute.

24             **THE COURT:**  All right.  I'm going to move on.  Thank

25   you.

1      Testimony of BT and Mertz about lay opinion based on

2  speculation.  To me that -- I've got to hear exactly what the

3  basis -- whether there is a sufficient foundation laid about

4  whatever they're going to talk about.  If this is information

5  that is received, you know, by their own personal observances,

6  that's one thing.  If it's based solely on what one person told

7  them, it seems to me that's something else.  And I don't know

8  what exactly the testimony is going to be.

9      But if BT -- if all of BT's testimony is just based on

10  what was told and not actual observations or overhearing group

11  conversations, this sort of thing, it just seems to me that's

12  problematic.

13      Let me --

14      **MS. PENG:**  Yeah.  I think both the grand jury

15  testimony of SM and BT have been submitted to the Court, and I

16  would submit that their grand jury testimony is not the

17  entirety of the foundation that could potentially be laid, but

18  just briefly on what the foundation would be, SM was best

19  friends with Victim 1 for about 15 years, both before and after

20  he joined the Hells Angels, and he actually himself personally

21  hung around the Hells Angels and considered himself a friend of

22  the club.  So he -- there is sufficient foundation for SM to

23  testify regarding that particular relationship.

24      And BT, as Your Honor has already heard a little bit about

25  today, was the old lady of Russell Lyles for about five years,

1    and so she was in an intimate relationship with him and

2    observed, as demonstrated through some of the co-conspirator

3    statements, precisely the types of conversations and

4    experiences that she personally overheard and saw.

5         And so I think with that basic foundation, it's sufficient

6    for these witnesses to testify, and any other objections as to

7    foundation or credibility can be addressed through

8    cross-examination.

9              **THE COURT:**  All right.  Response.

10             **MR. GOHEL:**  Your Honor, with respect to SM --

11             **THE COURT:**  Yes?

12             **MR. GOHEL:**  -- my understanding is that all the

13   information that he received, any statements he got and his

14   knowledge about the Hells Angels, at least from the discovery

15   that I've seen, came from the -- the alleged decedent in this

16   case, Mr. Silva.  I don't know if they're saying that Mr. Silva

17   is a co-conspirator.  I don't know what, you know -- but it's

18   based on hearsay.  It is -- it is not in furtherance of any

19   conspiracy.  And -- I don't know.  I just don't think there is

20   adequate foundation, especially since he -- he received, you

21   know -- that's the only person that he was supposedly tight

22   with.  And I think all the statements are attributable to

23   Mr. Silva supposedly telling him things about the Hells Angels.

24             **THE COURT:**  Well, it's been represented that he

25   also -- this person, this witness, hung around the clubhouse,

1  got to know the members, went to other chapter clubhouses,

2  including Vallejo, so it's not just one conduit.

3       **MR. GOHEL:**  Well, your Honor, the problem with this is

4  the Government's whole theory is everything from the

5  stitched -- you know, the stitched skull that their expert is

6  going to testify to, that this is a secret organization, that,

7  you know, people don't talk about club business, they are going

8  to introduce evidence about that, and then all of a sudden

9  there is a person of -- not even at the level of what you call

10  a "hang-around," is just some friend, all of a sudden has this

11  deep, intimate knowledge about the inner workings of the Hells

12  Angels to the degree that the Government -- the United States

13  government wants to put them on as a lay expert opinion when

14  they already have an expert that they're going to have testify

15  about the organization.  So I think there is serious foundation

16  problems and I think that we should get a hearing on what the

17  basis of --

18       **THE COURT:**  Let me ask the Government, give me an

19  example of the opinion, lay opinion that SM is expected to

20  give.

21       **MS. PENG:**  I think that, you know -- for example,

22  based on his relationship knowing Mr. Silva before and after he

23  joined the club, his personality changed, as one example, and

24  that is not based on a hearsay statement.  That is based on him

25  being friends with Silva for over 15 years and interacting with

1   him and describing him as a best friend.  That is precisely the

2   type of testimony that is permissible under Rule --

3       **THE COURT:**  Is he going to give a lay opinion with

4   about the HASC?

5       **MS. PENG:**  I think he is -- so in terms of the

6   foundation, he's going to give an opinion regarding his own

7   experiences.  True, he's not a member.  He is not a prospect,

8   but that doesn't mean that he is not permitted to have an

9   opinion based on what he perceived.

10      **THE COURT:**  I'm asking what is that opinion?  He can

11  testify about what he saw, what he heard, what he witnessed.

12  That's percipient.  Is there going to be an opinion from him

13  about the HASC?

14      **MS. PENG:**  I -- you know, I'm not sure precisely what

15  that opinion is going to be, but -- because, you know -- I

16  think I would direct the Court to his grand jury testimony at

17  this point.  I do think that he will have opinions regarding

18  Mr. Silva and his perception of what he was like before and

19  after he associated with the club.

20      **THE COURT:**  All right.  Well, that will have to wait

21  until trial and see what -- what happens there.

22      I've got to move on because it's now about an hour and a

23  half and the procedural stuff that's been raised by Mr. Ott

24  we'll address -- we'll address at the pretrial conference.

25      Let's see.  All right.  With respect to reference to

1    the -- to the Hells Angels as a motorcycle gang as opposed to a

2    club, I guess, what's -- what is the Government's response?  Is

3    there a problem here of not using the term "gang," just using

4    the term "motorcycle club"?

5        **MR. BARRY:**  Well, Your Honor, the Court already ruled

6    on this.  I mean, the Court has Jeremy Scheetz -- basically his

7    direct testimony in the form of that lengthy declaration.  He

8    uses the term "outlawed motorcycle gang."  In fact, he's

9    probably going to use "OMG" for the vast -- overwhelming

10   majority of times he is going to talk about it.  I mean, that's

11   the nomenclature he uses.

12       Every single case that the Defense cited for *oh, you can't*

13   *use the word gang* is from a non-RICO case.  The issue is does

14   this constitute it?  And if the -- if the words used and the --

15   the -- the enterprise itself refers to themselves as outlaws,

16   the one percenters.  And that's the right nomenclature.

17       In fact -- like, this issue comes up sometimes in

18   felon-in-possession cases where the defense says *oh, you*

19   *shouldn't use the word felon*.  Well, it's a handy shortcut.  So

20   "OMG," "outlawed motorcycle gang," those are the words that are

21   used time and again.

22       We're not going -- we are -- we've used reference to

23   "enterprise."  If the defense wants to use "club," they want to

24   question everybody about club, that's fine, but especially with

25   respect to Mr. Scheetz, it's going to be "OMG," "outlawed

1  motorcycle gang" because that's the term he has used, and the

2  Court has already blessed this.

3      THE COURT:  Well, if he uses it, though, is it

4  necessary for that term to be used repeatedly throughout the

5  trial by others who aren't giving that expert testimony?  In

6  his case, it has some legal significance.  That's why he is

7  using that term.

8      MR. BARRY:  Well, actually not even legal

9  significance, Your Honor.  I would put it that it has got

10  operational significant for him because that's what he does,

11  that's what who he studies.  But, yeah, I don't know what other

12  witnesses are going to be referring to it as anything other

13  than -- other than a club.

14      But this administrative motion that you can't refer to it

15  as X, if that's something that a person uses, I think is --

16  it's unwieldy and it's improper, especially in the RICO context

17  because that's what's at issue.

18      THE COURT:  All right.  I will take any brief comment

19  on that, if any.

20      All right.  Let me make a comment about testimony about

21  personal drug use.  It seems to me that testimony from a

22  witness about, for instance, Mr. Ott's use, to the extent it is

23  about telling people to do certain things, giving demands and

24  directives and commands to prospects and stuff, I've already

25  indicated that that may be relevant to the sort of hierarchy

1    and the structure and the existence of the enterprise, but if

2    it's just testimony about use in the presence of the witness to

3    show that they were close or, you know -- I understand there is

4    that case that says that, the *Johnson* case, but that seems

5    pretty weak.

6        I mean, you can demonstrate the length of a relationship

7    between the witness and the defendant, I assume, through many,

8    many other pieces of evidence.  If somebody had known -- if

9    they've known each other for decades or many years, there is

10   many ways to show that they're close other than saying *and I*

11   *saw him use drugs*.  So I see a distinction there.  Directives

12   to subordinates, yeah, I could see it, but just observing, if

13   that's going to be the testimony, in the privacy of two people,

14   pretty weak.

15       **MR. KRISHNAMURTHY:**  Yes, Your Honor.  I can address

16   that.

17       The first is I think especially with respect to Mr. Ott's

18   motion, I think the testimony will be in the form of a

19   directive, that someone, a prospect was directed to go procure

20   drugs for Mr. Ott.  Secondly, I think the Court has heard

21   variants of this argument before, even some today, which is

22   because these witnesses weren't part of the club, because they

23   were only prospects, because they were only hang-arounds,

24   because they were only friends of the club, they didn't

25   actually know anything that was going on, they weren't actually

1    close to any of these members, and I think this is another

2    brick in showing that connection.  So with that I'll submit.

3         **THE COURT:**  All right.  Well, let me go on to some of

4    the other matters.  The hour is getting late here.

