JOHN G. WALSH, ESQ. (MA Bar No. 555649)
63 Atlantic Avenue, 3rd Flr.
Boston, MA  02110
johngwalshlaw@gmail.com
Telephone No.: (617) 851-2429

Counsel for Defendant
CHRISTOPHER RANIERI
Appearing *Pro Hac Vice*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER RANIERI *et al.*,<br><br>Defendants. | **Case No. 3:17-cr-00533-7 EMC**<br><br>**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**<br><br>**Date:  December 21, 2023**<br>**Time:  10:00 a.m.**<br>**Dept.:  Hon. Edward M. Chen** |

**PRELIMINARY STATEMENT**

Christopher Ranieri hereby submits his *Reply* to the Government's *Opposition* to his

motions for acquittal pursuant to Federal Rules of Criminal Procedure 29.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   A.  The Rule 29 Standard  . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . 6

   B. Mr. Ranieri's Conviction That He Conspired to Murder Joel Silva in Aid of
       Racketeering Under 18 U.S.C. §1959(a) is Not Supported by Sufficient
       Evidence. . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . .. . . . . . . . . .. . . . . . . .. 8

       1. The Evidence is Insufficient to Support Mr. Ranieri's Conviction
          Because There Was No Evidence That He Was a Member of The
          Charged Enterprise or That His Purpose to Commit The Charged
          Crime Was to "Maintain or Increase His Position" in That Enterprise
          And as There Was No Evidence That He Aspired to Become a Member
          of The Charged Enterprise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       2.  The Evidence is Insufficient to Support Mr. Ranieri's Conviction
          Based on The Government's Claim That He Conspired to Murder
          Mr. Silva to Preserve His "Status Within" The Charged Enterprise. . . . .13

       3.  The Evidence Based on The Testimony of Joseph Hardisty is
          Insufficient to Support Mr. Ranieri's Conviction That He Conspired to
          Murder Joel Silva in Aid of Racketeering. . . . . . . . . . . . . . . . . . . . . . .19

       4. The "Additional Evidence" Offered by The Government is Insufficient
          To Support Mr. Ranieri's Conviction That He Conspired to Murder
          Joel Silva in Aid of Racketeering. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   C. The Evidence is Insufficient to Support Mr. Ranieri's R.I.C.O. Conviction
       Under 18 U.S.C. §1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

       1. The Evidence is Insufficient to Support Mr. Ranieri's  Racketeering
          Conviction Based on The Acts Associated With Mr. Silva's Murder
          Because Those Acts Do Not Amount to Continued Criminal Activity
          Under 18 U.S.C. §1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       2. The Evidence is Insufficient to Support Mr. Ranieri's Racketeering
          Conviction Based on Acts Not Associated With Mr. Silva's Murder. . . . 30

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . 33

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

2

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Allwaste, Inc. v. Hecht,* 65 F.3d 1523 (9th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . 29

*Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229 (1989) . . . . . . . . . . . . . . . 28, 29

*Jackson v Virginia*, 443 U.S. 307 (1979) ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*People v. Ware*, 14 Cal. 5th 151 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Banks*, 514 F.3d 959 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . 11, 14

U*nited States v. Bracy*, 67 F.3d 1421 (9th Cir., 1995). . . . . . . . . . . . . . . . . . . . . . .11

*United States v. Concepcion*, 983 F.3d 369 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . 10

*United States v. Croft*, 124 F.3d 1109 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 8, 22

*United States v. Ferguson*, 49 F. Supp. 2d 321 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . .11

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Fernandez,* 388 F. 3d 1199 (9th Cir. 2004). . . . . . . . . . . . . . . . . . 9, 11, 12, 14

*United States v. Fiel*, 35 F.3d 997 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . .  11

*United States v. Freeman*, 6 F.3d 586 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Houston*, 648 F.3d 806 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . .. 29

*United States v. Jaimez*, 45 F.4th 1118 (9th Cir. 2022),
    *cert. denied*, 143 S. Ct. 1038 (2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Landesman*, 17 F.4th 298 (2d Cir. 2021).. . . . . . . . . . . . . . . . . . .  7, 17

*United States v. Neapolitan*, 791 F.2d 489, 499 (7th Cir.),
    cert. denied, 479 U.S. 940 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States. v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . 6, 7, 8

*United States v. Pauling*, 924 F.3d 649 (2nd Cir. 2019). . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Pimentel*, 346 F.3d 285 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . .11

*United States v. Rodriguez*, 971 F.3d 1005 (9th Cir., 2020) . . . . . . . . . . . . . .   12,14, 29

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) ). . . . . . . . . . . . . . . . . . . . . . .   7

*United States v. Tam,* 240 F.3d 797 (9th Cir. 2001) ). . . . . . . . . . . . . . . . . . . . 8, 22, 23

*United States v. Williams,* No. CR 13-0764 WHO, 2018 WL 2724337
    (N.D. Cal. Jun. 6, 2018) ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8, 23

*United States v. Wong,* 2014 WL 923347 (N.D. Cal. 2014) . . . . . . . . . . . . . . . . .   6

**Statutes**

18 U.S.C. §1959(a) ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 9, 10, 11, 12, 13, 14 18

18 U.S.C. § 1651(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

18 U.S.C. §1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5,  6, 14, 27, 28

**Rules**

Fed. R. Crim. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

4

I.        INTRODUCTION

Cristopher Ranieri's motion for judgment of acquittal should be granted because there is insufficient evidence to support his convictions.

To sustain Mr. Ranieri's conviction of conspiring to murder Mr. Silva under 18 U.S.C. §1959(a), the evidence has to prove beyond a reasonable doubt that he was a member in the charged enterprise whose purpose in conspiring was to retain or enhance his position in it or that he conspired with that purpose to become a member of it.  The evidence at trial does not establish these essential facts.  Despite §1959(a)'s plain language, the Government asserts formal membership in a criminal enterprise is not required to be proven.  The authority it relies on in support of its "associate" proposition, however,  is markedly distinct from our case and imposes this theory of liability in circumstances in which defendants directly and significantly participated in the affairs of the charged enterprise.  That is not the case here. Nevertheless, the evidence is insufficient to sustain his conviction that he conspired to murder Mr. Silva to "preserve" his status within the charged enterprise as the Government maintains.  His connections to the enterprise are sporadic, social in nature, and non-culpable.  Also, the evidence based on the testimony of Joseph Hardisty, the only witness against him, is insufficient to support his conviction because it is undermined by aspects of Mr. Hardisty's own testimony; others' testimony and evidence; his testimony is uncorroborated in material respects; and as it also is so inconsistent or improbable on its face that no reasonable fact finder could accept it.  Evidence other than Mr. Hardisty's testimony is also insufficient to sustain his conviction that he agreed to murder Mr. Silva.