5         The Guardado homicide.  I understand that that's to show

6    these conflicts and territorial fights that is part of what

7    the -- HA and the HASC is about because this is one example of

8    that.  What's -- what's -- it's just a 403?  I mean, it seems

9    relevant.  Is the argument that this is so old that --

10        **MR. GOHEL:**  Your Honor, I could be wrong, but the

11   Court specifically -- and I think we put it in our papers.  The

12   Court specifically excluded this incident as part of

13   Mr. Scheetz' testimony.  Now, if this evidence is going to be

14   introduced through some other manner, I guess through the court

15   records of the conviction of the person that killed

16   Mr. Guardado, I do think that there is a 403 problem, and here

17   is why.

18        You have a little -- I mean, lets -- I will call it a

19   little bar fight.  Maybe it could be -- a bar fight that's

20   going to be proven up by the Government that was already

21   litigated, went to trial, went to verdict with a pretty -- as

22   minor a slap on the wrist as you can get given what the

23   allegations were.  And in that case, the co-defendant --

24   actually, the instigator of the particular incident was

25   allegedly Mr. Guardado and during the pendency of that -- of

1   that proceeding, criminal proceeding, Mr. Guardado was killed,

2   unfortunately, by supposedly by Mr. Ablett, which is the

3   subject of a federal prosecution.

4        And just as the court excluded in the state court case --

5   and I'm not saying that's binding on this Court -- you know,

6   that kind of evidence is pretty -- is pretty prejudicial to my

7   client, who is the person who was involved in that fight, ended

8   up getting a conviction for a misdemeanor battery because I

9   think that, you know, the jury finds out oh, he's in a fight

10  with a guy who gets killed by a rival gang member during the

11  case and it sort of elevates the whole thing, and I think it's

12  extremely prejudicial to the proof of that incident.  I'm not

13  sure what the -- the relevance of it is other than that.  The

14  fact that he was -- Mr. Ablett was prosecuted for that murder

15  and that there was a conviction.  But the Court did exclude

16  that particular incident as it related to Mr. Scheetz'

17  testimony, and it was in the Court's ruling.

18       **THE COURT:**  All right.  But you're saying -- your

19  client -- I didn't understand this.  Your client was -- there

20  is going to be testimony implicating your client in this

21  incident?

22       **MR. GOHEL:**  No, no.  So -- so there -- there is going

23  to be -- one of the overt acts is a 2008 bar fight in which

24  Mr. Guardado, who was killed during the pendency of that case

25  separate and distinct -- just totally -- he was killed by

1    Mr. Ablett, and I believe that the evidence that my client

2    is -- is with someone in a bar fight which was, I believe, a

3    relatively minor incident, and that during the pendency of that

4    case, Mr. Guardado was killed by a rival -- you know, rival

5    alleged gang member, I think it's -- it's confusing, it -- it's

6    irrelevant, and I think it has a tendency to -- to sort of

7    spill over onto my client, that he is sort of hanging out with

8    someone who gets killed by a rival gang member during the

9    pendency of a case.  The two cases are not related.

10        **MR. WAGGENER:**  And this was a motion raised by Mr. Ott

11    in terms of the prejudice.

12        The answer to the Court's question is yes, it's 403

13    argument.  Bringing in evidence of an unrelated homicide not

14    having to do with HASC that, you know -- so this Mr. Guardado

15    had a relationship or friendship, whatever, with some of the

16    HASC members.  The fact that he is killed by a rival gang

17    member is just -- just injects a whole other level of prejudice

18    into this case and -- and other evidence of violent conduct and

19    all kinds of different readings.

20        **THE COURT:**  Let me ask the Government, is there going

21    to be evidence introduced that Guardado had some kind of

22    relationship with HASC members?

23        **MR. BARRY:**  Absolutely, Your Honor.  He was quite

24    close to a number of HASC members.

25        The indictment specifically alleges that violence against

1    rival gang members, including the Mongols, is -- is one of the

2    issues that animates the enterprise.  This is not spillover.

3    This is direct evidence of the enterprise.  We're not going to

4    have a mini trial on it.

5        The way we are going to introduce the Guardado homicide --

6    and it wasn't, you know, an alleged murder by a Mongol.  He was

7    convicted of that in this courthouse.  So what we -- we -- the

8    way we're going to introduce it, it won't be a mini trial.  We

9    are going to have the court documents introduced, and then we

10   will have insiders, HASC insiders talk about how profoundly

11   that murder affected the enterprise.  It had a dramatic impact

12   on HASC members because he was a Hells Angel.  He was very

13   close with Sonoma County.  He was murdered just miles away from

14   their territory, and he was murdered by a Mongol, so that put

15   the -- that put the Sonoma County Charter in particular on high

16   alert.  And you see that in the Livermore road rage incident in

17   that the photographs of that -- of that incident show that just

18   days later, the Hells Angels were riding around with knives all

19   over their motorcycles, they had three weapons, three firearms,

20   in their saddlebags.  So they were on alert, they were worried

21   about the Mongols, and they were ready to go to war because of

22   this incident.  It's central enterprise evidence.

23       The fact of the murder and who committed it will be

24   introduced in about five minutes, so there won't be a mini

25   trial.  And, again, it has -- it goes to the core of what HASC

1    was all about, specifically violence against rivals, and the

2    fact that murder was possible because Mongols had murdered one

3    of theirs and they might have to do the same.

4         **MR. GOHEL:**  Your Honor, if that's the case, since now

5    the Government -- because I did think the Court excluded this

6    specific incident from the testimony of Mr. Scheetz, then we

7    have received no discovery from the Ablett prosecution so we

8    are going to be making a request for all of the discovery from

9    the Ablett prosecution which I believe also included discovery

10   from a Mongols Central District prosecution.  We don't have any

11   of the discovery from that case.  So in order to defend it, we

12   are going to be making a request for that discovery because

13   now -- this is the first time that they've articulated this

14   theory that they are going to introduce this for this purpose.

15        **MR. BARRY:**  Your Honor, these items, the conviction

16   documents, are specifically identified in the exhibit list.

17   That's what we're going to get into.  If they -- in their

18   rebuttal case, if they want to try to prove that it wasn't

19   Mongol related, they're welcome to do that.  They are welcome

20   to waste all the time they want on that.  But the point is this

21   was a Hells Angels close to the Sonoma County enterprise that

22   was murdered by a Mongol, and it had a huge impact on the case.

23   So in order to --

24        **THE COURT:**  How does the Government, other than the

25   face of the conviction -- how is the Government going to

1    demonstrate that this was part -- this murder was a rival gang

2    murder and not just a personal or some -- some kind of

3    one-on-one?

4         **MR. BARRY:**  It was -- it was -- he was convicted of

5    VICAR murder with the allegation that he was a Mongol attacking

6    a Hells Angel.

7         **THE COURT:**  Okay.  Well, so why should the Government

8    have to then produce anything else?  You've got the face of the

9    conviction of a VICAR.  That demonstrates a gang relatedness.

10   If you want to rebut it, I understand that, but what obligation

11   does the Government have to go beyond the face of that

12   conviction?

13        **MR. GOHEL:**  Well, because they have -- what happens in

14   that case and what the conviction was for VICAR, this is being

15   alleged as a -- to support a RICO enterprise in this case.  So

16   we need -- we need all of the evidence that comes from that

17   case with respect to what actually happened, what the -- what

18   the evidence was that was presented because I don't believe

19   just the conviction in and of itself is going to be enough for

20   us to be able to rebut that -- that claim, to show that in this

21   case, this was not a RICO --

22        **THE COURT:**  The factual issue as posed by Mr. Barry is

23   whether or not that then is related to the HASC because of the

24   closeness of Mr.-- of the victim, Mr. Guardado, and the HASC

25   and putting the HASC, quote, on high alert, close quote.

1          I mean, you can hear what the evidence is going to be in

2     that regard.  I guess he is going to have some witnesses talk

3     about the -- where they road and with the firearms and stuff,

4     and you'll have the ability to counter that or try to cross on

5     that.  I don't understand why the documents and the evidence in

6     the Guardado case itself has any particular bearing on the

7     reaction --

8          **MR. GOHEL:**  Your Honor, there could be all kinds of

9     evidence in that case.  We don't have possession of it.  The

10    Government does.  There could be all kinds of evidence in that

11    case that might refute the idea that Mr. Guardado was close to

12    the Sonoma Hells Angels.  I don't know.  I don't know what it

13    is.  But I think that we're entitled to it.  If we have to,

14    we'll file a motion.

15         **MR. BARRY:**  Well, Your Honor, I'm not sure that the

16    concept of a fishing expedition has been more clearly put than

17    right there.  *We don't know what's there.  We want it.  We need

18    it, but we don't know why we need it, and we don't know what it

19    could be, but we want it, and we're going to file a motion for

20    it.*

21         **MR. GOHEL:**  I'm assuming the Government has looked

22    through all the evidence in that case and that there is no

23    *Brady* materials in there and there is nothing that would refute

24    any of the elements or the purposes for which the Government is

25    introducing this evidence --

1          **THE COURT:**  That's a fair comment.  If there is *Brady*

2     evidence that tends to negate the theory you just articulated,

3     Mr. Barry, then you would have to produce that.  If there

4     isn't, there isn't.

5          **MR. BARRY:**  Yeah.  I don't know how there could be

6     *Brady* material, Your Honor.  What we're introducing is the fact

7     that will Ablett was charged with VICAR murdered and was

8     convicted of it and the victim was Mark Guardado, and then we

9     are going to have HASC insiders talk about the impact that that

10    murder had on them, and they are going to talk about what they

11    knew about the prosecution, too.  That's it.