As for Mr. Ranieri's conviction under 18 U.S.C. §1962(d), the evidence is insufficient to support an inference that he knowingly agreed to participate, directly or indirectly, in the conduct

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

5

of the charged enterprise's affairs through a pattern of racketeering. Again, his connections to the

enterprise are sporadic, social in nature, and non-culpable.  Given his lack of culpable

connections to or involvement in the charged enterprise until the alleged conspiracy to murder

Mr. Silva in June 2014 and his murder in July 2014, the evidence is insufficient to support his

racketeering conviction premised on the acts associated with Mr. Ranieri's murder because those

acts do not establish a threat of continued criminal activity necessary to prove the pattern of

racketeering element required to proven, and sustain, a conviction under §1962(d).  Also, in this

vein, his conviction cannot be sustained on the basis of these acts since this case involves one

conspiracy to murder and one murder and, consequently, is distinct from other authority.  Also,

as will be discussed below, the evidence is insufficient to support Mr. Ranieri's racketeering

conviction based on purported acts not associated with Mr. Silva's murder which the

Government raises in its *Opposition*.

## II.    ARGUMENT

### A.  The Rule 29 Standard

Rule 29 permits the Court to enter a judgment of acquittal  of any offense for which the

evidence is insufficient to sustain a conviction. Fed. R. Crim. Pro. 29. See also, *United States v.*

*Wong,* 2014 WL 923347, at *5 (N.D. Cal. 2014).  Such a challenge is a two-step process. First,

the Court must review the evidence  at trial in the light most favorable to the prosecution.

Second, the Court must determine whether the evidence, through this lens, is adequate to allow

"any rational trier of fact [to find] the essential elements of the crime beyond a reasonable

doubt." *Jackson v Virginia*, 443 U.S. 307, 319 (1979); *See also*, *U.S. v. Nevils*, 598 F.3d 1158,

1164-67 (9th Cir. 2010) (en banc) (evidence is insufficient if, viewing the evidence in the light

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION**
**TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

6

most favorable to the prosecution, a rational trier of fact could not have found the elements of the crime beyond a reasonable doubt). *United States v. Nevils,* 598 F. 3d 1158, 1163 (9th Cir. 2010).

In its *Opposition* the Government does not offer a fulsome account of the Rule 29 standard. (*Op.* Doc. 3633, pp. 4-6).

The Government, for instance, offers no insight as to the assessing the nature and reasonableness of inferences a trier of fact may draw from the evidence at trial in now determining whether that evidence is sufficient to sustain a conviction. (*Op.* Doc. 3633, pp. 4-6). See, e.g., *Jackson,* at 319 (trier of fact has responsibility "to weigh the evidence and to draw reasonable inferences"); *Nevils*, at 1167 (evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case); *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) ("[S]pecious inferences [should] not [be] indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty."); *United States v. Pauling*, 924 F.3d 649, 656   (2nd Cir. 2019) (an inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist); *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021) (where a fact to be proved is also an element of the offense it is not enough that the inferences in the government's favor are permissible, but rather, the Court must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt). Also, if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt. *Id.*

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

7

Furthermore, as to assessing testimonial evidence at this stage, the Court can conclude that such evidence is insufficient to sustain a conviction if it is "so inconsistent or improbable on its face that no reasonable fact finder could accept it. See, e.g., *United States v. Croft*, 124 F.3d 1109, 1125 (9th Cir. 1997); *United States v. Tam,* 240 F.3d 797 (9th Cir. 2001); *United States v. Williams,* No. CR 13-0764 WHO, 2018 WL 2724337, at *7 (N.D. Cal. Jun. 6, 2018).

Finally, the Government inaptly claims, citing to *Nevils,* 598 F.3d at 1167, that "… granting a motion of acquittal is necessarily rare". *Op.,* p. 6. Conversely, its citation to that page of the *Nevils* illustrates when the Government's cases may fail under the Rule 29 standard. *Nevils,* 598 F.3d at 1167 (evidence, construed in favor of the government "may still be so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt.").

While the standards for granting a Rule 29 motion are demanding, they are not, as suggested by the Government, impossible to meet. Here, the evidence before the Court as to Mr. Ranieri demonstrates that his is a case in which the entry of a judgment of acquittal is necessary and warranted.

### B.  Mr. Ranieri's Conviction That He Conspired to Murder Joel Silva in Aid of Racketeering Under 18 U.S.C. §1959(a) is Not Supported by Sufficient Evidence

The Government asserts the sufficient evidence of Mr. Ranieri's VICAR agreement to murder Mr. Silva consists of testimony Joseph Hardisty, *Op.,* pp. 6-8; and other evidence which "…completely supports the details that Hardisty provided…", *Id.,* p.8. According to the Government this latter evidence consists of CAST evidence, *Id*., pp. 8-9; call details records which show "a high volume of communications between Ranieri and Nelson and Ranieri and Wendt on the day Silva was killed" *Id.*, pp. 9-12; witness testimony that purportedly supports both Mr. Hardisty's testimony and Mr. Ranieri's liability for Silva's death, *Id.*, pp. 12-15; that

Mr. Ranieri left a Filthy Few patch at the Sonoma Clubhouse after a party, *Id*. p. 15; and,

testimony Mr. Silva threatened Mr. Sweeney because he was proud to have had the "81" pendant

or chain and became  angry towards Mr. Sweeney when he no longer had it.  *Id*., p. 16.

The Government contends Mr. Ranieri's conviction of VICAR conspiracy to murder Mr.

Silva is supported by sufficient evidence because Mr. Ranieri had "status within" HASC, which

expected its members and associates to violently react to perceived disrespect; as Mr. Silva's

threat to kill Christopher Sweeney was disrespectful to Mr. Ranieri who, therefore, reacted to it

by agreeing that Mr. Silva should be murdered; and since Mr. Ranieri's substantial purpose of

his supposed agreement was to preserve his "status within" the HASC. *Op.,* p. 27; pp. 16-27.

The Court should grant Mr. Ranieri's motion despite the Government's claims because,

as discussed below, his conviction that he conspired to murder Mr. Silva in aid of racketeering is

not supported by sufficient evidence.

### 1. The Evidence is Insufficient to Support Mr. Ranieri's Conviction Because There Was No Evidence That He Was a Member of The Charged Enterprise or That His Purpose to Commit The Charged Crime Was to "Maintain or Increase His Position" in That Enterprise And as There Was No Evidence That He Aspired to Become a Member of The Charged Enterprise

The evidence establishes that Mr. Ranieri was a member of the Salem, Massachusetts

chapter of the Hells Angels, and not the charged HASC enterprise.  Nonetheless, the

Government contends there is "… no requirement of formal membership in a criminal enterprise

for VICAR liability….[and] [a]ssociates of a criminal enterprise, like Ranieri, can still be

convicted under RICO. *See, e.g, United States v. Fernandez,* 388 F. 3d 1199 (9th Cir. 2004)."

*Op.*, p. 16.  It then asserts that there is sufficient evidence to sustain his  conviction of the

VICAR conspiracy to murder Mr. Silva because he, Mr. Ranieri, had "status within" the charged

enterprise. *Op.*, p. 16; pp. 16-27.