12         We are deliberately not trying to get into a mini trial

13    because it's not that -- it's not core, it's not an allegation

14    that this charter did anything wrong, but it has to do with how

15    this charter was -- how they constituted themselves and how

16    they viewed themselves with respect to the Mongols.

17         **MR. GOHEL:**  Your Honor, the charged enterprise here is

18    the Hells Angels Sonoma County, so the fact that there is some

19    rivalry between -- or there was a VICAR a Mongol shooting or

20    killing Mr. Guardado, who was a San Francisco Hells Angel -- if

21    there is evidence in their -- in their files that may undermine

22    the connection that this is a Hells Angels Sonoma County --

23    supports that this was a Hells Angels Sonoma County -- or

24    supports of the idea the enterprise was Hells Angels Sonoma

25    County, I think the Government has an obligation to review it

1   and to disclose any *Brady* materials, at the very least.

2          **MR. WAGGENER:**  Or it could be an independent conflict

3   with the San Francisco Charter as opposed to the HASC, and

4   there is no link there --

5          **THE COURT:**  Well, what's relevant is what the reaction

6   was.  I mean, it has little relevance except for the connection

7   that Mr. Barry has indicated, that because of his friendships

8   and his closeness with the HASC, that then spurred the HASC to

9   go on high alert and take certain precautionary actions.

10  That's -- and you can rebut that evidence.  I don't think that

11  comes from the Guardado case itself because it didn't -- from

12  what I understand, it has nothing to do with the HASC and the

13  connection to the HASC had nothing to do with that case.

14         Now, obviously if there is something in there that says he

15  had nothing to do with the HASC and didn't know the HASC and

16  that undermines your insider testimony, yeah, that would be

17  *Brady*, but I -- I'm not sure why that would exist in that case

18  so that doesn't seem to be an issue.

19         **MR. PHILIPSBORN:**  Your Honor, Philipsborn.

20         Mr. Guardado was killed in September of 2008 and outside

21  of a bar in the Mission.  The defense was self-defense, and as

22  Mr. Barry would not argue, it obviously didn't work because he

23  was convicted of VICAR murder, but the circumstances of the

24  offense -- I mean, I won't belabor it.  You've heard the

25  arguments from Mr. Gohel, but the point is, I do think that

1    once one understands that the Guardado situation is -- really

2    has an attenuated relationship, both to the charged overt act

3    in this case and also potentially to HASC, it does make sense

4    that we would ask for the Government to review that case file

5    to make sure that there isn't anything in there that is *Brady*.

6            **THE COURT:**  And what is *Brady* would be something that

7    would undermine a nexus -- the asserted nexus to the HASC, that

8    this is event spurred action by the HASC as a group, not what

9    happened at the murder and what -- did it really happen, was

10   the conviction justified, and all that sort of stuff.  It's the

11   aftermath that is the point.  If there is something in that

12   file that tends to show that there was no aftermath, there was

13   no connection to the HASC, yeah, that would be -- that would

14   seem to me to be *Brady* information because that would

15   contradict the Government's theory of the case as it just

16   explained to me.

17           **MR. BARRY:**  Your Honor, what we'll do is we will talk

18   to the case agents, and I am -- I am confident that there will

19   be nothing along those lines because there were no common

20   witnesses.  The -- our insiders had nothing to do with that,

21   but they were affected by it, and they did know about it

22   because it was a great topic of discussion.

23           **THE COURT:**  All right.  Let's move on to the next one.

24   The C.A.S.T. stuff.  I'm not going to revisit the C.A.S.T.

25   stuff except there is an issue I can see brewing here about a

1    demonstrative which if it's a demonstrative, it can be subject

2    to cross-examination if you think that something's not accurate

3    or if it's -- depicts something -- exaggerates something, but I

4    think it's -- of more concern if the Government wants to

5    introduce this as an actual exhibit under 1006 and that goes

6    back to the jury room.  And all I can say is, you know, number

7    one, it's going to have to comply with all the requisites of

8    1006; and, two, I would scrutinize it more closely because if

9    there is something inaccurate about it that is arguably

10   prejudicial, I would be very much inclined to exclude it as

11   evidence.  I can allow it as a demonstrative as part of the

12   testimony but once you give it the stature of evidence --

13   summary evidence is supposed to be summary.  It's supposed to

14   be you dry; not argumentive, not -- you know, it's supposed to

15   be, you know -- it's pretty much straightforward, so I have my

16   doubts about 1006, but I'll reserve that until I see it.

17        All right.  Why don't I get to Mr. Wendt's motions.

18        **MR. BARRY:**  Sorry to interrupt, Your Honor, but did

19   the Court address the motion, I think by Mr. Nelson, about

20   excluding evidence that witnesses are in fear?

21        **THE COURT:**  Well, I have that.  I don't know if I need

22   to hear much.  If you want to make a brief comment about that,

23   I will hear it.

24        **MR. BARRY:**  Yeah.  In fact, Your Honor, this relates

25   back to the -- the issue of the sex assaults as well in that

1    the -- the issue is going to be whether -- if the Defense is

2    going to challenge witnesses for bias, one of the reasons that

3    people are afraid is because of what the enterprise -- members

4    of the enterprise already did to them.

5        So, for instance, like the reason that MJ will be afraid,

6    that reason that BT took some of the steps she did were because

7    of what had happened, and the Defense is going to argue -- I

8    imagine they're going to argue or cross-examine that *nothing*

9    *has ever happened to you since the indictment*, and our point is

10   that we -- that doesn't matter because what had already

11   happened.  And so that's another reason that these witnesses

12   are going to have to be able to talk about why they're afraid,

13   and one of the reasons they're afraid is being able to testify

14   about the attacks that they suffered.

15       **MR. GOHEL:**  Just procedurally, Your Honor, that

16   wouldn't even come up until they've been challenged in

17   cross-examination and that their credibility has been attacked.

18       So what happened in the grand jury is the prosecutors

19   would say *aren't you afraid of the Hells Angels, are you afraid*

20   *of the Hells Angels*, repeatedly.  So it would be improper for

21   them to bolster their testimony prior to them being challenged.

22       Once their credibility is challenged, then potentially it

23   may be admissible.  I think it's up to the Court to -- to make

24   a determination as to whether or not under 403 that even the

25   relative probative value is not outweighed by the prejudice

1   because you have a case in which there has been no actions

2   taken against any witness in this case by any member where

3   there are, what, eight out of ten defendants that have been out

4   of custody, seven of whom have been nearby at least some of

5   these witnesses, at least in theory if they are in Sonoma

6   County.  So I think it would be proper for us to get into that

7   on recross as well, that these people have not had any

8   incidents.  That, in fact, that many of these witnesses may be

9   out and about in Sonoma County without really any fear at all,

10  out in the public, posting on Instagram and whatnot.  I think

11  it does open up a can of worms.

12          **MR. BARRY:**  Your Honor, two points about that.

13      Mr. Gohel completely misunderstands the concept of

14  bolstering.  Bolstering has to do with truth statements, the

15  fact that the Government can get into why the witnesses'

16  demeanor is such on direct.  And also, as we cited in terms of

17  bias, evidence of bias is always admissible, and we are allowed

18  and it is proper for us to front issues of bias on direct.

19          **THE COURT:**  Well, the problem here is if you front it,

20  as you say, it raises potential -- it's more prejudicial than

21  other types of fronting of -- and bolstering of credibility.

22  And, I mean, I think this is probably going to be moot because

23  even under Mr. Gohel's scenario, I can't imagine that the

24  credibility is not going to be challenged.  It ain't going to

25  be much to open that door, even under his proposed staging of

1    this where fear would come in on redirect as opposed to direct.

2        So I don't know how much difference it's going to make,

3    but I could see the argument that fronting fear is -- may be

4    more problematic because it raises all sorts of other

5    inferences and potential prejudice that may not be necessary if

6    there never -- if they're never challenged on credibility.

7        So, frankly, I think that's going to be moot because I

8    can't imagine that there is not going to be cross-examination

9    that goes to the credibility of these witnesses, and once that

10   happens, I think the door is open to motivation.  And so

11   anyway, that's -- that's my -- my take.

12       All right.  Let me -- let me ask about -- I'm going to

13   skip over some things here.  There is a reference here --

14   Mr. Wendt's Motion No. 5 about having committed 20 murders and

15   other things.  I -- you know, we've already -- I have already

16   thought about the corpus delicti situation and that's with

17   respect to the victim one issue.  I don't think that's --

18   that's an issue, but what about other incidents?  I'm not sure

19   exactly what they are.  There is some reference to other

20   murders that were allegedly talked about, and the motion is to

21   exclude that bragging.  Why should that come in?

22       **MR. KRISHNAMURTHY:**  Your Honor, I don't -- I actually

23   don't think the testimony is going to be that Mr. Wendt

24   committed 20 murders or anything like that.  I think this

25   motion may be referring to the grand jury testimony of witness

JH who testified in the grand jury that he was close with

Mr. Wendt and Mr. Nelson and a number of other members of the

Sonoma County and Fresno charters and was part of the initial

planning process to kill Mr. Silva.  It was in the context of

that that he says that Mr. Wendt told him that he had killed

other people before and that he had a way of disposing of

bodies in Fresno.  So this was all part of sort of the

conspiracy to kill Mr. Silva.