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

9

However, a plain reading of §1959(a)'s purposes prong[1] means that to convict Mr. Ranieri of this charge, the evidence must sufficiently establish beyond a reasonable doubt that *he was a member in the HASC enterprise and* conspired to murder Mr. Silva *with the motive, purposes, or intent* of retaining or enhancing *his position in that enterprise.*  Also, the Court instructed the jurors in its final instructions in harmony with the plain language of §1959(a)'s purposes prong. [2]

Section 1959(a)'s purposes or motive requirement is no mere technicality. As the Second Circuit explained in *Concepcion*, Congress "included" the requirement "as a means of proscribing murder and other violent crimes committed '*as an integral aspect of membership'* in such enterprises." *United States v. Concepcion*, 983 F.3d 369, 381 (2d Cir. 1992) (quoting S. Rep. No. 98-225, at 304 (1983) (the evidence must support an inference that "the defendant committed his violent crime because he knew it was expected of him *by reason of his membership in the racketeering enterprise or that he committed it in furtherance of that membership.*")  Thus, there must be sufficient evidence that Mr. Ranieri's alleged "gang-related

---

[1] As relevant here, 18 U.S.C. §1959(a) provides that:

> Whoever, …. or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, … or conspires so to do, shall be punished…

[2] As to this element, the Court instructed the jury that:

> Fourth, the defendant's purpose in conspiring to commit murder was to *gain entrance to or maintain or increase his position in the HASC enterprise.* It is not necessary for the Government to prove that this motive was the sole purpose or even the primary purpose of the defendant in committing the charged crime.
>
> *You need only find that gaining entrance to or maintaining or increasing his position in the enterprise was a substantial purpose of the defendant or that he committed the charged crime as an integral aspect of membership in the enterprise.*
> As -- an incidental motivation, however, is not enough….

R.T. 6608.

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

10

purpose" must "be more than merely incidental: It must be within his 'general' purpose, or, in the alternative, the violence committed must be in some way 'integral' *to the defendant's membership in the gang*." *United States v. Banks*, 514 F.3d 959, 969 (9th Cir. 2008).  See also, U*nited States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir., 1995) (defendant *acted for the purpose of promoting his position in a racketeering enterprise*); *United States v. Pimentel*, 346 F.3d 285, 295 (2d Cir. 2003) ("we have consistently held that "the motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime *because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership*"); *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994) ("The legislative history indicates that the phrase was added to proscribe murder and other violent crimes committed 'as an integral aspect of membership' in such enterprises" (quoting S.Rep. No. 225, at 304); *United States v. Ferguson*, 49 F. Supp. 2d 321, 327 (S.D.N.Y. 1999); *United States v. Ferguson*, 246 F.3d 129, 135-36 (2d Cir. 2001).

Despite the plain language of §1959(a)'s purposes prong and its settled parameters, as discussed immediately above, the Government offers *United States v. Fernandez,* 388 F. 3d 1199 (9th Cir. 2004) in support of its assertion that there is no requirement of formal membership in a criminal enterprise for VICAR liability and associates of a criminal enterprise, like Ranieri, can still be convicted under RICO.

However, the Government finds no refuge in *Fernandez* to support its claim. There, defendant Roy Gavaldon argued that there was insufficient evidence at trial to support his conviction for participation in a racketeering conspiracy because he was not a member of the enterprise.  The court found that although he was not a "member" of the Eme, i.e., did not have decision making authority within the group, this did not mean he did not conspire to participate

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

11

1  in the conduct or operation of the enterprise. *Fernandez,* 388 F. 3d at 1231.   The court also

2  found that as an Eme associate he managed the southeast Los Angeles gangs, was ordered to

3  assault someone who had "burned" Eme members, and collected payments on behalf of Eme

4  members, and, thus, he shared the liability of other individuals within the enterprise, even if he

5  was not a leader within the group. *Id.*

6

7         Nor does the Government find refuge for its proposition in *United States v. Rodriguez*,

8  971 F.3d 1005 (9th Cir., 2020). There, the court found Rodriguez served as "secretary" for the

9  leader of a branch of the Eme and for her ex-husband who was a member of the Eme; in that

10 capacity, she delivered messages among Eme members and their leadership teams, collected and

11 disbursed "tax" money earned from extortion, and, ultimately, conspired to murder gang

12 members who were deemed a threat to that leadership. *Id.,* p. 1008-09. Post  conviction, she

13 challenged the sufficiency of VICAR's membership-purpose requirement. *Id.*, p. 1011.

14 Although not considered an official member of the Eme, the government presented sufficient

15 expert and percipient testimony, as well as recorded conversations and seized correspondence, to

16 establish that she served as an Eme secretary and facilitated acts of violence as a part of her role,

17 and the conduct at the center of the VICAR count was inextricably tied to her position as

18 secretary—principally, her dissemination of communications to direct the activities of her boss's

19 faction, including instructions to murder or otherwise inflict violence upon those who threatened

20 him or people loyal to him. *Id.*

21         *Fernandez's* and *Rodriguez's* impositions of "associate" liability, however, do not

22 comport with the plain language of §1959(a)'s purposes prong nor with the authority analyzing it

23 discussed above and in Mr. Ranieri's opening memorandum.  Furthermore, *Fernandez* and

24 *Rodriguez* are factually distinct from our case.  *In both of these cases the relevant defendants*

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION**
**TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

*directly and significantly participated in the affairs of the charged enterprise.  That is not the case here* as will be discussed in more detail below.

Here, no reasonable juror could find that Mr. Ranieri's motivation for conspiring to murder Mr. Silva was to "maintain or increase his position" in the HASC enterprise because there was no evidence that he was a member of that enterprise.   The Government presented no evidence against him, direct, or circumstantial, that established this essential element of §1959(a)'s membership-dependent prong.  Nor did it ask the jury to find that he was a member of the HASC enterprise. Thus, it is impossible for any rational factfinder to convict him of this charge on that basis. The necessary, fundamental inferences to do so –membership in the HASC enterprise and a membership-dependent motive in the absence of evidence thereof in the face of evidence of non-culpable relations with members of the charged enterprise - are, therefore, irrational.

Likewise, no reasonable juror could find beyond a reasonable doubt that Mr. Ranieri conspired to murder Mr. Silva under §1959(a)'s "seeking to gain entry" prong. The utter lack of aspirational evidence here prevents reasonable jurors from making the rational inferences required to convict him of this charge on this basis.

### 2. The Evidence is Insufficient to Support Mr. Ranieri's Conviction Based on The Government's Claim That He Conspired to Murder Mr. Silva to Preserve His "Status Within" The Charged Enterprise

As noted above, the Government maintains that Mr. Ranieri's conviction of conspiring to murder Mr. Silva is supported by sufficient evidence since Mr. Ranieri had "status within" the HASC; Mr. Silva's threat to kill Mr. Sweeney was disrespectful to Mr. Ranieri who responded to it by agreeing that Mr. Silva be murdered; and Mr. Ranieri's substantial purpose in doing so was to preserve his "status within" the HASC.  *Op.,* p. 27; pp.16-27.

Mr. Ranieri's motion should be granted despite the Government's claims.

First, §1959(a) "itself contains no indication that Congress intended it to make gang membership a status offense such that mere membership plus proof of a criminal act would be sufficient to prove a ... violation. Otherwise, every traffic altercation or act of domestic violence, when committed by a gang member, could be prosecuted under [Section 1959(a)] as well." *United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008).  In short, "[b]y limiting the statute's scope to those cases in which the jury finds that one of the defendant's general purposes or dominant purposes was to enhance his status or that the violent act was committed 'as an integral aspect' of gang membership, [courts] ensure that the statute is given its full scope, without allowing it to be used to turn every criminal act by a gang member into a federal crime." *Id.* at 969-70 (footnote omitted). Here, as discussed above, the evidence is insufficient to support a reasonable inference that Mr. Ranieri was or aspired to become a member of the charged enterprise.