So I think in the context of that, it's -- it's reassuring

a recruit that there are ways to address problems.  It's

showing the ease with which this crime could be committed, and

so for those reasons, I think it's admissible as a

co-conspirator statement and if not, an admission of a party

opponent.

**THE COURT:**  So you're saying the testimony from JH

will be in the context of planning the -- Silva's murder that a

statement was made that "I killed others and I know how to

dispose of them."

**MR. KRISHNAMURTHY:**  Correct.

**THE COURT:**  And that was part of the planning process.

**MR. KRISHNAMURTHY:**  Correct.  I don't know if it's --

I don't know exactly when temporally it was made, but from the

statements that we have from JH so far, it was part of that --

the process of making the decision to and planning to kill

Silva.

1    **THE COURT:**  All right.  So it's not just a bragging

2    statement in isolation.  It is one that was part of the

3    planning process for the act in question.

4    **MR. KRISHNAMURTHY:**  Correct.

5    **THE COURT:**  What's the response to that?

6    **MS. McCLURE:**  Your Honor, the response is that the

7    corpus delicti rule applies to both the reliability of the

8    alleged admission and whether in fact the conduct occurred.

9    And we have really neither of those prongs met here because we

10   don't have any proof that these other incidents ever occurred.

11   There is not a shred of evidence to support them.  So we don't

12   have proof that the crimes occurred.

13   **THE COURT:**  Except the Government is arguing that

14   they're not trying to prove that this other crime occurred.

15   They're trying to say that it was an assurance to a potential

16   co-conspirator.  It's like *I know what to do.*

17   **MS. McCLURE:**  Right.  But the notion is that -- the

18   jury is still going to hear this notion of *I know what to do*

19   *because I've committed other crimes, I've committed other*

20   *violent murders*, so we get to both the *is there evidence*.

21   That's why the Ninth Circuit in *Lopez-Alvarez* talks about both

22   prongs here, not just is the statement reliable, but did the

23   crimes occur at all, and both have to be met.

24       And I think it's really important to note that this

25   particular witness, Mr. JH, has already been found to have lied

1   about the details of this -- of this murder, this alleged

2   murder.  So we have someone who is not very reliable who isn't

3   corroborated by any independent evidence saying things like *Oh,*

4   *yeah, Mr. Wendt bragged about this killing and that killing*.

5   That's exactly what this rule is designed to protect against.

6       And I would encourage the Court to really look at that

7   opinion because it's interesting, in the case, some of the

8   convictions are reversed, some are affirmed.  And the ones that

9   are affirmed, it was clear that the -- the informant or the

10  witness talking -- testifying about the admission had -- it was

11  corroborated.  The Court went to lengths to talk about the

12  specific corroboration, how that witness knew details of the

13  crime that weren't public.

14      Here we have nothing.  I think it's -- again, we have an

15  unreliable source, uncorroborated about crimes that haven't

16  even been established with any evidence.  I just think it's

17  squarely within the *Lopez-Alvarez* decision, Your Honor, and

18  none of it should come in.

19          **THE COURT:**  All right.  A response.

20      **MR. KRISHNAMURTHY:**  Your Honor, I think what takes

21  this outside the scope of that decision is exactly what the

22  Court said, the purpose for which this is being offered.  We

23  are not trying to prove that those murders actually happened.

24  We are just trying to prove that Mr. Wendt said those things

25  for the purpose of -- of reassuring that witness that there was

1  a way to carry out this plan.

2        **MS. McCLURE:**  There is no exception -- well,

3  Your Honor, read the opinion.  I think this sort of exception

4  is not -- does not exist, that I'm aware of, and it certainly

5  doesn't take it outside of the holding of that case and the

6  requirements that the Government has just not met here.

7        **THE COURT:**  All right.  Let me go on.  Testimony --

8  Mr. Wendt seeks to preclude the Government from eliciting

9  testimony that either he is violent and dangerous or the Fresno

10 Hells Angels is a violent and dangerous chapter.

11       What is -- well, is the Government planning to do that,

12 and what's the justification, starting with allegations about

13 the -- about the Fresno chapter when the Fresno chapter is not

14 the enterprise here?

15       **MR. KRISHNAMURTHY:**  Your Honor, I don't think we're

16 planning to elicit specific testimony that the Fresno charter

17 is a dangerous charter, although that is one of the things that

18 a particular witness talked about in the grand jury.

19       But with respect to the testimony that Mr. Wendt had a

20 reputation for being violent, I think that goes directly to the

21 VICAR allegations in this case.  So, again, this testimony is

22 going to come from someone who is very close to -- to the

23 defendants who are on trial and other members about the Sonoma

24 County and Fresno charters.

25       And, again, as the Court knows, one of the things that we

1  have to prove in this case is that these acts of violence were

2  committed for the purpose of maintaining or increasing one's

3  position in the enterprise.  And one way of showing that is

4  showing that other members of the enterprise already had a lot

5  respect status because of their reputations for being violent.

6  And so that's what we think the relevance of that testimony is.

7       **THE COURT:**  Well, is the testimony that others have

8  gained prominence through violence or that Mr. Wendt himself is

9  violent?

10      **MR. KRISHNAMURTHY:**  Mr. Wendt has gained prominence

11  through his reputation for violence.

12      **THE COURT:**  Why isn't that straight-out character

13  evidence?

14      **MR. KRISHNAMURTHY:**  I don't -- Your Honor, I don't

15  think it is because that witness is going to talk about

16  someone's reputation within the enterprise and what gives them

17  status, and so I think the distinction is sort of clear and

18  almost like the RICO and VICAR cases, that this is the exact

19  sort of testimony that the Government tries to elicit to show

20  VICAR motive.

21      **THE COURT:**  Can you give me an example -- is this

22  going to be reputational evidence, specific-acts evidence?

23  What is this evidence going to look like?

24      **MR. KRISHNAMURTHY:**  Let me offer the Court an example.

25       So one of the things that we cited in our response was a

1   little snippet from the *Williams* case where someone was

2   testifying this person had status because they were known to be

3   consistent shooters.  They were known to be -- they were known

4   to be like killers and that's why they had a lot of status with

5   the enterprise.

6       And so I think the testimony here is going to be similar

7   in that not that Mr. Wendt -- I don't think this witness is

8   going to testify to any specific acts of violence that he saw

9   Mr. Wendt commit.  I think he is going to talk about

10  Mr. Wendt's reputation for violence within the enterprise and

11  why that gave him a lot of respect.

12          **THE COURT:**  All right.  Let me hear the response.

13          **MS. McCLURE:**  Classic improper character evidence.

14  It's that Mr. Wendt has a reputation for violence, therefore he

15  must or is more likely to have committed this violent act.  I

16  mean, it's what the rules absolutely prohibit, Your Honor, and

17  this notion that in one particular RICO case where there was a

18  gang member who is a consistent shooter, I don't know all the

19  facts of that case or why that testimony was deemed relevant,

20  but we have Mr. Wendt, who is not a member of the charged

21  enterprise who is alleged under this association theory

22  somehow.  There has been no articulation of how his reputation

23  somehow is relevant -- it's -- and it's just character

24  evidence.  I think this is --

25          **THE COURT:**  Well, it's back-door character evidence.

1   It looks like 404(a), and the excuse is that well, he's -- the

2   evidence has shown how he has gained stature.  But so what if

3   he has gained stature?  In a way that almost cuts against it.

4   If he already has stature, why does he have to go out and

5   commit another murder?  What is the relevance?

6            **MS. McCLURE:**  I agree, Your Honor.

7            **MR. KRISHNAMURTHY:**  Your Honor, because the fact that

8   somebody already has stature or has gained stature through

9   these violent acts tends to show act of violence are committed

10  for the purpose of maintaining or increasing one's position in

11  the enterprise.

12       And it's not just one case.  We also clipped portions from

13  a couple of other circuit cases that describe testimony exactly

14  like this.

15           **THE COURT:**  Well, a shooter is different.  That is

16  saying somebody had a role of doing X.  That's not saying he

17  was a violent guy and that's why -- so your description of the

18  *Williams* case sounds not exactly on point.

19       I mean -- again, it raises a 403 because it looks a lot

20  like a 404(a) issue here, so even if the avowed purpose of your

21  evidence is to show, number one, he's -- he is violent and

22  therefore has a reputation and will continue to do so in order

23  to maintain his reputation, that's pretty marginally probative

24  compared to the -- to the prejudicial value of somebody saying

25  this guy is violent.

1      Now, violence could come up in another context if -- if

2    the defendant puts on character evidence under 404 saying *I'm a*

3    *peaceful guy and I have never done anything* and then you come

4    back, then I think that opens the door.  But just on its own,

5    I'm having a hard time seeing, if it is relevant, its real

6    probative value.

7      So, I mean, we don't know how things are going to play

8    out, and, again, this all may be moot depending on what the

9    defense tries to do.  It may come in one way or another, but

10   out of the box, I'm having trouble getting around a 403 because

11   it looks a lot like 404(a) and I think that's the problem.

12     All right.  Let me -- some of these we've talked about.

13   Hold on here.  Let's see.

14        **MS. McCLURE:**  Your Honor, I should have said it

15   earlier, that we join in the motions in limine filed by both

16   Mr. Nelson and Mr. Ott, and we also join in some of the

17   arguments that they made today that were relevant to our

18   motions as well.