Second,  although one's connections to and acts relating to a charged enterprise may be pertinent in assessing the sufficiency of evidence relating to one's "purposes" under §1959(a), courts which have found evidence to be sufficient on this point are premised on the fact that the charged defendants participated directly and considerably in the criminal affairs of the charged enterprises.  See, e.g.,  *Fernandez* and *Rodriguez*.  That is not the case here as will be discussed below.

Third, mere association with an enterprise does not constitute an actionable §1962(d) violation. *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) . In a RICO conspiracy, as in all conspiracies, agreement is essential. *Id.* (citing *United States v. Neapolitan*, 791 F.2d 489, 499 (7th Cir.), cert. denied, 479 U.S. 940 (1986).

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

14

Fourth, the Government notes that Mr. Ranieri's "….connection with HASC is longstanding, to at least 2008." *Op.,* p. 16. What is telling in view of that fact is the evidence at trial demonstrates that his ties to the HASC consists of his socializing with members of it.  Thus, assessing the totality of the evidence at trial demonstrates that it is insufficient to show that he was a culpable member in or associate of the charged enterprise for VICAR purposes.

For instance, there was no evidence Mr. Ranieri had a role or participated in or facilitated or encouraged or had knowledge of any unlawful enterprise-related criminal activities until June 2014 when it is alleged he conspired to murder Mr. Silva.  Even former HASC members and associates and law enforcement agents presented by the Government did not testify or offer evidence that he was culpably associated with the charged enterprise aside from the allegations that he conspired to murder Mr. Silva.[3]  Also, there is no evidence that he ever lived in California or any place other than Massachusetts.  If he had lived in California, that may have strengthened his connections to the charged enterprise - although not in a culpable manner, but he did not.  Likewise, although he visited California, the evidence shows that his visits there were irregular and infrequent.  Furthermore, there is no evidence that he was a member of the

_____

[3] In addressing Mr. Ranieri "status within" the HASC, the Government apparently attributes some significance to a conversation Russell Lyles and Raymond Foakes had on a recorded jail call during which they discussed the fact "Manny from Boston" had been arrested along with Mr. Lyles' at a marijuana growing site in Willetts, California in June 2008.  During that conversation Mr. Foakes stated he discussed Manny's case with Mr. Ranieri who wished to help secure bail for Manny. *Op.*, p. 16.   The Government, however, does not tell us in its *Opposition* that at trial the evidence showed that Manny was not charged with any crime related to that marijuana grow site, R.T. 1937-38; nor that the parties stipulated at trial that neither Manny or Mr. Ranieri were charged with any crime related to that grow site and neither were identified as Mr. Lyles' co-conspirators or unindicted co-conspirators relating to the prosecution of Mr. Lyles relating to that grow site.  R.T. 6516.  Hence, evidence of this phone conversation does not support a reasonable inference from which a rational juror could conclude that Mr. Ranieri was a culpable member in or associate of the charged enterprise for VICAR and RICO conspiracy purposes.

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

15

HASC, ever held an office in it,  attended one of its "church" meetings, voted on any of its

charter business, followed the progress of any criminal proceedings or potential criminal

liabilities against its members, attended any of its runs, aided or facilitated any of its affairs,

aided any of its incarcerated members or received any benefits from its non-criminal or criminal

activities.

Also, the Government contends testimony from Mariano Malvino, Stacy Silva, Brittany

Tolman and Steven Verhagen supports an inference that Mr. Ranieri had high "status" or

"position in the club". *Op.* , pp. 16-19.  Mr. Malvino, for example, who met Mr. Ranieri only

once, simply testified:  "Q. Were you able to see how Rainman behaved, how he carried himself?

A. He just looked like a bad – a bad motherfucker. Excuse my language." RT 1100-01." *Op.* , p.

16.  Also, Ms. Silva simply testified that she once heard her husband state the name "Rainman"

with respect. *Id.*, p. 17; R.T. 3193.  Similarly, Brittany Tolman testified that Mr. Ranieri "… was

just, I feel like, a normal houseguest. They [Lyles and Ranieri] were so excited to see each other.

JR also thought the world of Rain as well. He talked about his kids a lot and seemed very,

excited to see each other…. ". *Id.,* pp.17-18. The Government simply overstates this evidence in

suggesting its strained inference on status.  This evidence, as well as that of Mr. Verhagen's and

Mr. Conte's testimony, does not support a reasonable inference that Mr. Ranieri was a culpable

member in the charged enterprise for VICAR principles.  Indeed, the testimony of Ms. Tolman in

particular instead establishes the social nature of Mr. Ranieri's relationships with members of the

Sonoma County Hells Angels.

The Government next maintains that Mr. Ranieri's "status within" the charged enterprise,

and, thus, his VICAR purposes to support his conviction, can be inferred from evidence of

plaques, posters, and other Hells Angels materials honoring Mr. Ranieri at the HASC clubhouse

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

16

and materials there from Boston honoring HASC members, *Op*., p. 19; as well as from evidence he at times wore a Sonoma patch and had a Sonoma tattoo on his arm.  *Id*.,  24-26. Notwithstanding the Government's claim, this evidence instead demonstrates his social, non-culpable relations with the Sonoma County chapter of the Hells Angels and it members.   As the Government's gang expert Jeremy Scheetz testified as to a photo of Mr. Ranieri depicted wearing a "cut" with a Sonoma tag or patch on it, :

> Q. And if there is a charter name, such as Sonoma, do you   expect that to be worn by the members of that charter?
>
> A. Yes and no; but as you can see, Mr. Ranieri is not a member of Sonoma, but he is wearing that Sonoma County.
>
> **Q. So what does it mean when a member of a different charter wears a location tag from a different charter?**
>
> **A. It's the exact same thing as the side rocker. It's just a friendship thing.**

R.T.: 2500.

Here, even viewing this evidence in the light most favorable to the Government, this circumstantial evidence gives equal or nearly equal support to a theory of guilt and a theory of innocence, and, accordingly, a reasonable jury must necessarily entertain a reasonable doubt. *Landesman*, 17 F.4th, at p. 320. Accordingly, this circumstantial evidence is insufficient to show that Mr. Ranieri was a culpable member or associate of or had "high status" in the charged enterprise for VICAR purposes.

The Government next asserts that Mr. Ranieri's "… prominent display of his status as among the "Filthy Few" also supports his high status within HASC, because that tag indicated one committed violence on behalf of the Hells Angels." *Op*., p. 22; pp. 22-24.  However,  no evidence at trial supports  a reasonable inference he perceived that he needed to resort or resorted to violence in response to all acts of disrespect regardless of whether it was directed at him or

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

17

Mr. Sweeney.  Furthermore, no trial evidence supports a  reasonable inference he perceived he

must resort to or resorted to violence viz-a-viz the affairs of the charged enterprise in order to

maintain his non-position in it or to further its objectives. Moreover, the Government concedes

that any violent act he committed as purportedly indicated by his "Filthy Few" "display", of

which there is no evidence thereof at trial, was done on behalf of the Hells Angels and *not the*

*charged enterprise*.  Consequently, this evidence does not establish a reasonable inference that

he was a culpable member in,  associate of, or had high status in the charged enterprise for

VICAR purposes.