19        **THE COURT:**  All right.  Let me ask about opening the

20   door to cremations.  The defense has raised some examples of

21   what they think does not open the door.  If Sparano  -- I can't

22   remember exactly what it is concerning alleged calls made by

23   and to the telephone associated with Robbie Huff.  Is there

24   some argument that that somehow opens the door to introducing

25   the alleged disappearance and demise of Mr. Huff?

1          **MR. BARRY:**  Your Honor, this is Kevin Barry.

2          The Court doesn't need to do any -- doesn't need to rule

3     on anything right now.

4          The purpose of this motion really was to just put everyone

5     on notice that this is a very serious issue that needs a lot of

6     thought, and that we didn't want to spring it on the Court the

7     morning of the -- you know, after LP testifies.  But we just --

8     this is -- you know, it's -- because of the way that these

9     events happened, they are linked in -- in sequence, and if the

10    Defense tries to pick away at credibility in a way that opens

11    the door, then they will have to come in.

12         Again, we don't know what is going to happen until trial

13    comes, but we want to put everybody on notice this is a serious

14    issue.  I guess it's along the lines of the 18 or 15 issues

15    that the Court wants us to present next week, but this is one

16    of them.  So -- but I don't think the Court needs to take any

17    action.

18         **THE COURT:**  All right.  Well, obviously I'm going to

19    be listening very closely to the so-called open-door thing, and

20    it's not going to be that easy to open that door.  On the other

21    hand, that's not to say it's impossible.  But given the --

22    the -- all the issues that are raised if that door is opened,

23    that door is going to have some weight to it.  So I'll just

24    make that comment.

25         **MR. BARRY:**  Yes, Your Honor.  But the -- the

1  Defense -- my fear is that the Defense is going to take that

2  and just push and push and push and just say well, the Court

3  said we basically can't open it.

4          **THE COURT:**  I didn't say that.  I didn't say I'm never

5  going to open the door.  I'm just saying there is a lot of

6  reasons to make that a heavy door.

7      So let's move on.

8          **MR. PHILIPSBORN:**  Your Honor, though, if I could -- if

9  I could, just so we're clear, I think Mr. Barry was saying

10  this, but he essentially took ownership of two motions that are

11  asking you for current orders, and those are the Wendt motions

12  addressing the topic that you were centered on, so I'm assuming

13  that until -- until the issue is raised with you and until you

14  change your view or your existing order from June 23rd of 2020,

15  we're not -- we're not to mention any of these other killings

16  and other cremations in our openings and any part of the case

17  until --

18          **THE COURT:**  That's correct.

19          **MR. PHILIPSBORN:**  -- until we get to a red line.

20          **THE COURT:**  It is out.  As we stand here right now, it

21  is out, and the only way it will come in is if the door is

22  opened.  And I'm also indicating that for all the reasons

23  stated, that the door is going to have to be pushed pretty

24  hard.  I'm not saying it's impossible, but it's going to have

25  to be pushed pretty hard because there are a lot of

1    consequences to opening that door.

2         **MR. PHILIPSBORN:**  Thank you, Your Honor.

3         **THE COURT:**  The testimony about -- again, we have sort

4    of covered this, but from -- from JH about Mr. Wendt describing

5    the shooting, having killed several Mongols in the area.

6    Again, now that I understand it, if JH is going to say this was

7    in the context of the planning and reassurance in the

8    description, that's one thing.  If it's just a random statement

9    that doesn't, again, sort of further the effort or was not part

10   of the transaction, then I think there is some serious

11   questions about that, certainly as a matter of at least 403.

12   But I guess I'll have to wait and see how this comes out.

13        **MS. McCLURE:**  Your Honor, if I may, I'm not sure I

14   understand what you mean by wait and see how it comes out.

15        **THE COURT:**  If the evidence is as it was represented

16   to me a little earlier, that in the process of planning the

17   demise of Mr. Silva, Mr. Wendt said, you know, *I know how to*

18   *dispose of the body because I've done this before,* I know you

19   object, but to me that is different -- that is -- that explains

20   that that has a real purpose.  It's tied to the transaction,

21   and even though it may be prejudicial, it seems to me that

22   that's -- that has a lot of probative value.

23        If it's just *we were talking and he started bragging to me*

24   *about killing 20 people in Fresno,* that has -- it doesn't

25   further -- that was not part of the transaction, it's not tied

```
1    to accomplishing anything.  That's the kind of thing that
2    therefore has very little probative value to me.
3         I understand your corpus delicti argument, which I will
4    look at the case but I have my doubts as to whether that
5    applies in the first instance.  In the second instance, I think
6    there is a serious 403 problem.
7              MS. McCLURE:  I agree with Your Honor that there is a
8    serious 403 problem, but I would encourage the Court to look.
9    I think the rule in that case really does deal with admissions,
10   regardless of their point, so I'm comfortable with that.  I
11   will submit on that.  Thank you.
12             THE COURT:  All right.  Thank you.
13        And, again, number of photographs of firearms, that could
14   well be cumulative to the point where it's overly prejudicial.
15   I have to see, and, again, I would urge the Government to try
16   to be selective in what it's going to introduce.
17        Testing of the clubhouse.  Let's talk about that for a
18   moment.  And I had issued an extensive ruling about what
19   forensic evidence comes in.  I said that the confirmatory tests
20   could come in, not the presumptive tests.  I said that there
21   could be then accompanying that an explanation as to why the
22   confirmatory tests might be negative, etc., etc., so I don't
23   see any reason to revisit my ruling about confirmatory versus
24   presumptive tests, what's coming in, what could come in, I
25   disallowed.
```

1       But what about the evidence of bullet fragments?  I take

2    it there is evidence that there were evidence of shootings

3    having occurred in the clubhouse, although not necessarily tied

4    to the Silva incident.  And I take it the Government's argument

5    is that well, that's probative because it shows, if nothing

6    else, violence was capable of being had or occurring,

7    shootings -- guns could be fired in the clubhouse, and,

8    therefore, it was not an impossibility.  Is that -- is that

9    kind of the relevance?

10        **MS. PENG:**  That's correct, Your Honor.  And also, you

11   know, bullets and guns are a part and parcel of the fact that

12   the members have a weapon.

13        **THE COURT:**  All right.  What's the response?

14        **MR. PHILIPSBORN:**  In November of 2017, the FBI goes

15   in, finds some evidence that guns have been shot in the

16   clubhouse.  And so -- and I understand the Government -- the

17   Government's reasoning to try to get this evidence in.

18        All I would say -- and I thought the Government's response

19   was actually reasonable in view of the objection raised, but

20   that the -- it should be clear that the purpose for the

21   admission of the evidence is not specific proof that the gun --

22   the bullet or bullet jacket or shell casing evidence can be

23   tied to the Silva killing.

24        **THE COURT:**  Right.  Well, I'm sure -- and the

25   Government does not contend that; right?  There is nothing to

1    suggest that?

2            **MS. PENG:**  No.

3            **THE COURT:**  And I'm sure if that is not brought out on

4    direct, that will be made very clear on cross, that this is --

5    no connection was established here.

6            **MR. PHILIPSBORN:**  Your Honor, yes.  Hopefully between

7    both parties, that will be made clear.

8        Before you go too far away from the -- from the infamous

9    testing issue, at least as I read -- as I read the Government's

10    papers, I thought I had the understanding of the Court's ruling

11    that the Court just stated.  I thought that the Government was

12    suggesting that it's evidence of the processing of the

13    clubhouse will include some descriptions of the presumptive

14    testing.

15        I think the Government's concerned that there be no false

16    picture presented that the governor -- sorry -- that Government

17    meant was negligent or casual in the way that it went about the

18    processing of the clubhouse.

19        I think there is a distinction between our remaining

20    silence on that issue and there being an affirmative eliciting

21    of their being chemical testing for the presence of blood

22    inside the clubhouse.  That, I think, has been cabined.  I just

23    want to make sure that that is the Court's understanding and

24    that that's the ruling for now.

25            **THE COURT:**  My ruling was that there is not going to

1    be any evidence either of the results or of -- frankly, of a

2    presumptive blood test being taken because once you raise that

3    issue, then it naturally raises in the jury's mind, *well, what*

4    *was the result.*  So we are not going to get into that for the

5    reasons I already stated.

6         The Government's concern about *well, it may look like we*

7    *weren't thorough*, etc., etc., I don't -- there is already going

8    to be evidence that there was testing done.  It was the

9    confirmatory tests.  I don't think the jury needs to know that

10   there was another stage of testing that was done which, for all

11   the reasons I've stated, is not going to be allowed.  And, you

12   know, obviously if the Defense starts to cross-examine and say

13   *well, you didn't do a really complete job* or something, which

14   I'm sure you won't do, then, you know, that could open the

15   door, but, otherwise, there is no need to go into -- even

16   raise, mention the presumptive tests because that gets us down

17   a road that I've already said we're not going to go down.

18        So to the extent that the Government intended to include

19   that as part of the laundry list of things that were done, you

20   should strike the presumptive blood test reference.  We're not

21   going to go there.

22             **MR. PHILIPSBORN:**  Thank you.

23             **THE COURT:**  All right.  Let me ask about these

24   offensive imagery:  Stuff seized from the Fresno clubhouse,

25   which, again, Fresno is not the enterprise here.  It's Sonoma

1   County.  I'm having trouble understanding why that's relevant

2   here.

3        **MR. BARRY:**  Your Honor, this is Kevin Barry.