      Fifth, the evidence is insufficient to show that Mr. Ranieri was a culpable member in,

associate of or had "status" in the charged enterprise for VICAR purposes insofar as there was no

evidence that he was a sergeant-at-arms in any chapter, and he conspired to murder Mr. Silva in

that role to enforce HASC rules.  Nor is there any evidence that he  planned, participated in,

facilitated, or recruited others to murder Mr. Silva; or bragged or used Mr. Silva's murder to

bolster his reputation or facilitate the commission of other crimes.  Nor is there any evidence that

he felt disrespected by Mr. Silva's alleged threat against Mr. Sweeney *as an associate of the*

*charged enterprise* or feared failing to violently respond to it *would affect his standing  or*

*position in the charged enterprise---one with which he had no culpable standing or position in or*

*relationship to.*

      Finally, Mr. Ranieri's conviction based of his substantial purpose in conspiring to murder

Mr. Silva being to preserve his "status within" the HASC cannot be affirmed on the trial record

because the inferences required to do so are unreasonable, strained, speculative and specious.

They are no more than guess work.  Also, the evidence totally fails to support an inference as to

the essential elements of the plain language of this §1959(a) charge and settled authority. While

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION**
**TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

18

one's §1959 conviction may be affirmed if a motivation or purpose to maintain or increase one's

position can be reasonably inferred from the evidence, that is not the case here and his conviction

cannot be sustained.

### 3.   The Evidence Based on The Testimony of Joseph Hardisty is Insufficient to Support Mr. Ranieri's Conviction That He Conspired to Murder Joel Silva in Aid of Racketeering

The Government asserts that Mr. Ranieri's conviction of the VICAR conspiracy to

murder Mr. Silva is supported by sufficient evidence as established by the testimony of Mr.

Hardisty.  *Op*., pp. 6-8. It maintains that "[t]here is no question that Hardisty implicated Ranieri

in his testimony." *Id.*, p. 7.  Mr. Ranieri's motion should be granted regardless of the

Government's claims because the evidence based on Mr. Hardisty's testimony is insufficient to

support Mr. Ranieri's conviction that he conspired to murder Mr. Silva in aid of racketeering.

At the outset, at this stage it is critical that the trial evidence be viewed in its totality.

*United States v. Glenn* 312 F.3d 58, 69  (2d Cir. 2002).

Here, the inferences of Mr. Ranieri's guilt the Government seeks to draw based on Mr.

Hardisty's testimony are undermined by other aspects of his own testimony as well as others'

testimony and evidence offered by the Government.

First, at trial Mr. Hardisty testified that Mr. Silva and he traveled from either Oakland or

San Francisco to Boston, or Manchester, New Hampshire, to attend a motorcycle rally in

Laconia, New Hampshire. R.T.: 3918. When they arrived in Boston they first went to Mr.

Ranieri's home in Lynn, Massachusetts, and then, perhaps, the "clubhouse". R.T.: 3918, 3920.[4]

They entered Mr. Ranieri's house, and later left, along with "members from Fresno", and drove

to Laconia. R.T.: 3919-22.

---

[4] The Salem/Lynn "clubhouse" was also located in Lynn. R.T.: 5711

1    The Government offered call details records for Mr. Silva's cell phone records along with

2    those of others' targeted cell phones into evidence. (GX: 128-130, 132-138 and 143; GX-

3    127). It also offered a voluminous CSLI report by F.B.I. Special Agent Meredith Stanger, its

4    CLSI expert, which included her mapping of the targeted phones identified in her

5    Report into evidence. (GX-127; RT: 3485).

6

7    S.A. Stanger testified that she analyzed Mr. Silva's CDRs to determine his travel

8    throughout the month of June 2014 - a timeframe during which his CDRs indicated  his phone

9    was on the East Coast.  R.T.: 3556. *See also*, R.T.: 3560.  As for the mapping in her report, she

10   collaborated with the prosecution team in deciding what CSLI information to depict in the maps

11   in her report, i.e., GX-127. R.T.: 3547-48. In her overall analysis, however, she mapped cell

12   location information of all Mr. Silva's cell phone records to determine his locations during the

13   period covered by those records. RT: 3555-56.[5] She did not map all of the locations arising from

14   his CDRs for the entire period covered by them but instead focused on time frames "necessary"

15   for the analysis and maps depicted in her report. R.T.: 3555-56. Nevertheless, she examined all

16   the travel-related information she extrapolated from his CDRs but did not depict or map all of

17   that information in her report, i.e., GX-127. R.T.: 3557.

18

19   S.A. Stanger testified that  after analyzing all of Mr. Silva's CDRs from June 1, 2014

20   through August 15, 2014,  she determined his cell site activity is not consistent with his ever

21   being at Mr. Ranieri's home in Lynn from the time he arrived on the East Coast from California

22   through the time he left the East Coast from the Manchester, New Hampshire Airport to

23   California on June 16, 2014. R.T.: 3560.

---

[5] Those records encompass the period from June 1, 2014 through August 15, 2014. (GX-128)

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION**
**TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

20

Thus, inferences of Mr. Ranieri's guilt which the Government seeks to draw from Mr. Hardisty's testimony and CDRs and CSLI evidence are unreliable and unreasonable inasmuch as they are undermined by its own CAST expert and her analysis of Mr. Silva's CDRs.   This evidence also rebuts its claims that S.A. Stanger's testimony and report "… squares with Hardisty's testimony on virtually every significant point." *Op.*, p. 8.

Second, Mr. Hardisty testified that after Mr. Silva threatened Mr. Sweeney in New Hampshire, he, and Messrs. Wendt, Huff and Bueno, members from Fresno, drove directly to Mr. Ranieri's home in Lynn. RT: 3926-27. There, according to Mr. Hardisty, Messrs. Wendt and Ranieri had a private discussion in Mr. Ranieri's garage, RT: 3928; 3854, after which these men allegedly discussed this supposed threat including that something had to be done and that he, Mr. Silva, had to be killed.[6] R.T.: 3855.

However, TFO Menke testified that Mr. Hardisty did not mention or talk about this meeting at Mr. Ranieri's home during his interviews with Mr. Hardisty in June and July 2016. R.T.: 4930; 4932.  Also, S.A. Stanger testified that if Messrs. Wendt and Huff were standing together when that meeting allegedly occurred, they would have been in the vicinity of the Salem Clubhouse not Mr. Ranieri's residence, R.T.: 3552-53. Neither she nor her report, GX-127, offered evidence that Messrs. Wendt's, Huff's, and Bueno's cell phones were near Mr. Ranieri's home on that day not, or as the Government now contends "…in the vicinity of…" his home. Furthermore, Mr. Hardisty did not testify that he and those three men were ever separated from one another during that time and there was no evidence that supports such an inference.

Consequently, again, inferences of Mr. Ranieri's guilt based on Mr. Hardisty's testimony are undercut by both TFO Menke's testimony and S.A. Stanger's testimony, and Messrs.

---

[6]  Mr. Hardisty also testified this was not explicitly stated but was his understanding. R.T.: 3855

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

21

Wendt's, Huff's, and Bueno's CDRs and her analysis thereof. Again, her testimony and those CDRs, refute the Government's assertions that her testimony and report "… squares with Mr. Hardisty's testimony on virtually every significant point." *Op.*, p. 8.