4        Most of the things -- the material that we are -- that we

5   are introducing into evidence from Fresno has to do with their

6   connection to both, Salem, where Mr. Ranieri is president, and

7   with Sonoma County.  You know, there are things like

8   Mr. Nelson's framed boxing shorts, there are tributes

9   between -- to and from members of Sonoma and members of Fresno.

10       So I'm not quite sure about what the other issue is in

11  terms of offensive imagery, but that's the goal, to show that

12  there was a tight connection between Sonoma County and Fresno.

13       **THE COURT:**  No.  I understand that.  But apparently

14  there is some -- there is going to be some allegedly

15  inflammatory stuff that was obtained from the Fresno inventory

16  sexist is, racist, picture of an ax with a noose around --

17       **MS. McCLURE:**  That's correct, Your Honor.

18       **MR. BARRY:**  Your Honor, I believe what they are

19  talking about is the imagery of Mr.-- Mr. Hefferman in the KKK

20  hood.  I think that's all part and parcel of the -- of the

21  white supremacist motion because there were photographs of

22  Mr. Wendt and Mr. Hefferman that are in the -- in the motion

23  with the lightning bolt, SS Filthy Few flag and things like

24  that.  I think that's what they are getting at.  And whatever

25  the Court rules on that I think will cover these.

1        **THE COURT:**  All right.

2        **MR. BARRY:**  Just to be clear, there were some

3   incredibly offensive images from electronic devices.  We are

4   not seeking to introduce those.  We think those would go beyond

5   the pale, but the ones that we have identified do have a link

6   between the images that the enterprise has adopted and they do

7   show a connection between Fresno and Sonoma County.

8        **THE COURT:**  Okay.

9        **MS. McCLURE:**  There is also sort of suggestive,

10  arguably, I guess -- I don't know how to describe it, but

11  paintings on the walls in the Fresno clubhouse of a woman in a

12  suggestive pose.

13       Mr. Philipsborn, jump in if I'm forgetting here other

14  images from the Fresno clubhouse, but our position is that

15  the -- images in the Fresno clubhouse are not relevant here,

16  and there is a 403 issue.

17       **THE COURT:**  Right.  Well, that's what I thought.  If

18  it's painting on the walls of the Fresno clubhouse that's

19  different from a picture of an HASC member with Mr. Wendt in a

20  costume or something.  So stuff that's just particular to

21  Fresno, it seems to me -- I don't see the relevance.  If it is

22  relevant, it's barely relevant.

23       **MR. BARRY:**  Actually, Your Honor -- sorry.  I didn't

24  understand that's where they were going.

25       The allegation is that's where Joe Silva was murdered, so

1   the jury has to be able to see what the location looks like.

2   So pictures of the inside of the clubhouse could not be more

3   relevant based on the critical charge in this case.

4            THE COURT:  Well --

5       MR. BARRY:  I don't see how they can say that the jury

6   can't see that.  I didn't know that's where they were going

7   because it makes absolutely no sense.

8            THE COURT:  Well, if you are saying incidentally in a

9   picture of the scene where the -- where the murder allegedly

10  occurred and you can see incidentally in the background some

11  photo, that's one thing, but if you are going to introduce this

12  as evidence of, well, see what a sexist, racist club this is,

13  that's different.

14       MR. BARRY:  Yeah.  But the goal is like this is what

15  the Fresno clubhouse looks like.

16           THE COURT:  Well, yeah.  If it's relevant to -- you

17  know, you don't have to have a thousand pictures and you don't

18  have to have a picture of the mural if it has nothing to do

19  with where the murder took place.  I don't know if it does or

20  not.  It may be that happens to be where the alleged shooting

21  occurred, but, you know, it's got to be relevant to the matter

22  at hand.

23       So I guess I'll just have to reserve judgment until I see

24  it.  If it's gratuitous, then there is going to be a 403

25  problem as well as a relevance problem.

1    **MR. BARRY:**  Your Honor, as I indicated, there are some

2    horrendously gratuitous images that we're not getting into, but

3    I think the jury will see it when it comes in, but the jury

4    should be able to see the crime scene.

5    **THE COURT:**  All right.  Let me ask, on Mr. Scheetz, I

6    have already said that he can testify as to the -- the opinions

7    that I allow him to testify on and he can, of course, identify

8    the bases of those opinions, whether it's from a book or from

9    some writing, you know, some charter or something else.  But

10   that -- that's how some of these incidents may come in, to the

11   extent that it is something he's done, and he has rendered an

12   independent -- as I said before, he can't just be a conduit and

13   say *this, this and this happened*.  It has to be part of a

14   synthesis, part of his analysis, but the bases are likely to

15   come in.  So I don't know what else to say about that.

16   **MR. PHILIPSBORN:**  Your Honor, I think that's all we

17   were looking for.  So submitted on that one.

18   **THE COURT:**  Okay.  And then finally, Mr. Heinrich so

19   he's not going to give any -- from what I understand from the

20   Government's response, he's not going to offer any opinion.

21   He's just going to explain what he does and how -- what he does

22   with witnesses and when he pays them and how much he pays them,

23   is that my understanding.

24   **MR. BARRY:**  Exactly.  That's exactly it, Your Honor.

25   It's not going to be like -- I don't know what the Defense is

1    worried about, you know, that he developed some threat matrix

2    and these are the most at-risk witnesses.  No.  It's what kind

3    of -- what kind of payments do you authorize for witnesses and

4    when did you pay these people and for what.  It couldn't be

5    more simple.

6         **THE COURT:**  What about the *why*?  There is reference in

7    there about why he paid them.  What is the testimony going to

8    be about that?

9         **MR. BARRY:**  As we indicated in our letter to the

10   Defense, it's for subsistence, it's for cell phones, and often

11   for -- in fact, some of the more sizeable payments were for

12   actual relocation, things like first-and-last-months rent,

13   things like that.

14        **THE COURT:**  In other words, what it was for, not the

15   motive like *oh, I -- I calibrated the fear factor to be X and*

16   *therefore I figured I'm going to have to increase this payment*

17   *by double*?

18        **MR. BARRY:**  No.  Especially not this witness.  He's

19   more sort of the administrative aspect of it.

20        We anticipate that other witnesses will say *yeah, we made*

21   *arrangements to get this witness out of town*, but that's not

22   what -- those are percipient witnesses talking about what they

23   did.  Special Agent Heinrich, if he actually testifies, would

24   be *yeah, I made these payments and this is what the payments*

25   *were for and here's why I made them*.

1          **THE COURT:**  Okay.

2          **MR. BARRY:**  And if the Defense wants to cross him on

3     that, then he might get was this consistent with policy and

4     things like that, but, yeah, generally it's -- the Defense has

5     made a huge issue about payments.  And in case we need to

6     address that, we've identified him as a witness for that

7     reason.

8          **THE COURT:**  All right.  I understand.  I understand

9     there is almost a constitutional theory about witness payments,

10    and I'm aware of that issue.

11         All right.  Well, we've covered --

12         **MR. PHILIPSBORN:**  Your Honor, just on that one

13    witness, without belaboring it, the main concern is if -- if

14    it's kept simple and tight, then he testifies exactly as

15    Mr. Barry presumes, he may testify.  One of the difficulties

16    being is if he starts explaining what payments were for, then

17    we get into the documentation that has been generated.  In the

18    cases I've been in to this point, it -- it's been somewhat

19    usual, although grudging at times, for the Government to

20    actually just turn over some of the documentation that exists

21    about the payments, and actually the reason for it so that you

22    don't essentially have to question somebody in the dark about

23    why somebody was paid and how the documentation is maintained

24    and how there's -- there are policies and procedures to

25    accomplish this, so all I wanted to do is to try to see if --

1    if it's kept simple, then no problem, but if we get a little

2    bit further down the line, then I think the Government's

3    position that we're entitled to know essentially in the form of

4    a letter disclosure with a spreadsheet in it how much people

5    were paid and what date they were paid on but we can't see the

6    vouchers, we can't see any of the internal memoranda that are

7    normally provided, we can't see any of that kind of

8    documentation -- I think that that may in the end be a problem.

9    So I just wanted to flag it.  It's sort of -- I'm borrowing

10   Mr. Barry's theory of this is a flagging motion.

11          **THE COURT:**  Well, maybe we ought to address this

12   sooner rather than later.

13        You are saying if there is testimony about what the

14   payments were for, for, let's say relocation, you think that

15   you're entitled then to some additional documentation about the

16   decision to make that payment?  Or tell me more about what it

17   is you're looking for.

18          **MR. PHILIPSBORN:**  Just the documentation that is

19   generated when payment is actually made and authorized and the

20   reasoning for the payment.  And I won't go too far into this,

21   but witness JH, for example, at times is dealing sort of

22   low-grade extortions of the FBI and task force officers by

23   periodically saying *look, I've gone as far as I can go, you*

24   *people aren't helping me*, etc.  And then it seems that the

25   logjam is worked through, and he is rendered happy again, and

1   he also actually receives a payment.

2       There are occasions on which -- and to the Government's

3   credit, they disclosed this -- he's texting a handler saying

4   he's in need of funding.  I have no idea if that actually

5   resulted in any action from the FBI.  They might not have

6   authorized any payment in response to that particular request,

7   but without the documentation, it's a little bit hard to tell

8   how those things were reacted to.