Third, Mr. Hardisty testified that the impetus for the alleged VICAR conspiracy to murder Mr. Silva was his threat in Laconia to kill Mr. Sweeney. R.T.: 3850. According to Mr. Hardisty, Mr. Silva made this threat because he was angry that Mr. Sweeney had given a gold neck chain to a prospect, and *Mr. Silva saw that prospect wearing it in Laconia*. RT: 3897-98; 3900; 3902-03. Mr. Hardisty recalled he had also testified to that effect before the Grand Jury. RT: 3900.

On cross-examination, Mr. Hardisty testified that in June and July of 2016 he told TFO Menke this chain was the centerpiece of a dispute between Mr. Silva and Mr. Sweeney, but their dispute occurred at the Salem clubhouse in Massachusetts. RT: 3904-05.  TFO Menke testified Mr. Hardisty stated that Mr. Sweeney and Mr. Silva had an altercation because *Mr. Silva saw Mr. Sweeney wearing this chain*. RT: 4728. *Mr. Hardisty also testified on cross-examination that he – neither a prospect nor Mr. Sweeney - was wearing this chain when he came to Boston and Laconia with Mr. Silva in 2014*. RT: 3908, 3810.

Mr. Hardisty's testimony on this point, undermined by TFO Menke's testimony, is also so inconsistent and improbable on its face that no reasonable fact finder could accept it, and it does not support a rational inference that the impetus for Mr. Silva to threaten to kill Mr. Sweeney and, hence, Mr. Ranieri's motive for conspiring to murder Mr. Silva.  This evidence, therefore, is insufficient to sustain Mr. Ranieri's conviction that he conspired to murder Mr. Silva. *See*, *United States v. Croft*, 124 F.3d 1109, 1125 (9th Cir. 1997); *United States v. Tam*, 240

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

22

F.3d 797 (9th Cir. 2001); *United States v. Williams,* No. CR 13-0764 WHO, 2018 WL 2724337, at *7 (N.D. Cal. Jun. 6, 2018).

Fourth, the Government asserts that Mr. Ranieri's conviction is also supported by sufficient evidence based on Mr. Hardisty's testimony that after Mr. Silva was murdered, he, Mr. Hardisty, met with Mr. Ranieri "… during a party at the Fresno clubhouse, and they discussed that killing once again." *Op.,* p. 8.  Mr. Hardisty first made this claim during cross-examination at trial. By then he had been cooperating with law enforcement since May 2016. From that point to the time he first made this claim at trial, the record shows he had been interviewed several times by the Government; communicated frequently with his handlers; and prepared himself, with the Government's help, for his Grand Jury testimony, his Group One trial testimony, and Mr. Ranieri's trial.  Yet it took him almost seven years - over approximately 2, 444 days, more than 58,000 hours - to make this claim.  His testimony in this regard is unreliable and specious and also so improbable on its face that no reasonable fact finder could accept it. Consequently, it does not support a rational inference that Mr. Ranieri agreed to murder Mr. Silva.  Thus, it is insufficient to sustain Mr. Ranieri's conviction. See, *Croft,* 124 F.3d at 1125 (9th Cir. 1997); *Tam,* 240 F.3d 797 (9th Cir. 2001);  *Williams,* No. CR 13-0764 WHO, 2018 WL 2724337, at *7 (N.D. Cal. Jun. 6, 2018).

Finally, although Mr. Hardisty provided evidence of a plan to conduct Mr. Silva's murder "… as well as details of the killing itself...", *Op.*, p. 8, this evidence is insufficient to sustain Mr. Ranieri's conviction that he conspired to murder Mr. Silva insofar as it does not implicate him in that claimed plan and murder, and there is no evidence he facilitated that plan or murder or the acts of witness intimidation, arson and obstruction of justice related thereto.

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

23

1

2

3

4

5

6

For the foregoing reasons, Mr. Ranieri's motion should be granted because the evidence based on Mr. Hardisty's testimony is insufficient to support his conviction since it is undermined by his own testimony, others' testimony and evidence offered by the Government, and aspects of his testimony are so inconsistent or improbable on its face that no reasonable fact finder could accept it.

7

8

### 4. The "Additional Evidence" Offered by The Government is Insufficient to Support Mr. Ranieri's Conviction That He Conspired to Murder Joel Silva in Aid of Racketeering

9

10

11

12

13

14

15

16

17

18

19

20

The Government contends the record is otherwise replete with evidence which "…completely supports the details that Hardisty provided…", *Op.* p.8.  It asserts this evidence consists of CAST evidence, *Id.*, pp. 8-9; CDRs that show "a high volume of communications between Ranieri and Nelson and Ranieri and Wendt on the day Silva was killed" *Id.*, pp. 9-12; witness testimony that purportedly supports both Mr. Hardisty's testimony and Mr. Ranieri's liability for Silva's death, *Id.*, pp. 12-15; that Mr. Ranieri left a Filthy Few patch at the Sonoma Clubhouse after a party in 2015, *Id.* p. 15; and, testimony that Mr. Silva threatened Mr. Sweeney because he was proud to have had the "81" pendant or chain and was angry towards Mr. Sweeney when he no longer had it.  *Id.*, p. 16.

21

22

23

24

25

26

First, CAST evidence at trial indicates that Messrs. Nelson and Wendt were in Lynn in July 2014.  According to that evidence Mr. Nelson was in Lynn and Boston between July 11 and 13, 2014, and Mr. Wendt was in Lynn between July 12 and 14, 2014. R.T.: 3504.  The Government's sought-after inference is that during this time these men communicated with Mr. Ranieri about an agreement or plan to kill Mr. Silva. *Op.*, p. 9.

27

28

The fact that Messrs. Nelson and Wendt were in Lynn during that time is by itself insufficient to establish Mr. Ranieri's agreement to murder Mr. Silva or his knowledge of his

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

murder.  Particularly given the evidence that Messrs. Wendt and Nelson were in Lynn to celebrate the forty-fifth anniversary members-only party in Lynn during that period. R.T.: 5710-55.  Furthermore, the Government's desired inference is dependent on Mr. Hardisty's testimony which, as discussed in the immediately foregoing sub-section is undermined and is so inconsistent or improbable on its face that no reasonable fact finder could accept it. Consequently, this evidence is insufficient to support Mr. Ranieri's conviction.

Second, the circumstantial CDR evidence that shows "a high volume of communications between Ranieri and Nelson and Ranieri and Wendt on the day Silva was killed", *Op*., pp. 9-12, is insufficient to establish Mr. Ranieri's agreement to murder Mr. Silva or his knowledge of his murder. For instance, the communications between Messrs. Ranieri, Nelson and Wendt are less frequent and lengthy compared to those by and between Messrs. Wendt, Nelson, Silva, Hefferman, Huff and by and between Messrs. Hardisty and Silva. *See*, GX 127-130; GX 132-138; GX-143. Also, a reasonable inference from this evidence is that Messrs. Ranieri and Nelson and Messrs. Ranieri and Wendt were communicating about their having attended the Salem's charter's forty-fifth anniversary members-only party in Lynn. Moreover, again the Government's preferred inference is conditioned on Mr. Hardisty's testimony which, as discussed in the directly foregoing sub-section is undercut and so inconsistent or implausible on its face that no reasonable fact finder could accept it. Therefore, this evidence viewed in the context of the totality of the trial evidence is insufficient to support Mr. Ranieri's conviction.