9       So all I'm forewarning the Court is we may get to points

10  at which there is a legitimate basis on which for us to

11  actually get copies of documentations of the basis for payments

12  made to certain witnesses at certain times; otherwise, I

13  completely agree.  If somebody has relocated and that's the

14  extent of the reason for a lump-sum payment, then that's it.

15  That's the -- that's the reasoning.

16      **THE COURT:**  So when you say documents when payment is

17  made, what does that look like?  What are these documents?

18      **MR. PHILIPSBORN:**  Mr. Barry knows better than I do.

19  I'm not being facetious or disrespectful, but I've never been

20  in his position, but I have been in cases in which we had

21  copies of documentation that was provided to us through an

22  agency, through the FBI and through the DEA, and it showed sort

23  of the -- you know, their payment system.  It's the federal

24  government.  It's a fairly well-documented apparatus, at least

25  the apparatus that I was privy to.

1      And I know that for the task force officers -- I don't

2  know so much about Santa Rosa, but in other -- in other cases

3  in which local law enforcement was also springing a bit for the

4  cooperators, they produced ledgers so you could tell what the

5  payments were for.

6      Again, I'm not suggesting that there is an absolute need

7  to go down that road.  I'm just saying, depending on how the

8  testimony comes out or how the cross-examination of some of

9  these cooperators goes, we may have to get access to whatever

10  specific payments may be in question and, you know, get some

11  understanding of what the documentation for the payment says.

12          **THE COURT:**  You have --

13          **MR. BARRY:**  I'm sorry, Your Honor.

14          **THE COURT:**  You have the information about timing and

15  amounts of payments; right?

16          **MR. PHILIPSBORN:**  Yes, Your Honor, we do.

17          **MR. BARRY:**  In fact, Your Honor, in the flurry of

18  materials in the last week, Mr. Philipsborn may have missed

19  this, but we actually did update the dates of the payments, so

20  Mr. Philipsborn can track, you know, as he described it,

21  extortion texts and see if it was met with a later payment.  So

22  he does have the dates of payments made to specific witnesses.

23          **MR. PHILIPSBORN:**  I agree.  I saw that letter, and

24  Mr. Barry is absolutely right.  That was updated information.

25  But, again, I'll submit it.  We're at the end of a long day,

1   but that's --

2           **THE COURT:**  All right.  I'm just not sure what

3   other -- if you're talking about some kind of a voucher thing

4   or something --

5           **MR. PHILIPSBORN:**  Exactly.  Exactly, Your Honor.  And

6   so I'll tell you what.  In part, because of what Mr. Barry

7   explained, if necessary, we will make a more specific request

8   that is focused on certain payments if there is the need for us

9   to make those requests.

10          **THE COURT:**  I think that's fair because I don't want

11  to have this come up in the middle of somebody's testimony at

12  trial and then we have to take a recess because you've got to

13  get the documents.

14          **MR. PHILIPSBORN:**  Understood.

15          **THE COURT:**  All right.  Well, this has been helpful.

16  I've got a few things obviously to do.  I'm going to try to

17  rule on as many of these as I can.  Obviously some of this

18  stuff is going to have to be reserved for trial.  And I've got

19  the 11 x 17 chart in mind as 59 pages long of 11 x 17 that I'm

20  going to get out a ruling on.  They are going to be succinct

21  rulings, but you'll have rulings on as many of these things as

22  I can.  Some of it will have to await trial, but my goal is to

23  get the parameters down as much as possible, take as many

24  things off the table as possible so you know what's coming,

25  what's in and out from my perspective, and, if nothing else,

1   you'll also know how I'm framing stuff so if things come up,

2   you'll understand how I'm seeing these matters.  I want to

3   minimize, you know, argument before the jury and time wasted --

4   time spent with the jury waiting.

5        **MR. PHILIPSBORN:**  So to minimized -- again,

6   Philipsborn for Wendt -- time wasted, would the Court be

7   willing to clarify whether it has a view as to how far in

8   advance of witnesses actually appearing the Defense should be

9   notified of their appearance?

10        **THE COURT:**  Yeah.  I think witnesses and the exhibits

11  intended in connection with those witnesses should be done two

12  court days in advance so that if I have a court day before the

13  day before the actual presentation of that testimony, I can

14  either hear argument if I need to hear argument, or I can get a

15  ruling out so you'll know because I need time to see what's

16  going to come, what the objections are so we'll have to -- I'll

17  have to lay out a time frame of when it's disclosed, when any

18  objection is made, and then how we're going to rule, but we're

19  going to do it on a rolling basis, but I think essentially two

20  days in advance for a case of this complexity is -- and given

21  the number of issues that you all have raised, I think that's

22  an appropriate amount of time to give both the parties and me a

23  chance to make rulings.

24        **MR. KRISHNAMURTHY:**  Your Honor, I actually had one

25  quick housekeeping issue before we end today.

1    **THE COURT:** Yes.

2    **MR. KRISHNAMURTHY:** We ordered and obtained a

3 transcript from the sealed hearing last week. The court

4 reporter has reminded me that I should have obtained an order

5 from the Court authorizing the release of that transcript, and

6 so I apologize for that oversight, but I was wondering if the

7 minute order for this hearing could reflect that the Court

8 authorizes either party to obtain that transcript so long as

9 they keep it under seal.

10    **THE COURT:** All right. No objection, I assume?

11    **MR. WAGGENER:** No objection. I got a copy of the

12 transcript and distributed it to the Defense. So long as it's

13 mutual for both sides.

14    **THE COURT:** Otherwise under seal but for use only by

15 the parties and counsel.

16    **MR. KRISHNAMURTHY:** Thank you.

17    **THE COURT:** So ordered. We will make sure that is

18 reflected in the minutes.

19    **MR. BARRY:** This is Kevin Barry again. One last

20 question.

21   I don't know if the Court wants any more material, but in

22 light of the fact that so much of this -- this argument has

23 centered around Rule 403, very often we did not propose

24 limiting instructions, so if there are issues where the Court

25 is wrestling with it, if the Court wants to put in the minute

1   order you want proposed limiting instructions on certain

2   issues, we are happy to provide those.

3           **THE COURT:**  All right.  I'll keep that in mind.

4   Great.  All right.

5           **MS. PENG:**  Your Honor, one last issue.

6       So there was, I think, a minute order issued by Your Honor

7   about joint exhibit lists, objections and responses due on

8   March 15th.  I just wanted to raise here that the Government

9   still has not received the Defense's list of objections to our

10  exhibits which were previously ordered due March 9th.  So we

11  had expected that we would get those objections and we would

12  have time to file our responses to meet the 15th deadline, but

13  at this point I'm not sure quite sure when we can expect those

14  objections.

15          **THE COURT:**  All right.  Let's hear from the Defense.

16          **MR. WAGGENER:**  I can speak to that issue, Your Honor.

17      The first thing I would point out is that for -- well,

18  one, I think the Court has a pretty good idea of all the things

19  that have been going on with what the Defense has been occupied

20  with over the last 10 days or so, but we just got the complete

21  set of electronic exhibits from the Government so that we could

22  everything together.  I think it was two, maybe three days ago,

23  and those went to the discovery coordinator.

24      That set of electronic exhibits of the -- we're now up

25  to -- 13-, 1400 exhibits have now been distributed to us.

Speaking of 11 x 17 pages, the list and the exhibit list with all this information is about 70 pages on a an 11 x 17.

We are -- have not been able to fully digest all of these exhibits and to address all of this.  I speak for my colleagues.  I talked to them about this this morning.  I don't know that -- you know, there is also a complication with Ms. Morrissey not being available for the last eight days, but we're working on it, but in terms of what I'm terming a fulsome set of objections to the exhibits, we're doing the best I can -- we can, all of us can, to examine this and to have a mutual list that we all share and make our objections and get it to the Government.

I don't think that it's realistic -- I'm happy to discuss this and it came up.  I don't think it's realistic for us to get that by the 15th.  We are working hard on it.  I don't know if one of my colleagues want to speak more to this whole issue of how we are looking at these exhibits, but it is a work in progress.

**THE COURT:**  Well, for one thing, I've asked for a bellwether example of 15.  You certainly can do that; right?  And I want to be able to discuss this at the pretrial conference so you can identify 15, each side representative -- and the idea is to get some representative -- there is going to be some patterns here and, you know, even though you didn't get all the physical exhibits, you have had this for a while now,

1  so by the 15th, I certainly think each side can identify 15

2  bellwethers which we can then discuss at the pretrial

3  conference.

4         **MR. WAGGENER:**  Yes.  We can do that.

5         **THE COURT:**  And then I would like the fulsome one, how

6  about at least by the end of that week, by the pretrial

7  conference, by the 18th.

8         **MR. WAGGENER:**  We'll get on it, Your Honor.  I

9  understand the Court wants to set deadlines, and we're

10  approaching this trial, so we will do the best we can.

11         **THE COURT:**  Okay.

12         **MR. NOVAK:**  Your Honor, this is Richard Novak.  I have

13  a question.

14      I may be the only one in the room, but I don't really

15  understand what the Court means by bellwether objections.

16         **THE COURT:**  All right.  So I'm probably not going to

17  rule in advance at trial on 1400 exhibits, and I'm hoping that

18  exhibit list is going to be a lot slimmer than that, but I

19  found it's useful for the parties to pick out *here are some key*

20  *documents*, either by category, you know, involving this kind of

21  problem, you know, and each side -- I usually say -- well, you

22  know, whatever the number is, 10, 15, sometimes 20, whatever.