Third, the Government asserts Mr. Ranieri left a Filthy Few patch at the Sonoma Clubhouse after a party in 2015 and suggests a rational juror could therefore infer he conspired to murder Mr. Silva in aid of racketeering because he left that patch as a token of appreciation for Mr. Silva's murder.  *Op.*, p. 15.  However, the Government concedes that the witness who

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION**
**TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

25

testified to this alleged fact, Steven Verhagen, "… did not link this event with the Silva killing,…" *Id.* There is no other evidence on this point. Hence, viewed in the framework of the totality of the trial evidence this evidence is insufficient to support a reasonable inference that Mr. Ranieri conspired to murder Mr. Silva or his knowledge of the murder of him.

Fourth, the Government contends that the testimony of Stacy Silva, Stevie Silva, Brittany Tolman, and Ann and Johnnie Crail supports Mr. Hardisty's testimony and Mr. Ranieri's conviction. *Op.*, pp. 12-15. The Government plainly overstates this evidence in suggesting these inferences. This evidence does not implicate Mr. Ranieri as a culpable member in the charged enterprise for VICAR or RICO conspiracy principles. This evidence does not corroborate Mr. Hardisty's testimony as it pertains to Mr. Ranieri. This evidence does not rebut that fact, as discussed above, that Mr. Hardisty's testimony as it concerns Mr. Ranieri For the foregoing reasons, Mr. Ranieri's motion should be granted because the evidence based on Mr. Hardisty's testimony is insufficient to support his conviction since it is undercut by his own testimony, others' testimony and evidence offered by the Government, and aspects of his testimony are so inconsistent or improbable on its face that no reasonable fact finder could accept it. The testimonial evidence from these witnesses viewed in the context of the totality of the trial evidence is insufficient to support a reasonable inference that Mr. Ranieri conspired to murder Mr. Silva or his knowledge of the murder of him.

Fifth, in Section II.B.3 above, Mr. Ranieri addresses the significance of evidence relating to chain or pendant as an impetus for Mr. Silva's  threat to kill Mr**.** Sweeney, and, hence, Mr. Ranieri motive to conspire to murder Mr. Silva in the context of  demonstrating that Mr. Hardisty's testimony  is undermined by other aspects of his own testimony as well as others'

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

26

testimony and evidence offered by the Government.  Here, Mr. Ranieri refers the Court to his points in Section II.B.3 above.

Finally, although the Government does not raise this point in its *Opposition*, it did not offer any evidence at trial to corroborate Mr. Hardisty's account as to what happened on the East Coast in June 2014.  There are, for instance, no call detail records, photographs, cell-phone photographs, airline tickets, travel itineraries, flight records, car rental information, credit card receipts, cancelled checks, money order receipts or historical cell data location information that corroborates that he traveled from the West Coast to East Coast in 2014 as he claims, or which corroborate his claims as to what occurred while he was there, or of his being at Mr. Ranieri's home on two occasions in June 2014, or of his account that Mr. Ranieri conspired to murder Mr. Silva.

For the foregoing reasons, in view of the totality of the trial evidence, the evidence is insufficient to support a reasonable inference that Mr. Ranieri conspired to murder Mr. Silva or his knowledge of the murder of him.

### C.  The Evidence is Insufficient to Support Mr. Ranieri's Racketeering Conspiracy Conviction Under 18 U.S.C. §1962(d)

The Government claims Mr. Ranieri's conviction for RICO conspiracy is supported by sufficient evidence because he participated in or agreed to the commission of racketeering acts "associated with" Mr. Silva's homicide, and, aside from those acts, since he knew of other racketeering acts involving the charged enterprise and agreed that its members and associates would commit them. *Op.,* pp.27-33.  The Court should nonetheless grant Mr. Ranieri's motion because, as discussed below, the evidence is insufficient to sustain his conviction the he

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

27

knowingly agreed to participate in the affairs of the charged enterprise through a pattern of racketeering.

**1. The Evidence is Insufficient to Support Mr. Ranieri's  Racketeering Conviction Based on The Acts Associated With Mr. Silva's Murder Because Those Acts Do Not Amount to Continued Criminal Activity Under 18 U.S.C. §1962(d)**

The Government asserts that Mr. Ranieri's conviction for RICO conspiracy is supported by sufficient evidence because he participated in or agreed to racketeering acts "associated with" Mr. Silva's homicide. *Op.*, pp.27-28.  It maintains the evidence at trial showed he "…was deeply involved in the VICAR murder conspiracy….[which] demonstrates his agreement to a pattern of racketeering activity because the events of the Silva murder encompass a host of racketeering acts: murder; conspiracy to commit murder; witness intimidation; arson; and obstruction of justice";  as he put the conspiracy in motion when he and Wendt agreed in June 2014 that Silva "had to go."; and, that his role continued because CDRs show frequent communication between he and Mr. Wendt and he and Mr. Nelson in the hours leading up to Mr. Silva's murder. *Op.*, pp. 27-28.

Mr. Ranieri's motion should be granted despite the Government's claims.

To support Mr. Ranieri's conviction for a violation of 18 U.S.C. §1962(d), the Government must show and the evidence must support that he knowingly agreed "to participate, directly or indirectly, in the conduct of the [enterprise's] affairs through a pattern of racketeering." *United States v. Jaimez*, 45 F.4th 1118, 1129 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1038 (2023).

The Supreme Court, in *H.J., Inc. v. Northwestern Bell Telephone Co.,* held that this element requires that a  prosecutor show both "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." 492 U.S. 229, 239 (1989).

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

28

S*ee also,* 18 U.S.C. § 1951(5).  The continuity requirement stems from Congress's concern "in RICO with long-term criminal conduct." *Id.* at 242.  *H.J., Inc.* states that 'continuity' may refer to either a closed-ended or an open-ended period. *Id.* at 241. This case must be evaluated under the closed-ended concept because it involves a closed period of conduct given Mr. Ranieri's lack of culpable connections to or involvement in the charged enterprise until the alleged conspiracy to murder Mr. Silva in June 2014 and his murder in July 2014 as discussed in Section II. B. above.  Sufficient proof of continuity over a closed period may be demonstrated "by providing a series of related predicates extending over a substantial period of time". *Id.*

However, "[p]redicate acts extending over a few weeks or months and threatening no criminal conduct do not satisfy this requirement." *H.J., Inc.* 492 U.S. at 242.  *See also*, *Allwaste, Inc. v. Hecht,* 65 F.3d 1523, 1528 (9th Cir.1995) (thirteen months could demonstrate a "substantial period of time" to satisfy the continuity requirement); *United States v. Freeman*, 6 F.3d 586, 596 (9th Cir. 1993)  (two years).   Here, the evidence is insufficient to sustain Mr. Ranieri's conviction that he knowingly agreed to participate in the affairs of the charged enterprise through a pattern of racketeering premised on the acts associated with Mr. Silva's homicide, i.e., a conspiracy to murder Mr. Silva, his murder and the acts of obstruction of justice, because all of those all occurred over a period of thirty-days.  His present motion should, therefore, be granted.[7]

---

[7] On  the issue of the sufficiency of proof of a pattern of racketeering activity, Mr. Ranieri suggests that he also cannot be convicted on the basis that the acts relating to Mr. Silva's murder constitute a sufficient pattern insofar as this case involves one conspiracy to murder and one murder and, consequently, is distinct from *United States v. Houston*, 648 F.3d 806 (9th Cir. 2011) and *United States v. Rodriguez*, 971 F.3d 1005 (9th Cir., 2020).