23  Those rulings will serve as guideposts, hopefully to the

24  parties, so you'll know what my thinking is on -- on whether

25  it's a hearsay rule, whatever the objection is.  And so they're

1   examples, so they're bellwether, essentially.

2       It also helps me understand more what's coming down the

3   road because I don't want to be hit with something for the

4   first time and it's a problem I've never even thought of.  I

5   want to be able to see what of the tough ones, what are the

6   ones that, you know, give me a fair chance to have thought

7   through some of these -- if there are some trickier issues or

8   critical documents, sometimes based on the most critical

9   documents.  In this case, you know, 15 is not going to do it,

10  but it's a useful exercise.

11      **MS. PENG:**  Your Honor, so a follow-up question.  Given

12  that we've discussed today some of the exhibits that are going

13  to come in, are these representative exhibits hopefully not

14  going to be duplicative of the racist imagery, some of those

15  things --

16      **THE COURT:**  Yes.  Since we have been discussing a lot

17  of this and I'm going to rule on some of this, some of the

18  evidentiary stuff is already incorporated in the MILs.  Don't

19  waste your 15 on something I've already given you an indication

20  how I'm going to rule on some of this --

21      **MS. PENG:**  Right.  And is the Court expecting the

22  Government to kind of raise key documents, because clearly it's

23  our exhibit list at issue so we don't necessarily want -- I

24  mean, we're not going to object to our own list.  So is the

25  Court looking for us to identify key documents, or what is the

1    Government expected to do?

2            **THE COURT:**  All right.  I'm expecting the Defense to

3    have its list of exhibits.  There may be some -- so you can use

4    some of the 15 on those.  If there are some documents that you

5    want to -- kind of like a declaratory clearance in advance that

6    you can anticipate, that would be a good idea because I'm

7    trying to give you advance rulings so you sort of know what the

8    rules of the road are going to be.

9            **MS. PENG:**  Okay.  Thank you.

10           **MR. WAGGENER:**  Your Honor, I've made this suggestion

11   before.  I think it would be a good idea for us to provide the

12   Court with a full set of the exhibits now that we all have them

13   in electronic form.

14           **THE COURT:**  Yeah.

15           **MR. WAGGENER:**  That way you could see some of these

16   photographs, you could actually put -- pull them up on the

17   screen.

18           **THE COURT:**  Yep.

19           **MR. WAGGENER:**  I would ask the Government to provide

20   that set of documents.  If they can't do it, then I can get a

21   drive over there, work it out.  But the sooner the better that

22   the Court has access to that stuff I think is better for all of

23   us.

24           **THE COURT:**  I will ask the Government to do that, make

25   sure that we have your -- the actual exhibits so -- chances are

1    I will need to look at photographs or whatever it is or
2    transcripts or whatever it is that is going to be an exhibit.
3            MR. BARRY:  Certainly, Your Honor.
4         Mechanically how does the Court want that to happen?
5            THE COURT:  Well, for now, I guess in some digital
6    form that we can download.
7            MR. BARRY:  Yes.  I mean, delivered to chambers?  Is
8    there anyone in chambers?
9            THE COURT:  That's a good question.  If you bring it
10   to the clerk's office, they will figure out a way -- Vicky, we
11   can alert the court clerk's office.  They can figure out a way
12   of getting it to us.
13        If we had time, we would set up box.com, something, some
14   kind of Cloud --
15           MR. BARRY:  We might be able to work with your
16   courtroom deputy about getting a USA Effects account set up.
17           THE COURT:  Yes.  Something like that would be even
18   better, frankly.  Then we can access remotely or from the
19   courthouse.
20           MS. PENG:  I just want to flag that we might need more
21   time to do this because obviously a lot of the exhibits here
22   are very voluminous because they are cell phone extractions,
23   numerous of them, video, things like that so I think we will
24   have to figure out the best way to do that.
25           MR. WAGGENER:  Your Honor, I just pulled it up on my

1    computer screen, and it's a little over 80 gigabytes of

2    material.  I don't know if USA Effects is going to be the most

3    effective with that so probably getting a drive would be the

4    best way to do it.

5        **THE COURT:**  Okay.  Well, maybe for now if you can just

6    put it on a drive -- we can get two drives so we have a couple

7    copies of that.

8        **MR. BARRY:**  We'll work on it, Your Honor.

9        **THE COURT:**  Okay.  In fact, if you are going to make

10   two, if you could give me three, that would be helpful.  All

11   right.

12       **MR. NOVAK:**  Your Honor, I know we are getting to the

13   top of the hour.  I have one more very quick issue.

14       The parties -- or at least some of the parties -- have

15   filed some jury instruction materials.  At least on behalf of

16   Mr. Nelson, I think there is still at least one lingering

17   concern with one of the Government's proposed instructions, and

18   I will discuss that with Government counsel.  It's instruction

19   44, which has something to do with *Pinkerton* and VICAR.  We

20   will talk about it.

21       I just want the Court to know the filings related to the

22   jury instructions are almost complete, at least as far as we

23   can get at this point because we don't know really what the

24   final jury instructions need to look like, right, until we see

25   what kind of he testimony there is, what kind of exhibits there

are, right, what type of evidence is offered for certain

purposes and not other purposes.  But even for this very sort

of preliminary stage with respect to jury instructions, there

is just a little bit more that needs to come in concerning -- I

think it's Counts Eight and Nine at this point -- Six and

Seven.  Six and Seven.  I'm sorry.

**THE COURT:**  All right.  And, yes, I'm looking for

something to be over-inclusive because chances are we may end

up deleting a bunch of instructions because stuff was never

used for a limited purpose or whatever.  Obviously it's always

subject to change -- adjustment given trial evidence and

everything else.

**MR. NOVAK:**  I assume we would have like a final jury

instruction conference between the closing of evidence and the

instructions and argument; right?

**THE COURT:**  We will.  But I'm going to issue

something -- what I consider, you know, maybe not final-final

but semifinal before you start because I -- unlike some judges,

I like to have the substantive instructions resolved as much as

possible based on our understanding of what the evidence is

going to look like because, number one, that will help you

understand what the rules I intend to apply are in terms of

presentation of your evidence, your arguments, etc., etc.;

Two -- and I want the parties to start thinking about this,

given the nature of this case, this is, I think, one of those

cases that warrants consideration of giving some substantive

instructions in the beginning so the jury has some idea of

what -- what you're all trying to do.  I understand there is

going to be an opening statement, but I think it's useful to

think about whether there are some instructions on the law that

may be -- not the whole thing because then it will be

overwhelming to them, but something in the beginning so they

have some guidance to understand, you know, why this enterprise

evidence is coming in, for instance.

So, yes, I --

**MR. NOVAK:**  Understood.

**THE COURT:**  Nothing is final until it's final, but I

do like to have a substantive discussion and an intended set of

instructions going into this.

**MR. PHILIPSBORN:**  Your Honor, this is Philipsborn.

Just so the Court knows, the Government actually has put a

fair amount of work into the process, and we -- for the last

week, I've essentially been the Defense lawyer involved in the

process.

We have almost completely complied as much as we can with

the Court's directive, and any delay in finalizing -- I think

there -- in the packet we've got, in addition to Mr. Novak's

issue -- as of this morning, there may have been one or two

instructions that I hadn't clarified some edits on, but the

point is we're almost there in terms of your getting the -- the

1   instructions you wanted submitted today, and we could submit

2   them with the understanding that there -- there are some

3   Defense objections that the Government is trying to clarify the

4   scope of with me that we're still -- that I need to talk to my

5   colleagues about which I think involve one or two instructions.

6       **THE COURT:** Well, if it means an extra day to try to

7   clarify, that's fine.  I would rather try to get as much of the

8   testimony sort of clarified and teed up as possible so if you

9   need an extra day or so, that's fine as well.

10      I saw from your statement the comment about the format

11  doesn't give you enough space to make your arguments, and I

12  didn't mean to say you can't use more than, you know, a hundred

13  words or something, but I did want the discussion to be tied to

14  a particular instruction and not some long brief so I can look

15  at each instruction and say *well, here are the parties'*

16  *respective positions*.  So maybe the footnote is a rather

17  lengthy footnote, but it's helpful to have it appended in a way

18  and organized in a way that I can see it in and see the

19  context.

20      **MR. PHILIPSBORN:** Fully understood, Your Honor.

21      I think the reason for the comment may apply to just a

22  very few instructions in which the Government essentially, you

23  know, provides a fairly full response to what essentially is a

24  footnote Defense objection, and where our footnote may have

25  been a little light on either authority or explanation, that's

1    what we were concerned to make sure that we at least made a

2    record on so that -- given the importance of the instructions.

3           **THE COURT:**  Yes.

4           **MR. PHILIPSBORN:**  Again, we will be looking at that

5    over the next couple of days, and we'll get it to you

6    forthwith.

7           **THE COURT:**  All right.  Great.  Thank you.

8        Anything else?

9           **MR. BARRY:**  Nothing from the Government.  Thank you,

10   Your Honor.

11          **THE COURT:**  All right.  So I guess we'll see you next

12   Friday.  Thanks everyone.

13              (Proceedings adjourned at 4:00 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4           I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Monday, March 28, 2022

8

9     /s/ Pamela Batalo Hebel

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25