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

29

### 2. The Evidence is Insufficient to Support Mr. Ranieri's Racketeering Conviction Based on Acts Not Associated With Mr. Silva's Murder

The Government next claims Mr. Ranieri's conviction for RICO conspiracy is supported by sufficient evidence because he was aware of other racketeering acts involving the charged enterprise and agreed that its members and associates would commit them. *Op*., p. 28. It asserts these acts consist of the "…murder of rivals; witness intimidation and obstruction of justice; and drug trafficking." *Id*.  The Court should grant Mr. Ranieri's motion despite these claims because that evidence is insufficient to sustain his conviction that he knowingly agreed to participate in the affairs of the charged enterprise through a pattern of racketeering.

First, the evidence is insufficient to sustain Mr. Ranieri's  conviction that he knowingly agreed that the pattern of racketeering of the charged enterprise would encompass an agreement to murder rivals.  Initially, the record is devoid of evidence that he participated in, contemplated, planned, facilitated, furthered or was aware or agreed any member of  charged enterprise might engage in, or committed, the murder of a purported rival.  Nor is there any evidence that he encouraged, rewarded, or provided weapons to any member of the enterprise who might engage in, or committed, the murder of a rival.  Nor is there any evidence that he knew of any member who murdered a rival.  Nor is there any evidence that he went on any runs or had any encounters with members of the enterprise during which they confronted and agreed to murder, or murdered, a rival.  Furthermore,  consistent with *People v. Ware*, 14 Cal. 5th 151 (2022),  which the *Superseding Indictment* in pertinent part incorporates as the basis of his potential liability under this so-called "rivals conspiracy", the Court instructed the jury that racketeering activity involving a conspiracy to commit murder requires evidence that:

> one intended to agree, and did agree, with one or more people to
> intentionally and unlawfully kill; ... at the time of the agreement, one or

more of the other members of the conspiracy intended that one or more of them would intentionally and unlawfully kill; … one or more members of the conspiracy committed at least one overt act in accomplishing the killing; and,… at least one of the overt acts was committed in California. An overt act is an act by one or more members of the conspiracy that is done to help accomplish the agreed-upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be the criminal act itself.

R.T.: 6599-600.

Here, however, there is no evidence which supports an inference that Mr. Ranieri or any member of the enterprise conspired to murder a rival under California law. For the foregoing reasons, this evidence is insufficient to support Mr. Ranieri's conviction that he knowingly agreed that the pattern of racketeering of the charged enterprise would encompass an agreement to murder rivals.

Second, although witness intimidation may constitute a predicate act of racketeering activity, the evidence is insufficient to uphold Mr. Ranieri's conviction that he intentionally agreed or was aware that the pattern of racketeering of the charged enterprise would involve acts witness intimidation. There is no evidence in the record from which one can reasonably infer that he participated in, contemplated, planned, facilitated, furthered, agreed, knew of, encouraged, or rewarded a member of charged enterprise who might or did engage in such acts. There is no evidence that he encouraged or rewarded any such conduct. This lack of evidence includes the purported acts of intimidation of Javad Trew, Mr. Malvino, Jamie King, and Levi Phipps the Government lists in its *Opposition* at pp. 32-33. Likewise for the alleged intimidation acts involving Mr. Foakes and Brian Burke against Michelle Conte. Furthermore,

the latter alleged act by Mr. Burke cannot serve as a reasonable negative inference against Mr. Ranieri insofar as Mr. Burke was acquitted on this charge.

    Third, the evidence is insufficient to support Mr. Ranieri's conviction that he knowingly agreed that the pattern of racketeering of the charged enterprise included an agreement involving drug trafficking. There is no evidence in the record that he participated in, contemplated, planned, facilitated, furthered, or knew or agreed that any member of the charged enterprise might or did engage in drug trafficking. Nor is there any evidence that he encouraged, rewarded, or benefitted from anyone who might or did engage in such conduct.

    Here, the Government first suggests the June 2008 jail call between Messrs. Foakes and Lyles demonstrates that Mr. Ranieri knew the enterprise engaged in marijuana cultivation, and he continued to associate with the charter. As discussed in Footnote 3 above, Messrs. Foakes and Lyles then discussed that "Manny from Boston" had been arrested along with Mr. Lyles' at a marijuana growing site in Willetts in June 2008, and Mr. Foakes told Mr. Lyles he had discussed Manny's case with Mr. Ranieri who indicated that he wished to help obtain bail for Manny. The trial record shows Manny was not prosecuted with respect to that marijuana grow site, R.T. 1937-38; and the parties stipulated at trial that he and Mr. Ranieri were not charged with any crime related to that grow site and neither were identified as Mr. Lyles' co-conspirators or unindicted co-conspirators in a bill of particulars relating to Mr. Lyles' prosecution on charges related to that grow site. R.T. 6516. Therefore, the totality of the trial evidence on this point does not support a reasonable inference that Mr. Ranieri was a culpable member or associate of the charged enterprise for VICAR and RICO conspiracy purposes. .

    The Government next suggests Steve Verhagen's testimony Mr. Ranieri was present at a party in Sonoma and drugs were "… out in the open at the party, …is evidence of distribution of

**CHRISTOPHER RANIERI'S REPLY TO THE UNITED STATES' OPPOSITION
TO HIS MOTION FOR JUDGMENT OF ACQUITTAL UNDER F.R.C.P. 29**

32

controlled substances" , *Op*., p. 33. This is a strained inference at best.  Mr. Verhagen's testimony provides no evidence of the type or quantity of those drugs. It also does not offer any of the familiar indicia of drug trafficking such as packaging, bandings, marking, bags, scales, or money.  Indeed, his testimony indicates those drugs were for the personal use of those who attended that party.  R.T.: 1386-87.  As with the rest of the trial record, his testimony does not demonstrate that Mr. Ranieri participated in, contemplated, planned, facilitated, furthered, or knew or agreed that any member of the charged enterprise who might or did engage in drug trafficking or encourage, reward or benefit from anyone who might or did engage in such conduct.

Finally, the Court should grant Mr. Ranieri's motion because the evidence of the foregoing acts of a "rivals conspiracy", witness intimidation, obstruction of justice, and drug trafficking is insufficient to sustain his conviction that he knowingly agreed to participate in the affairs of the charged enterprise through a pattern of racketeering.

## III.    CONCLUSION

Mr. Ranieri, for the foregoing reasons and for those in his Motions for Judgment of Acquittal, respectfully requests that the Court grant him relief and enter a judgment finding him not guilty of Counts One and Two of the *Superseding Indictment*.

December 6, 2023                                     Respectfully submitted,


                                                    By: /s/ John G. Walsh
                                                    John G. Walsh
                                                    Attorney for Defendant,
                                                    CHRISTOPHER RANIERI